Receipt number AUSFCC-8585673

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MICHAEL WHITE, on behalf of himself and all others similarly situated, | : **Case No.**  23-383 C |
| | : |
| Plaintiff, | : **Judge** |
| | : |
| v. | : |
| | : **CLASS ACTION COMPLAINT** |
| THE UNITED STATES OF AMERICA, | : |
| | : |
| Defendant. | : |
| | : |

Plaintiff Michael White, individually and on behalf of a class of 9/11 first responders, alleges, upon personal knowledge as to himself and his own acts and upon information and belief as to all other matters, based upon the investigation of counsel, as follows:

### I.  INTRODUCTION

1.       With this action, Plaintiff Michael White seeks redress on behalf of himself and several thousand 9/11 first responders and rescue workers for an inexplicable and improper action by the United States government (the "Government") amidst the effort to facilitate compensation for persons harmed by the 9/11 terrorist attacks.

2.       In the wake of the September 11, 2001 attacks, the Government created a "Victim Compensation Fund" (VCF). The VCF served two purposes: 1) to efficiently distribute funds to 9/11 victims, and 2) to prevent victims' legal claims from inundating U.S. courts and generating enormous liabilities for airlines and other potential defendants.

3.       To achieve these goals, the Government established a contract-based system with prospective VCF applicants. In order to pursue VCF funds, applicants first had to waive any right to bring a civil action to recover damages suffered as a result of the 9/11 attacks. In

exchange, the Government agreed to consider a claimant's VCF application and, if appropriate, issue an award based on the protocols in place when the applicant submitted their claim.

4.     This arrangement ensured that claimants could make an informed decision whether to waive their rights as part of their agreement with the Government.

5.     However, in Plaintiff's case – and that of many other first responders – the Government blatantly violated the terms of its agreement through what can only be described as a bait-and-switch.

6.     Plaintiff, a former firefighter and Navy submariner, drove from Philadelphia to Lower Manhattan to perform rescue and recovery work at Ground Zero. He has since suffered from numerous debilitating, but non-cancerous, medical conditions.

7.     In 2013, Plaintiff waived his right to bring a civil action to recover damages in favor of the Government's offer to participate in the VCF program.

8.     Plaintiff's claim sat with the VCF for the next two years.

9.     In 2015, Congress passed a law that extended the duration of the VCF, established limits on compensation available to certain VCF claimants who had not yet been issued their award, and deprioritized loss claims of certain claimants. As the VCF has acknowledged, these limitations detrimentally impacted claimants, like Plaintiff, who suffered VCF-related ailments but had not been diagnosed with cancer.

10.     Plaintiff's agreement with the Government did not include a monetary limitation on account of his non-cancer diagnosis. By imposing such a limitation on Plaintiff and others in his position, and by taking other steps to reduce the amounts that they would recover, the Government breached its agreement with those parties.

2

11.     As a result, Plaintiff and a class of several thousand first responders and rescue workers received less in compensation for their 9/11-related losses than they were entitled under their agreement with the Government.

## II.      JURISDICTION AND VENUE

12.     Under the Tucker Act, 28 U.S.C. § 1491, this Court has jurisdiction over this action and venue is proper because this suit asserts a claim for breach of contract against the United States of America.

## III.      PARTIES

13.     Plaintiff Michael White ("Plaintiff") is a former Philadelphia firefighter and U.S. Navy submariner. Following his service at Ground Zero, Plaintiff began suffering severe respiratory issues and other debilitating and uncomfortable conditions, including obstructive chronic bronchitis, chronic rhinitis, nodules on his vocal cords, esophageal reflux, and laryngeal spasm. Plaintiff has been hospitalized on multiple occasions and requires regular respiratory therapy as a result of these conditions.

14.     Defendant is the United States of America, acting through the VCF Special Master and Department of Justice, as well as their employees and agents.

## IV.      FACTUAL BACKGROUND

15.     On or about September 13, 2001, Plaintiff drove from Philadelphia to Lower Manhattan to work on the pile together with thousands of other selfless first responders hoping to rescue victims trapped beneath the World Trade Center rubble.

16.     Like many others, Plaintiff continued working at Ground Zero for approximately six days, around the clock, without proper protective equipment.

17.     In the ensuing years, Plaintiff developed serious breathing issues and other health complications. Plaintiff has been hospitalized numerous times resulting from the respiratory damage he sustained at Ground Zero. He struggles to breathe each day. His quality of life has dramatically worsened as a result of his efforts following the 9/11 terrorist attacks.

18.     Plaintiff is not unique in his heroism, nor in the horrible impact his bravery had on his body and quality of life.

19.     Plaintiff and thousands of others similarly impacted have elected to engage with the Government, and its Victim Compensation Fund, in order to pursue compensation for the damages they suffered in connection with 9/11.

20.     As set forth herein, the Government has breached its agreement with Plaintiff and many others, depriving them of the full compensation to the which they were entitled under the parties' agreement.

### A.     The 2001 Victim Compensation Fund

21.     The United States Government created the VCF in 2001, immediately after the 9/11 terrorist attacks.

22.     The VCF served two principal objectives: 1) to distribute funds to 9/11 victims efficiently, and 2) to prevent victims' legal claims from inundating U.S. courts and generating enormous liabilities for airlines and other potential defendants.

23.     The VCF was conceived as a contractual offering: If an individual waived their right to bring a civil action concerning damages sustained related to the 9/11 attacks, the VCF would – in exchange – evaluate that person's eligibility and, when appropriate, award compensation pursuant to the applicable loss calculation methodology.

24.    The legislation creating the VCF established a Special Master, operating within the Department of Justice, to lead the VCF.

25.    The Department of Justice, in turn, promulgated regulations regarding the operation of the VCF.

26.    The VCF divided compensation into two categories: economic and non-economic losses. Economic losses concerned the loss of income and benefits. Non-economic losses concerned pain, suffering, and other impacts on claimants' wellbeing.

27.    The VCF established methodologies and formulas to determine the losses to be awarded to eligible claimants.

28.    From the outset, the Special Master emphasized that potential applicants needed to be aware of the manner in which their awards would be calculated. This would ensure that prospective claimants would make an informed decision whether to waive the right to pursue civil actions for damages.

29.    The Special Master, in a statement submitted with the Department of Justice's 2001 "Interim Final Rule With Request for Comments," explained:

> The first objective is that the process should be efficient, straightforward, and understandable to the claimants. . . . More important, however, is that claimants be able to enter the program—or choose not to enter the program—with an understanding of how their claims will be treated. This is especially important because the Act provides that, **upon submission of a claim, a claimant waives the right to file a civil action for damages sustained as a result of the September 11 attacks**. For claimants to make an informed decision regarding this waiver, **they should have some understanding of how their award will be calculated and how much they would receive from the Fund should they decide to file a claim**.

[Emphasis added.]

30.    The VCF was initially open for approximately two years, closing in December 2003. Over that period the VCF primarily provided payments on claims for persons who suffered

immediate death or injury in the 9/11 terrorist attacks. From 2001 to 2003, the VCF issued compensation of over $7 billion to over 5,500 claimants.

### B.      Congress Re-opens the VCF in 2011

31.     In subsequent years, it became clear that the physical harm of 9/11 extended to first responders, rescue workers, and others who spent time in the areas of the terrorist attacks.

32.     Recognizing this fact, Congress passed the James Zadroga 9/11 Health and Compensation Act of 2010. The Zadroga Act, among other things, restarted the VCF and expanded eligibility to first responders, rescue workers, and others who had been in the areas of the terrorist attacks in the months that followed 9/11.

33.     Under the Zadroga Act, the VCF was to re-open for an additional five years of claims in order to distribute up to $2.775 billion in additional compensation.

34.     The Zadroga Act required the Special Master to update the 2001 VCF regulations to reflect changes implemented through the new legislation.

35.     The Special Master updated the applicable regulations so that the VCF would be, in her words, "fair, transparent, and easy to navigate."

36.     The VCF remained contract-based. Claimants would first have to waive their ability to bring related civil actions in order to be considered for VCF eligibility.

37.     The VCF retained a compensation structure comprising economic and non-economic losses. The 2011 regulations established a presumed non-economic loss for decedents of $250,000 plus an additional $100,000 for the spouse and each dependent of the deceased victim.

38. For living claimants who had suffered physical harm, presumed non-economic losses would be calculated through adjustment from the presumed non-economic losses for decedents.

39. The VCF calculated non-economic loss awards by grouping medical conditions. Individuals with cancer diagnoses would receive presumptively higher non-economic loss awards than persons without cancer. However, there was no limitation on non-economic losses for non-cancer conditions.

40. In addition, the VCF issued all eligible claimants a minimum non-economic loss award of $10,000.

41. For economic losses suffered by decedents, the Special Master was to create a methodology and schedules, tables, or charts identifying "presumed determinations of loss of earnings or other benefits related to employment for annual incomes up to but not beyond the 98th percentile of individual income in the United States for the year preceding the year of death." The 98th percentile of income for 2011 was approximately $368,000. This methodology was also used to determine economic losses for living claimants.

42. To participate in the re-opened VCF, claimants would submit a claim form, together with a set of signed "Attestations and Certifications." One such attestation was a statement by the claimant that, by submitting their VCF claim, they were waiving their right to file a civil lawsuit to pursue damages related to the 9/11 terrorist attacks. Submission of the waiver, alongside the claim form, consummated a contractual relationship between the claimant and the Government.

43. After a claimant waived their rights to pursue 9/11-related civil claims, the VCF would consider that person's VCF eligibility.

44.     For those claimants deemed eligible, the VCF would then determine the loss incurred by the claimant, pursuant to the applicable loss calculation methodology, and issue a monetary award.

45.     The Zadroga Act regulations reaffirmed a fundamental aspect of the agreement between claimants and the Government: In exchange for a claimant waiving their civil claims, the individual's VCF claim would be evaluated under the loss calculation criteria *effective at that time*. This was intended to ensure that claimants could "make an informed decision" regarding their waiver of rights.

   **C.     Congress Reauthorizes the VCF in 2015 Without Regard for First Responders Who Had Already Entered into Agreements With the Government and Waived Their Rights**

46.     The re-opened VCF commenced operation in 2011. Between that time and December 18, 2015, over 20,000 people sought compensation through the VCF. However, the pace of VCF award issuance was extremely slow. As of January 2, 2015, only 3,128 VCF compensation determinations had been made.

47.     In addition, by 2015 it became clear that first responders and rescue workers were continuing to fall ill from the effects of their exposure to the terrorist attack areas, and that the funding authorized in the Zadroga Act would be inadequate.

48.     On December 18, 2015, President Barack Obama signed into law the James Zadroga 9/11 Victim Compensation Fund Reauthorization Act. This law extended the time period for VCF claim submissions and made available additional funds for compensation.

49.     Critically, the Zadroga Reauthorization Act established two different groups for VCF compensation purposes. "Group A" comprised VCF claimants to whom "the Special Master postmarks and transmits a final award determination" on or before December 18, 2015.

8

50.     "Group B" comprised those VCF claimants excluded from Group A, including thousands of claimants who, prior to December 18, 2015, had waived their rights to bring any related civil action to as part of their agreement with the government.

51.     Compensation calculations for Group A remained the same after December 18, 2015, consistent with the terms of those claimants' agreement with the government: Non-economic and economic loss calculations for living claimants were not subject to a cap, nor were awards prioritized for parties based on their condition.

52.     Persons placed into Group B, however, faced a different loss calculation methodology. The new approach was contrary to agreements between claimants and the VCF that pre-dated December 18, 2015. This approach especially harmed living VCF participants without a cancer diagnosis.

53.     Under the Zadroga Reauthorization Act, Group B was subject to a $90,000 cap on non-economic damages for living parties without a cancer diagnosis.

54.     In addition, for Group B claimants, the Special Master prioritized "claims for claimants . . . suffering from the most debilitating physical conditions" – thereby *reducing* the compensation available to Group B claimants *not* suffering from the "most debilitating" conditions.

55.     Unlike Group A, economic loss calculations for Group B were based on a maximum of $200,000 in gross income.

56.     Claimants in Group B also would not receive a minimum award of $10,000 as was the case for those in Group A.

57.     The Zadroga Reauthorization Act required the VCF Special Master to issue updated regulations consistent with the new statute, which the Special Master did on September 2, 2016.

58.     The Special Master conceded that certain VCF participants would be harmed under the Group B loss calculation methodology. In May 2016, the Special Master wrote:

> The reauthorization statute caps non-economic loss and incudes a prioritization mandate. **This means the non-economic awards will be lower for certain conditions than they were under Group A, . . . In some cases, typically involving milder conditions that have a limited effect on daily life, the non-economic award could be 50% lower**. The statute also removes the minimum awards and **you should prepare your clients for the possibility of $0.00 awards** or awards less than $10,000. . . .
>
> Specific to economic loss, the statute caps AGI at $200,000 and sets forth the definition of what is included as income. **We are updating our models** and will post a description of the revised methodology on our website once it is finalized.
>
> [Emphasis added.]

59.     The changes to the Group B loss calculation methodology had a significant negative impact on the awards issued to claimants with non-cancer conditions.

60.     From 2011 through December 30, 2016, the re-opened VCF had rendered 7,138 Group A compensation decisions on claims for "only non-cancer conditions." Those claimants received an average award of $162,333.

61.     By contrast, the first 1,617 compensation decisions rendered on **Group B** applicants without a cancer condition resulted in average awards of $104,737.48 – representing a reduction of over 35%.

62.     Plaintiff is one of thousands of first responders and rescue workers who were placed in Group B despite having already waived their rights and entered into an agreement with the Government requiring application of the prior loss calculation methodology.

### D.    <u>The Government Breaches Its Agreement With Plaintiff</u>

63.    Plaintiff filed a claim with the VCF in October 2013. In doing so, Plaintiff sought compensation for the severe respiratory and gastrointestinal conditions that began following his work at Ground Zero.

64.    Plaintiff filed an Eligibility and Compensation Form, with the VCF. Together with that document, Plaintiff submitted an Acknowledgement of Waiver of Rights, a copy of which is attached as Exhibit 1.

65.    In the Acknowledgement of Waiver of Rights, Plaintiff affirmed that:

> I hereby acknowledge that **by submission of a substantially complete Eligibility Form, I am waiving the right to file a lawsuit (or be a party to a lawsuit) in any federal or state court for damages sustained** as a result of the terrorist-related aircraft crashes of September 11, 2001 or for damages arising from or related to debris removal.

> [Emphasis added.]

66.    There was nothing contingent or ambiguous about Plaintiff's waiver. This waiver was the consideration furnished by Plaintiff in contracting with the government for purposes of pursuing compensation through the VCF.

67.    At the time that Plaintiff submitted his claim documents and waived his rights, the VCF placed no upper limit on non-economic damages for claimants not suffering from cancer. In addition, the VCF was not deprioritizing claims from claimants with less debilitating physical conditions.

68.    The Government reaffirmed the parties' contractual relationship in its letter of September 11, 2014, which confirmed that Plaintiff had "waived [his] right to file or be a party to a September 11th-related lawsuit." *See* Exhibit 2.

69.     The VCF did not issue Plaintiff an award prior to the 2015 Zadroga

Reauthorization Act. Instead, the VCF forced Plaintiff into Group B and subjected Plaintiff to a

reduced loss calculation methodology.

70.     On January 11, 2017, Plaintiff received a loss calculation letter awarding non-

economic damages of $90,000 (Exhibit 3). The letter stated:

> Based on the information you submitted, the VCF has calculated the amount of
> your eligible loss as **$90,000.00**. *This determination is in accordance with the
> requirements of the Reauthorized Zadroga Act* . . . . [Italics added.]

71.     Plaintiff was awarded the maximum non-economic loss available under Group B

for living non-cancer claimants.

72.     Plaintiff appealed this determination in order to seek additional non-economic

loss compensation.

73.     On April 4, 2017, Plaintiff had a VCF appeal hearing. Plaintiff testified about his

persistent respiratory ailments and the dramatic impact those conditions had on his quality of

life.

74.     At the conclusion of Plaintiff's appeal hearing, the senior VCF representative

attending the hearing expressed sympathy to Plaintiff. The VCF official then explained that

Plaintiff's non-economic loss was capped under the Reauthorized Zadroga Act, and that the VCF

therefore could not issue Plaintiff additional compensation.

75.     On July 5, 2017, the VCF issued Plaintiff a determination on his appeal denying

any additional compensation. *See* Exhibit 4.

76.     Plaintiff's placement in Group B, and the subsequent limitation on his non-

economic loss calculation, breached the terms of Plaintiff's agreement with the Government.

77.     Having waived his rights prior to December 18, 2015, Plaintiff was entitled to have his loss calculation performed pursuant to the 2011 VCF standards.

## V.      CLASS ACTION ALLEGATIONS

78.     Plaintiff brings this action pursuant to Rule 23 of the Rules of the United States Court of Federal Claims, individually and on behalf of all others similarly situated, for a Class defined as:

> **All 9/11 Victim Compensation Fund claimants who, in pursuing VCF compensation: waived their right to bring civil actions concerning damages related to the 9/11 attacks prior to December 18, 2015 and had claims decided as part of "Group B," and who: 1) had claims for only non-cancer conditions, or 2) had gross income at the time of their VCF claim that exceeded $200,000.**

79.     Plaintiff reserves the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

80.     This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Rules of the United States Court of Federal Claims.

81.     **Numerosity – Rule 23(a)(1)**. The members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. According to VCF data, over 22,000 eligibility forms had been submitted as of December 31, 2015, while only 9,131 compensation decisions had been rendered by that date. Further, the VCF regularly reports that claimants hail from states around the country.

82.     While Plaintiff believes that there are thousands of Class members, the precise Class size may be ascertained from the Government's records.

83.     Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and/or published notice.

84.     **Commonality and Predominance – Rule 23(a)(2) and 23(b)(3)**. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including:

a. Whether the Government contracted with Plaintiff and the Class;

b. The terms of the parties' contract;

c. Whether the Government breached that contract by changing the loss calculation methodology for the Class; and

d. Whether Plaintiff and other Class members sustained damages as a result of the Government's conduct.

85.     **Typicality – Rule 23(a)(3)**. Plaintiff's claims are typical of the other Class members' claims. Plaintiff and each of the other Class members entered into identical agreements with the government to be evaluated for VCF eligibility and, if appropriate, to receive a compensation award pursuant to the agreed upon loss calculation methodology. Plaintiff's and Class members' waivers contained the same language. The same statutes and regulations applied to all Class members. And the Special Master applied the same loss calculation methodologies across all Class members. Plaintiff and each of the other Class members were subject to the Government's breach of contract by placing those claimants into Group B and subjecting their claims to an improper loss calculation methodology.

86.     **Adequacy of Representation – Rule 23(a)(4)**. Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel who is competent and experienced in

14

class action litigation. Plaintiff intends to prosecute this action vigorously, and Plaintiff has no interests that conflict with or are otherwise antagonistic to other Class members' interests. The Class's interests will be fairly and adequately protected by Plaintiff his counsel.

87.    **Generally Applicable Action – Rule 23(b)(2)**. The Government acted on grounds generally applicable to the Class by utilizing the same documents with all Class members, taking actions that were applicable across all Class members, and acting pursuant to statutes and regulations that applied equally to all Class members.

88.    **Superiority – Rule 23(b)(3)**. A class action is superior to all other available methods of adjudicating this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against the Government, so it would be impracticable for Class members to individually seek redress. Even if the Class members could afford to pursue individual litigation, this Court would be overburdened by so many cases. Further, individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of uniform supervision and adjudication by a single judge in a single court.

## VI.    CLAIMS FOR RELIEF

### COUNT I - Breach of Contract

89.    Plaintiff incorporates by reference the allegations set forth in Paragraphs 1–88 as if fully set forth herein.

90.    Plaintiff brings this Count individually and on behalf of the other Class members.

91.    Plaintiff and each of the other Class members entered valid, enforceable contracts with the Government following the re-opening of the VCF in 2011.

92.    All parties mutually intended to be bound in contract.

93.    From the outset, the VCF was conceived as a contractual program. The Special Master spoke of the need for certainty on the part of claimants: that they knew what they would receive in exchange for their waiver of claims.

94.    The Government created claim submission documents that included a waiver form pursuant to which claimants waived their rights in order to be considered for VCF compensation.

95.    Claimants were required to affirmatively waive their claims in order to be considered for compensation under the VCF.

96.    Once the Government received a claimant's signed waiver document, the VCF would evaluate the claimant for eligibility and compensation.

97.    Prior to the Government's breach, which is the subject of this action, the Government had followed its contractual agreement with claimants and adhered to the prevailing loss calculation methodology at the time of waiver.

98.    The Government, through its 2011 regulations, established that claimants were entitled to have their claims evaluated under the prevailing loss calculation methodology at the

time of waiver, thus reinforcing the contractual nature of the waiver as consideration for a contract between the parties.

99.    There was no ambiguity in the Government's offer, nor in the acceptance of that offer by Plaintiff and other members of the Class.

100.    The Government offered potential claimants the opportunity to participate in the VCF in exchange for their waiver of civil claims related to 9/11.

101.    The Government made this offer by, *inter alia*, authorizing the VCF by statute; promulgating regulations governing claimant eligibility and compensation; establishing methodologies and publishing information concerning the manner in which claimant losses would be calculated; creating claim forms that enabled claimants to pursue recovery for losses; and requiring that claimants provide a signed statement waiving their rights to bring 9/11-related civil claims as a prerequisite to being considered for compensation by the VCF.

102.    There was no ambiguity in the Government's offer: If a person first waived their right to bring 9/11-related civil claims, the Government would, in return, evaluate the claimant for participation in the VCF and, where appropriate, compensate that claimant for losses pursuant to the loss calculation methodology in place at the time the claimant waived their rights.

103.    Plaintiff and the other Class members accepted this offer by providing the government with a signed document waiving all civil claims for 9/11-related damages together with their VCF claim documents.

104.    Plaintiff's acceptance of the Government's offer, and the acceptance of the other Class members, was unambiguous. As explained by the Special Master, any ambiguity in this process would have been grossly unfair to claimants given that they were required to accept the Government's offer, and waive their rights, before the VCF claim evaluation even began.

17

105.    Plaintiff and the Class, on the one hand, and the Government, on the other, provided consideration to facilitate the parties' contractual engagement.

106.    Plaintiff and the Class provided consideration in the form of their waiver of any 9/11-related civil claims.

107.    The Government provided consideration with its promise to evaluate claimants' VCF claims for eligibility and, where appropriate, provide compensation pursuant to the loss calculation methodologies prevailing at the time of the claimant's waiver of claims.

108.    The Special Master, on behalf of the VCF, had actual authority to bind the Government in contract pursuant to the Zadroga Act.

109.    Plaintiff and the other Class members performed their obligations under the contract by waiving their rights to pursue civil claims regarding 9/11. Plaintiff and the other Class members waived those claims prior to December 18, 2015.

110.    The Government breached its contract with Plaintiff and each of the other Class members by forcing those individuals into Group B and retroactively subjecting their claims to a loss calculation methodology that was contrary to the parties' agreement and that deprived them of compensation to which they were entitled.

111.    Plaintiff and the Class sustained damages as a result of the Government's wrongdoing. They did not receive the benefit for which they bargained.

**COUNT II - Breach of Contract (Implied-in-Fact)**

112.    Plaintiff incorporates by reference the allegations set forth in Paragraphs 1–111 as if fully set forth herein.

113.    Plaintiff brings this Count individually and on behalf of the other Class members, in the alternative to Count I.

18

114.    If Plaintiff and the other Class members did not enter into express contracts with the Government, then implied contracts may be inferred from the conduct and representations of the parties and the surrounding circumstances, as set forth above.

115.    Plaintiff and the other Class members performed their obligations under the contract by waiving their rights to pursue civil claims related to 9/11. Plaintiff and the other Class members waived those claims prior to December 18, 2015.

116.    The Government breached its contract with Plaintiff and each of the other Class members by forcing those individuals into Group B and subjecting their claims to a loss calculation that was contrary to the parties' agreement and that deprived them of compensation to which they were entitled.

117.    Plaintiff and the Class sustained damages as a result of the Government's wrongdoing. They did not receive the benefit for which they bargained.


## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class he seeks to represent, respectfully requests that the Court enter judgment in their favor and against the United States Government, as follows:

a.  Entering an order certifying the Class, appointing Plaintiff as representatives of the Class, and appointing Plaintiff's attorney as Class Counsel;

b.  Entering a judgment declaring that Plaintiff and each of the other Class members entered enforceable contracts with the U.S. Government that the U.S. Government breached;

c.  Awarding damages to Plaintiff and each of the members of the Class he represents in amounts to be determined at trial;

d.  Declaring that Plaintiff and all other members of the Class are to be included in Group A for all future engagement with the VCF, including any claim amendments and/or appeals;

e. Awarding reasonable attorney's fees and costs; and

f. Awarding other relief that the Court deems just and proper.


Respectfully submitted,


Dated:  _____March 17, 2023_____          /s/ Jeremy S. Spiegel
                                              Jeremy S. Spiegel, Esq.
                                              **LAW OFFICE OF JEREMY SPIEGEL**
                                              1 South Broad Street, Suite 1500
                                              Philadelphia, PA 19107
                                              Tel. (215) 609-3154
                                              Spiegel@JeremySpiegelLaw.com