IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MICHAEL WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 23-383 |
| v. | ) | (Judge Silfen) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO DISMISS

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

ELIZABETH M. HOSFORD
Assistant Director

ERIC E. LAUFGRABEN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone:   (202) 353-7995
Facsimile:   (202) 353-0461
Email:        Eric.E.Laufgraben@usdoj.gov

November 8, 2023                    Attorneys for Defendant

TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................ii

INTRODUCTION ............................................................................................1

QUESTIONS PRESENTED ..................................................................................4

STATEMENT OF THE CASE ..............................................................................4

    I.     Nature Of The Case ..........................................................................4

    II.    Statement Of Facts ..........................................................................4

          A.     Congress Establishes The VCF In 2001 .............................................4

          B.     Congress Reopens The VCF In 2011 .................................................6

          C.     Congress Reauthorizes The VCF In 2015 ...........................................7

          D.     Mr. White's Claim For VCF Compensation .........................................8

ARGUMENT ................................................................................................9

    I.     Standards Of Review .......................................................................9

          A.     Rule 12(b)(1) .............................................................................9

          B.     Rule 12(b)(6) .............................................................................9

    II.    Mr. White's Claim Is Barred By The Statute Of Limitations .........................10

    III.   Mr. White Does Not Plausibly Allege The Existence Of A Government
        Contract ...................................................................................14

          A.     Neither The VCF Statute Nor Its Implementing Regulations Reflect A
                Mutual Intent To Form A Contract ..................................................15

          B.     Mr. White Does Not Allege An Unambiguous VCF Offer To Determine
                Compensation Using The "Loss Calculation Methodology" In Place
                When He Applied, Or His Unambiguous Acceptance Of Any Such Offer ....22

          C.     The Special Master Lacks Actual Authority To Form Contracts With
                Claimants ...............................................................................24

CONCLUSION .............................................................................................26

TABLE OF AUTHORITIES

Cases

*Acceptance Ins. Co. v. United States*,
   583 F.3d 849 (Fed. Cir. 2009) ............................................................................... 10

*Am. Bankers Ass'n v. United States*,
   932 F.3d 1375 (Fed. Cir. 2019) ................................................................. 16, 17, 18

*Anderson v. United States*,
   344 F.3d 1343 (Fed. Cir. 2003) ........................................................................ 22, 23

*Ariadne Fin. Servs. Pty. v. United States*,
   133 F.3d 874 (Fed. Cir. 1998) .......................................................................... 10, 12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................... 9, 10

*Baker v. United States*,
   50 Fed. Cl. 483 (2001) ............................................................................................ 15

*Boston v. United States*,
   43 Fed. Cl. 220 (1999) ............................................................................................ 19

*Boyd v. United States*,
   No. 22-1473, 2023 WL 3118132, (Fed. Cl. Apr. 27, 2023) .................................... 17

*Brooks v. Dunlop Mfg.*,
   702 F.3d 624 (Fed. Cir. 2012) ................................................................. 15, 16, 17

*Brown Park Estates-Fairfield Dev. Co. v. United States*,
   127 F.3d 1449 (Fed. Cir. 1997) .............................................................................. 10

*City of El Centro v. United States*,
   922 F.2d 816 (Fed. Cir. 1990) .......................................................................... 14, 24

*Cutler-Hammer Inc. v. United States*,
   441 F.2d 1179 (Ct. Cl. 1971) .................................................................................. 18

*Flint v. United States*,
   162 Fed. Cl. 91 (2022) ............................................................................................ 17

*Hanlin v. United States*,
   316 F.3d 1325 (Fed. Cir. 2003) ........................................................................ 14, 16

*Hopland Band of Pomo Indians v. United States*,
    855 F.2d 1573 (Fed. Cir. 1988) ................................................ 10

*Last Chance Mining Co. v. United States*,
    12 Cl. Ct. 551 (1987) ...................................................... 17, 21

*Matthews v. United States*,
    72 Fed. Cl. 274 (2006) ......................................................... 9

*McAfee v. United States*,
    46 Fed. Cl. 428 (2000) ........................................................ 24

*McNutt v. Gen. Motors Acceptance Corp.*,
    298 U.S. 178 (1936) ........................................................... 9

*Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*,
    470 U.S. 451 (1985) ....................................................... 15, 21

*Norman v. United States*,
    942 F.3d 1111 (Fed. Cir. 2019) ............................................... 19

*Radium Mines, Inc. v. United States*,
    153 F. Supp. 403 (Ct. Cl. 1957) ............................................. 17

*San Carlos Apache Tribe v. United States*,
    639 F.3d 1346 (Fed. Cir. 2011) ............................................... 13

*San Carlos Irrigation & Drainage Dist. v. United States*,
    877 F.2d 957 (Fed. Cir. 1989) ............................................... 14

*Schism v. United States*,
    316 F.3d 1259 (Fed. Cir. 2002) ............................................... 14

*Shane v. United States*,
    161 F.3d 723 (Fed. Cir. 1998) ......................................... 11, 12, 13

*Simmons v. United States*,
    53 Fed. Cl. 131 (2002) ....................................................... 11

*Trauma Serv. Grp. v. United States*,
    104 F.3d 1321 (Fed. Cir. 1997) ............................................... 24

*Turping v. United States*,
    913 F.3d 1060 (Fed. Cir. 2019) ............................................... 15

*Ultra-Precision Mfg. v. Ford Motor Co.*,
    338 F.3d 1353 (Fed. Cir. 2003) ..................................................... 9

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996) ..................................................... 11, 12

*Wewe v. Mt. Sinai Hosp.*,
    518 F. Supp. 3d 643 (E.D.N.Y. 2021) ..................................................... 5

## Statutes

10 U.S.C. § 2922d ..................................................... 25

12 U.S.C. § 5416 ..................................................... 25

28 U.S.C. § 2501 ..................................................... 10, 14

38 U.S.C. § 1703 ..................................................... 24, 25

49 U.S.C. § 40101 note ..................................................... passim

## Regulations

28 C.F.R. § 104.6 ..................................................... 19

28 C.F.R. § 104.22 ..................................................... 5

28 C.F.R. § 104.31 ..................................................... 21

28 C.F.R. § 104.43 ..................................................... 20, 24

## Secondary Sources

Restatement (Second) of Contracts ..................................................... 22

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MICHAEL WHITE, | ) |
| | ) |
|      Plaintiff, | )    No. 23-383 |
| | )    (Judge Silfen) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
|      Defendant. | ) |

<u>DEFENDANT'S MOTION TO DISMISS</u>

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims (RCFC), defendant, the United States, respectfully submits this motion to dismiss the amended complaint filed by plaintiff, Michael White. *See* ECF No. 13 (Am. Compl.). The Court should dismiss the amended complaint because it lacks jurisdiction to entertain it and because the amended complaint fails to state a claim upon which relief may be granted.

<u>INTRODUCTION</u>

The September 11th Victim Compensation Fund (VCF) provides compensation to individuals (or a personal representative on behalf of a deceased individual) who suffered physical harm or death as a result of the September 11, 2001 attacks, as well as to those who experienced health issues related to the rescue, recovery, and cleanup efforts at the attack sites. The VCF is an alternative to litigation that enables claimants to collect money without assuming the risks, delays, and expenses of a court proceeding. By statute, a claimant seeking VCF compensation "waives the right to file a civil action (or to be a party to an action) in any Federal or State court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001." 49 U.S.C. § 40101 note § 405(c)(3)(B)(i).

The VCF initially existed from December 2001 to June 2004. *See* Air Transportation Safety and System Stabilization Act (ATSSSA), Pub. L. No. 107-42, 115 Stat. 230, 237 (2001) (ATSSSA). In 2010, given an increasing number of individuals—*e.g.*, responders, recovery workers, and residents—developing health issues from hazardous substance and toxin exposure in the aftermath of the attacks, Congress enacted legislation to reopen the VCF to accept claims from October 2011 through October 2016. *See* James Zadroga 9/11 Health and Compensation Act of 2010, Pub. L. No. 111-347, 124 Stat. 3623, 3659 (2011) (Zadroga Act). Then, in December 2015, Congress reauthorized the VCF and extended the claim filing period through December 2020. *See* James Zadroga 9/11 Health and Compensation Reauthorization Act, Pub. L. No. 114-113, 129 Stat. 2242, 3000 (2015) (Reauthorization Act). Most recently, in July 2019, Congress enacted legislation to ensure that the VCF would remain open to accept claims until October 2090. *See* The Never Forget the Heroes: James Zadroga, Ray Pfeifer, and Luis Alvarez Permanent Authorization of the September 11th Victim Compensation Fund, Pub. L. No. 116-34, 1030 Stat. 1040, 1040 (2019) (Permanent Authorization Act).

In reauthorizing the VCF in December 2015, Congress updated the methodology used to calculate VCF compensation. Among other things, Congress divided VCF claims into two groups—Group A and Group B. Congress defined Group A to include claims for which an award decision letter had been sent to the claimant as of December 18, 2015. Congress defined Group B to include all other claims. For "economic losses" suffered by those in Group B (e.g., loss of future earnings), Congress directed the VCF to limit to $200,000 the annual gross income used to calculate future lost earnings, which affected high earners. As for Group B "non-economic losses" (e.g., pain and suffering awards), Congress imposed a $250,000 cap on

compensation for any single cancer condition and a $90,000 cap on compensation for any single non-cancer condition.

Mr. White applied for VCF compensation in October 2013.  Because the VCF did not notify Mr. White of his award determination before December 18, 2015, Mr. White's claim was reviewed and his award was calculated under the rules governing Group B claimants.  In January 2017, the VCF awarded Mr. White $90,000 in non-economic loss compensation—the Group B maximum for a single non-cancer condition.

Mr. White contends that he and a putative class of other Group B claimants are entitled to additional compensation under a breach of contract theory.  According to Mr. White, by establishing the VCF and making compensation available, and by requiring him to waive his right to file a civil damages suit, the Government formed an alleged contract to determine Mr. White's compensation using the "loss calculation methodology in place at the time [he] waived [his] rights"—*i.e.,* without the caps on economic and non-economic losses—rather than the loss calculation methodology in place at the time the VCF evaluated his claim.  *See* Am. Compl. ¶ 101.

Mr. White's suit should be dismissed for two reasons.  First, his suit is untimely and must therefore be dismissed for lack of jurisdiction.  Given that Congress capped Group B economic and non-economic losses effective December 18, 2015, the limitations period expired six years later, on December 18, 2021—over a year before Mr. White filed this suit on March 17, 2023.

Second, even if the suit were timely, it should be dismissed on the merits because it does not state a claim upon which relief may be granted.  Mr. White is a claimant, not a contractor.  Although he asserts that the Government is bound by an express or an implied contract to evaluate his VCF claim under "the loss calculation methodology in place at the time [he] waived

[his] rights," Am. Compl. ¶ 101, Mr. White does not plausibly allege the existence of a Government contract, let alone one that imposes a contract duty on the Government to use a particular award methodology.  Instead, Mr. White attempts to recast various statutory and regulatory duties as contractual, but the VCF administers a compensation program—it does not form contracts with VCF claimants.

Accordingly, the amended complaint should be dismissed.

## QUESTIONS PRESENTED

1.      Whether this suit is time barred because it was not filed within six years of Congress enacting VCF legislation that limited certain compensation for Group B claims.

2.      Whether Mr. White plausibly alleges the existence of an express or implied contract with the Government about his VCF compensation claim.

## STATEMENT OF THE CASE

I.      Nature Of The Case

This case involves allegations that the Government breached an express or implied contract to determine Mr. White's VCF compensation using "the loss calculation methodology in place at the time [he] waived [his] rights," which he alleges would have resulted in a higher award.  Am. Compl. ¶ 101.

II.     Statement Of Facts

A.     Congress Establishes The VCF In 2001

In response to the September 11, 2001 attacks, Congress passed the ATSSSA.  Title IV of the ATSSSA established the VCF to compensate persons injured or the representatives of persons killed in the attacks or their immediate aftermath.  49 U.S.C. § 40101 note § 403.  The VCF was enacted to provide claimants "with an expeditious, non-judicial proceeding to enable

claimants to liquidate their claims promptly, and without assuming the risks and delays inherent in court proceedings." *Wewe v. Mt. Sinai Hosp.*, 518 F. Supp. 3d 643, 645 (E.D.N.Y. 2021) (quoting *In re Sept. 11th Litig.*, No. 21 MC 97 (AKH), 2007 WL 1965559, at *1 (S.D.N.Y. July 5, 2007)).

In the ATSSSA, Congress directed the Attorney General to appoint a Special Master to determine the compensation, if any, payable to claimants for economic losses and non-economic losses. 49 U.S.C. § 40101 note § 405(b)(1)(B). Compensation was reduced by certain collateral source payments, such as life insurance benefits, available to the claimant. *Id.* § 405(b)(6). Congress further directed the Special Master to promulgate implementing regulations within 90 days of the law's enactment. 49 U.S.C. § 40101 note § 407. All claims were required to be filed within two years of the regulations' promulgation, at which time the VCF would close. *Id.* §§ 405(a)(3)(A), 407(a).

Congress required the Special Master to "develop a claim form that claimants shall use when submitting claims." *Id.* § 405(a)(2); *see also* Am. Compl., Ex. 3. The claim form has two parts: an Eligibility Form, which contains information about the claimant for the VCF to first evaluate eligibility; and a Compensation Form, which sets forth information necessary for the VCF to determine the amount of compensation to be provided. 28 C.F.R. § 104.22(b), (c).

Congress also provided that, "upon the submission of a claim under this title, the claimant waives the right to file a civil action (or to be a party to an action) in any Federal or State court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001,

or for damages arising from or related to debris removal." 49 U.S.C. § 40101 note

§ 405(c)(3)(C)(i).[1]  The Eligibility Form requires claimants to acknowledge the statutory waiver:

> I hereby acknowledge that by submission of a substantially
> complete Eligibility Form, I am waiving the right to file a lawsuit
> (or be a party to a lawsuit) in any federal or state court for damages
> sustained as a result of the terrorist-related aircraft crashes of
> September 11, 2001 or for damages arising from or related to
> debris removal.

Am. Compl. ¶ 68 and Ex. 3.

The original VCF received 7,403 claims and made awards totaling $7.049 billion to 5,560

claimants before it closed in December 2003.  *See* Congressional Research Serv., The September

11th Victim Compensation Fund (Oct. 27, 2019), *available at*

https://crsreports.congress.gov/product/pdf/R/R45969.

B.    Congress Reopens The VCF In 2011

Concerns about injuries and illnesses incurred by individuals involved in emergency

response, recovery, and debris removal operations at the September 11th aircraft crash sites led

Congress to reopen the VCF for claims from October 2011 through October 2016 with the

enactment of Title II of the Zadroga Act.  49 U.S.C. § 40101 note § 403.  The reopened VCF

expanded VCF eligibility to individuals who suffered physical injuries or illnesses as a result of

rescue, recovery, or debris removal work at or near the September 11th aircraft crash sites during

the period from September 11, 2001, to May 30, 2002, as well as to certain individuals who

lived, worked, or were near the World Trade Center during the same time period.  *Id.* § 405(c).

---

[1]  Although not relevant to the case here, Congress provided that the waiver "does not
apply to a civil action to recover collateral source obligations, or to a civil action against any
person who is a knowing participant in any conspiracy to hijack any aircraft or commit any
terrorist act." 49 U.S.C. § 40101 note § 405(c)(3)(C)(i).

C.    <u>Congress Reauthorizes The VCF In 2015</u>

Although the reopened VCF was scheduled to stop taking claims on October 3, 2016, Congress reauthorized the VCF on December 18, 2015.  Am. Compl. ¶ 48.  The Reauthorization Act extended the VCF for five more years, allowing individuals to submit their claims until December 18, 2020.  49 U.S.C. § 40101 note § 405(a)(3)(B).

Under the Reauthorization Act, Congress divided claims into two groups: Group A and Group B.  Group A comprises those claims for which "the Special Master postmarks and transmits a final award determination to the claimant" on or before December 18, 2015.  *Id.* § 405(c)(3)(C).  Group A claims are subject to the same rules as claims under the Zadroga Act. *See id.* § 405(b)(7).  Group B encompasses all other claims, which are subject to certain additional rules established by the Reauthorization Act, including:

- Claims for victims who are determined by the Special Master to be suffering from the most debilitating physical conditions are to be given priority.

- In determining economic losses for past earnings and future earning capacity, the Special Master must limit the annual gross income used to calculate the losses to $200,000.

- Non-economic losses for a single cancer condition are capped at $250,000; non-economic losses for any other single condition (i.e., non-cancer) are capped at $90,000.

*Id.* § 405(b)(7), 406(d)(2)(C)(i)(III).[2]

In 2019, Congress passed the Permanent Authorization Act.  The statute extends the VCF's claim filing deadline to October 1, 2090, and appropriates such funds as may be necessary to pay all eligible claims.  *Id.* § 405(a)(3)(B).  The Permanent Authorization Act generally keeps the Group B rules in place, but provides the Special Master with authority to

_____

[2]  A redline reflecting changes between the Zadroga Act and Reauthorization Act is attached to this motion.

exceed the non-economic loss caps in "special circumstances," and allows inflation adjustments for the $200,000 limitation on gross income used to calculate economic losses. *Id.* § 405(a)(7)(A)(ii), (b)(7)(B)(ii).

        D.     <u>Mr. White's Claim For VCF Compensation</u>

Mr. White is a former Philadelphia firefighter and United States Navy submariner who participated in the September 11th rescue and recovery efforts. Am. Compl. ¶¶ 14, 16. Subsequently, Mr. White "developed serious breathing issues and other health complications," and other ill effects from his Ground Zero exposure. *Id.* ¶ 18. Mr. White submitted a VCF Eligibility Form in October 2013 and, after the VCF found him eligible, Mr. White submitted his Compensation Form in September 2014. *Id.* ¶¶ 66, 71. In his Eligibility Form, Mr. White acknowledged "that by submission of a substantially complete Eligibility and Compensation Form, [he is] waiving the right to file a lawsuit . . . in any federal or state court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001, or for damages arising from or related to debris removal." *Id.* ¶ 68.

Congress passed the Reauthorization Act while Mr. White's claim was pending. *Id.* ¶ 69. Given that the VCF had not transmitted an award before December 18, 2015, Mr. White's claim was evaluated under the rules applicable to Group B. *Id.* In a letter dated January 11, 2017, the VCF awarded Mr. White $90,000—the maximum amount for non-economic losses under the Reauthorization Act for any single non-cancer condition. *Id.* ¶¶ 70-71, Ex. 5. Mr. White does not allege that he requested or received an award for economic losses. And although Mr. White appealed the award and an appeal hearing was held, the Special Master determined that the existing award was correct and that no change was warranted. *Id.* ¶ 76.

On March 17, 2023, Mr. White filed this suit as a putative class action in which he alleges that the Government entered into a contract with him in which the Government promised to determine Mr. White's compensation using "the loss calculation methodology in place at the time [he] waived [his] rights," rather than the methodology in place at the time of claim evaluation. Am. Compl. ¶ 101. Mr. White further alleges that, by modifying the methodology in the Reauthorization Act, the Government breached its contract with Mr. White. *Id.* ¶¶ 109, 115.

We moved to dismiss the complaint on July 14, 2023, after which Mr. White filed an amended complaint.

ARGUMENT

I.    Standards Of Review

A.    Rule 12(b)(1)

"Jurisdiction is a threshold issue and a court must satisfy itself that it has jurisdiction to hear and decide a case before proceeding to the merits." *Ultra-Precision Mfg. v. Ford Motor Co.*, 338 F.3d 1353, 1356 (Fed. Cir. 2003) (quoting *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1241 (Fed. Cir. 2002)); RCFC 12(b)(1). If the Court determines that "it lacks jurisdiction over the subject matter, it must dismiss the claim." *Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006); RCFC 12(h)(3). If the United States or the Court questions the factual basis of jurisdiction, the plaintiff must bring forth relevant, adequate proof to establish jurisdiction by a preponderance of evidence. *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936).

B.    Rule 12(b)(6)

Under Rule 12(b)(6), the Court must dismiss a complaint when it does not plausibly give rise to an entitlement to relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To avoid

9

dismissal for failure to state a claim under Rule 12(b)(6), "a complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Acceptance Ins. Co. v. United States*, 583 F.3d 849, 853 (Fed. Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). The Court should dismiss a complaint if it fails to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially implausible if it does not permit the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Allegations "that are 'merely consistent with' a defendant's liability" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## II.    Mr. White's Claim Is Barred By The Statute Of Limitations

Dismissal for lack of jurisdiction is warranted because Mr. White filed this suit more than six years after his alleged contract claims accrued.

Under 28 U.S.C. § 2501, claims brought in this Court "shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. Because Section 2501 is a statutory limitation on the Government's waiver of sovereign immunity, it is jurisdictional and thus must be strictly construed. *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576–77 (Fed. Cir. 1988).

The Federal Circuit has determined that a "claim first accrues" under Section 2501 when "all the events have occurred that fix the defendant's alleged liability and entitle the plaintiff to institute an action." *Ariadne Fin. Servs. Pty. v. United States*, 133 F.3d 874, 879 (Fed. Cir. 1998); *Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1455 (Fed. Cir. 1997). The "[p]laintiff need only be aware of sufficient facts to know a wrong occurred."

*Simmons v. United States*, 53 Fed. Cl. 131, 133 (2002).  Thus, "[i]t is not necessary that plaintiff be fully appraised of the merits of the claim or the extent of damages before filing suit."  *Id.* (citing *Boling v. United States*, 220 F.3d 1365, 1371 (Fed. Cir. 2000) (rejecting proposition that filing of lawsuit can be postponed until full extent of damages is known)).

When an alleged breach arises from a change in the law, the limitations period begins to run when the law is effective.  *See Shane v. United States*, 161 F.3d 723, 727 (Fed. Cir. 1998).  The Supreme Court's decision in *United States v. Winstar Corp.*, 518 U.S. 839, 870 (1996), illustrates this point.  In response to a series of thrift failures in the 1980s and the depletion of Federal bank deposit insurance reserves, bank regulators encouraged healthy thrifts and outside investors to take over ailing thrifts by, among other things, entering into contracts that permitted acquirers to count intangible assets, such as supervisory goodwill, toward meeting Federal capital reserve requirements.  *Id.* at 846-48, 853.  But the regulatory response was insufficient to stave off thrift industry decline, so Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA).  *Id.* at 856-58.  FIRREA directed the Office of Thrift Supervision (OTS) to promulgate rules prohibiting thrifts from counting intangible assets toward their capital reserve requirements and taking action against thrifts that failed to meet those requirements.  *Id.* at 857-58.  Many thrifts failed because they could not meet the new OTS capital reserve requirements.  *Id.* at 858.  The acquirers then sued the United States alleging that the Government breached contracts that permitted use of intangible assets to meet capital reserve requirements.  *Id.* at 858-59.

The Supreme Court determined that the Government breached its contracts with the acquirers when it changed the law: "When the law as to capital requirements changed in the present instance, the Government was unable to perform its promise and, therefore, became

liable for breach." *Id.* at 870.  Given this holding, the United States moved to dismiss two related suits as time-barred because they were filed more than six years after the OTS capital reserve rules went into effect.  *See Ariadne Fin. Servs.*, 133 F.3d at 878; *Shane*, 161 F.3d at 727. Although the plaintiffs in those suits argued that their claims did not accrue until the OTS actually disallowed their capital restoration plans, the Federal Circuit rejected that argument, determining that the Government's "liability was fixed when it refused to allow use of supervisory goodwill as it had promised"—not when it took individualized action against the thrifts.  *Shane*, 161 F.3d at 726.

Here, because Mr. White's claims accrued more than six years before he filed his original complaint, his suit should be dismissed as untimely.  Mr. White alleges that he entered into a contract in which the Government agreed to determine his VCF compensation "pursuant to the loss calculation methodology in place at the time [he] waived [his] rights," Am. Compl. ¶ 101, in October 2013.  He further alleges that the Government breached the alleged contract in 2015 by capping Group B compensation for economic and non-economic losses, eliminating a minimum award, and prioritizing claimants with the most debilitating conditions—new rules enacted on December 18, 2015, under the Reauthorization Act that did not exist under the Zadroga Act.  49 U.S.C. § 40101 note § 405(b)(7), 406(d)(2)(C)(i)(III); Am. Compl. ¶¶ 61-63, 100; *see also* Am. Compl. ¶¶ 109, 115 ("The Government breached its contract with Plaintiff . . .  by failing to apply the more favorable claims process and loss calculation provisions from the 2011 Regulations, and instead retroactively subjecting their claims to a loss calculation methodology that was contrary to the parties' agreement and that deprived [him] of compensation to which [he was] entitled.").  Thus, if Mr. White were a party to a contract in which the Government agreed to determine compensation based on the rules in effect before the Reauthorization Act was

enacted on December 18, 2015, then the statute of limitations commenced when the Reauthorization Act was enacted, and expired six years later, on December 18, 2021—more than a year before Mr. White filed this suit on March 17, 2023.  Mr. White also alleges that the Reauthorization Act "was implemented through 2016 amendments to the VCF regulations," Am. Compl. ¶ 9, but even if the Court measured the limitations period from the regulations' June 15, 2016 effective date, the limitations period would have expired six years later, on June 15, 2022— about nine months before Mr. White filed this suit.

Mr. White may argue that his claim did not accrue until either the VCF awarded compensation on January 10, 2017, or rendered a decision on his compensation appeal on July 5, 2017, at which point Mr. White knew the award amount.  But the Federal Circuit has "'soundly rejected' the notion 'that the filing of a lawsuit can be postponed until the full extent of the damage is known.'"  *San Carlos Apache Tribe v. United States*, 639 F.3d 1346, 1354 (Fed. Cir. 2011) (quoting *Boling*, 220 F.3d at 1371); *see also Shane*, 161 F.3d at 726 (plaintiffs' limitations period began to run upon effective date of legal change even if their damages were "speculative and therefore uncompensable" at the time).

Indeed, the initial award determination and subsequent decision on Mr. White's appeal only confirmed what he already knew when the Reauthorization Act was enacted—that non-economic losses "that [do] not result from any type of cancer shall not exceed $90,000."  49 U.S.C. § 40101 note § 405(b)(7).  Thus, the statute of limitations accrued when Mr. White knew, upon the enactment of the Reauthorization Act on December 18, 2015 (or at the latest when the implementing regulations took effect on June 15, 2016), that he could not receive a non-economic loss award for a single non-cancer condition that exceeded $90,000.  Plus, the statute contains no exhaustion requirement that would have prevented Mr. White from filing suit before

receiving a final decision from the VCF.  Indeed, the statute contemplates no judicial review of

Special Master decisions at all.  *Id.* § 405(b)(3).

In sum, because the events underlying Mr. White's claims occurred more than six years

before he filed the original complaint, the suit must be dismissed as untimely.  28 U.S.C. § 2501.

III.    <u>Mr. White Does Not Plausibly Allege The Existence Of A Government Contract</u>

Even if the Court were to determine that Mr. White's suit is timely, dismissal is

nonetheless warranted because he does not state a plausible express or implied contract claim.

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between

the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4)

damages caused by the breach."  *San Carlos Irrigation & Drainage Dist. v. United States*, 877

F.2d 957, 959 (Fed. Cir. 1989).

As for the first requirement—the existence of a contract—a plaintiff must plausibly

allege four elements: (1) mutuality of intent to contract; (2) unambiguous offer and acceptance;

(3) consideration; and (4) actual authority to contract.  *See City of El Centro v. United States*, 922

F.2d 816, 820 (Fed. Cir. 1990).  An implied-in-fact contract has the same elements as an express

contract, but is founded upon a "meeting of minds" and "'the conduct of the parties showing, in

the light of the surrounding circumstances, their tacit understanding.'"  *Hanlin v. United States*,

316 F.3d 1325, 1328 (Fed. Cir. 2003) (quoting *Balt. & Ohio R.R. v. United States*, 261 U.S. 592,

597 (1923)).  And the existence of an "express contract precludes the existence of an implied-in-

fact contract dealing with the same subject matter, unless the implied contract is entirely

unrelated to the express contract."  *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir.

2002)

Here, Mr. White alleges that the Government formed either an express or an implied

contract with him to evaluate his claim "pursuant to the loss calculation methodology in place at

the time [he] waived [his] rights," Am. Compl. ¶ 101, but as we demonstrate below, the facts

alleged do not support the existence of either type of contract.

A.    Neither The VCF Statute Nor Its Implementing Regulations Reflect A Mutual
      Intent To Form A Contract

To show mutuality of intent to contract, the plaintiff must identify "an objective

manifestation of voluntary, mutual assent." *Turping v. United States*, 913 F.3d 1060, 1065 (Fed.

Cir. 2019). Because courts presume that "a law is not intended to create private contractual or

vested rights but merely declares a policy to be pursued until the legislature shall ordain

otherwise," absent clear evidence to the contrary, legislation and regulation do not reflect the

Government's intent to bind itself in contract. *Nat'l R.R. Passenger Corp. v. Atchison Topeka &

Santa Fe Ry. Co.*, 470 U.S. 451, 465-66 (1985) (quoting *Dodge v. Bd. of Educ.*, 302 U.S. 74, 79

(1937)); *see also Baker v. United States*, 50 Fed. Cl. 483, 489 (2001) ("[T]he United States

cannot be contractually bound merely by invoking the cited statute and regulation."). The

rationale behind this presumption is that Congress' function is to make laws establishing

policy—not contracts—and, unlike contracts, policies "are inherently subject to revision and

repeal." *Id.* at 466. Thus, "the party asserting the creation of a contract must overcome this

well-founded presumption and [courts should] proceed cautiously both in identifying a contract

within the language of a regulatory statute and in defining the contours of any contractual

obligation." *Brooks v. Dunlop Mfg.*, 702 F.3d 624, 630-31 (Fed. Cir. 2012) (quoting *Nat'l R.R.

Passenger Corp.*, 470 U.S. at 466).

Consistent with this well-established presumption, in *Brooks* the Federal Circuit rejected

the contention that a *qui tam* relator entered into a contract with the United States by filing suit

15

against a third party for false patent marketing. The *qui tam* statute at issue provided that "[a]ny person may sue for the penalty, in which one-half shall go to the person suing and the other to the use of the United States." *Id*. at 631. The relator alleged that this provision comprised a unilateral offer by the Government to enter into an implied-in-fact contract, and that Congress violated his due process rights by repudiating this contract when it subsequently eliminated the *qui tam* provision. *Id.* at 630. Rejecting the implied-in-fact contract theory, the Federal Circuit explained that "[n]othing in this language 'create[s] or speak[s] of a contract' between the United States and a *qui tam* relator." *Id*. at 631 (quoting *Nat'l R.R. Passenger Corp.*, 470 U.S. at 467).

Likewise, in *American Bankers Ass'n v. United States*, 932 F.3d 1375 (Fed. Cir. 2019), the Federal Circuit rejected the contention that the Federal Reserve Act (Act) constitutes a contract to pay fixed 6 percent dividends on Federal Reserve regional bank stock to member banks in exchange for subscription fee payments to the regional banks. *Id.* at 1382-84. Between 1913 and 2015, the Act specified a fixed 6 percent dividend on regional bank stock. *Id.* at 1379. In 2015, Congress amended the Act by replacing the fixed 6 percent dividend with a variable dividend equal to the lesser of: (1) the rate of the 10-year Treasury note or (2) 6 percent. *Id.* The plaintiffs alleged that the Act constituted a contract, which the Government breached by changing the dividend rules. *Id.* at 1381. In rejecting plaintiffs' argument, the Federal Circuit determined the duties arising from the Act do not reflect a "bargained-for *quid pro quo* between two parties" as would be necessary to show "the government's clear intent to confer vested contractual rights on each member bank who complies with the stock subscription requirement." *Id.* at 1383; *see also Hanlin*, 316 F.3d at 1329 (finding no contract where the "statute is a directive from the Congress to the [agency], not a promise from the [agency] to" a third party).

This Court and its predecessor have also rejected efforts to characterize a Government program as a contract following Government action that frustrated the plaintiff's expectations. *See, e.g., Boyd v. United States,* No. 22-1473, 2023 WL 3118132, at *2-4 (Fed. Cl. Apr. 27, 2023) (dismissing suit in which plaintiffs alleged that their application forms seeking financial relief under the American Rescue Plan Act of 2021 constituted contracts to provide assistance payments); *Flint v. United States*, 162 Fed. Cl. 91, 125 (2022) (dismissing suit in which plaintiff alleged that her participation in an offshore tax penalty program constituted contract in which IRS agreed not to assess additional penalties); *Baker*, 50 Fed. Cl. at 493-95 (dismissing suit in which plaintiff alleged that the Consolidated Farm and Rural Development Act and implementing regulations constituted an offer to provide guaranteed loans to farmers); *Last Chance Mining Co. v. United States*, 12 Cl. Ct. 551, 555-56 (1987) (dismissing suit in which plaintiff alleged that the Federal Land Policy and Management Act formed a contract between the Government and mine owners by establishing a framework for claiming and evaluating mines).

When, as in this case, a plaintiff alleges that a statutory or regulatory program reflects a mutual intent to form a contract, courts have looked to several indicia to determine if such intent exists, including:

- Promissory language in the statute or regulation, *Brooks*, 702 F.3d at 630; *Baker*, 50 Fed. Cl. at 490; *Radium Mines, Inc. v. United States*, 153 F. Supp. 403, 404-05 (Ct. Cl. 1957);

- Statutory or regulatory language providing for execution of a written contract, *Am. Bankers*, 932 F.3d at 1381;

- Bargaining, *Flint*, 162 Fed. Cl. at 125;

- A Government admission that a contract exists, *Radium Mines*, 153 F. Supp. at 404-05; and

- Specific prices and quantities, *Cutler-Hammer Inc. v. United States*, 441 F.2d 1179, 1182 (Ct. Cl. 1971).

Without these indicia, a party cannot show an intent to form a contract through the creation and participation in a statutory or regulatory program. *Am. Bankers*, 932 F.3d at 1382-83.

Here, Mr. White's amended complaint fails to allege any such indicia from which he could plausibly show that the parties had a mutual intent to contract, especially given the background principle that legislation does not form a contract. Mr. White identifies no promissory language in the VCF statute or implementing regulations. He also cites no statutory or regulatory language providing for execution of a written contract. Mr. White does not allege that he bargained or negotiated for the Government to apply "the loss calculation methodology in place at the time [he] waived [his] rights." Am. Compl. ¶ 101. And Mr. White does not allege that the Government admitted the existence of a contract with him or guaranteed him a specific award amount. Indeed, even under the prior methodology the Special Master was free to award Mr. White the same amount he ultimately received.

Although Mr. White points to several Government actions that he claims suffice to show a mutuality of intent to contract, none of these actions plausibly show that the Government intended to form a contract with Mr. White, let alone one in which the Government committed to evaluating his claim under "the loss calculation methodology in place at the time [he] waived [his] rights." *Id.*

First, Mr. White alleges that by passing legislation enacting the VCF, Congress expressed an intent to form contracts with claimants. *Id.* ¶ 100. But authorizing the VCF is a legislative act, not a contractual one, and the VCF statute says nothing about forming contracts with

claimants, much less promises to use a particular claim evaluation methodology.  *See generally* 49 U.S.C. § 40101 note.

Second, Mr. White alleges that "promulgating regulations governing claimant eligibility and compensation" also shows an intent to form contracts with claimants, but in promulgating regulations the Government was implementing a statutory requirement, not adopting a contract. *Compare* Am. Compl. ¶ 100, *with* 49 U.S.C. § 40101 note § 407(a) ("The Attorney General, in consultation with the Special Master, shall promulgate regulations to carry out this title").

Third, Mr. White contends that a 2011 regulation, which provided that claimants are entitled to have "their claims processed in accordance with the provisions of this Part that were in effect at the time that their claims were submitted" shows the parties' intent to contract.  Am. Compl. ¶¶ 3, 31, 97 (citing 28 C.F.R. § 104.6 (2011 ed.) (Amendments to this part)).  Mr. White's reliance on this 2011 regulation is misplaced.  To begin, the 2011 regulation is inconsistent with the later-enacted Reauthorization Act, which established a specific set of rules for Group B claimants without regard to the time of claim submission, and the Reauthorization Act supersedes any prior conflicting regulation.  *See Norman v. United States*, 942 F.3d 1111, 1118 (Fed. Cir. 2019) ("It is well-settled that subsequently enacted or amended statutes supersede prior inconsistent regulations.").

And even if the 2011 regulation were not superseded by the Reauthorization Act, Mr. White still could not plausibly show mutual intent because "statutes and regulations (or promises that they will be followed) do not give rise to [a] contract."  *Boston v. United States*, 43 Fed. Cl. 220, 225 (1999).  Indeed, treating the 2011 version of 28 C.F.R. § 104.6 as a contract duty would have interfered with Congress' ability to modify the VCF program in the Reauthorization Act.

Fourth, Mr. White alleges that "establishing methodologies and publishing information" reflects a contractual offer, Am. Compl. ¶ 100, but those actions were performed pursuant to the regulatory requirements adopted under the VCF statute. *See* 28 C.F.R. § 104.43(a) (the Special Master "has developed a methodology and may publish updated schedules, tables, or charts" to permit claimants to "estimate determinations of loss of earnings or other benefits related to employment based upon individual circumstances of the deceased victim"). In any event, the published information reflects estimated compensation, not a guarantee to pay any particular amount.

Fifth, Mr. White cites the VCF "claim forms that enabled claimants to pursue recovery for losses" as another example of an intent to form contracts with claimants. Am. Compl. ¶ 100. Yet again, however, Mr. White attempts to convert a legislative or regulatory requirement into a contractual one. The VCF created the claim form in response to a statutory directive to "develop a claim form that claimants shall use when submitting claims." 49 U.S.C. § 40101 note § 405(a)(2).

Sixth, Mr. White points to the claim form itself—which requires claimants to acknowledge that, by submitting the form, they are waiving their 9/11-related civil claims—as reflecting an intent to form contracts with claimants. *See* Am. Compl. ¶ 100 and Ex. 3 (Acknowledgment of Waiver of Rights). But the claim form merely reflects the terms of the VCF statute itself, which provides that by submitting a claim, a "claimant waives the right to file a civil action (or to be a party to an action) in any Federal or State court" for 9/11-related damages." 49 U.S.C. § 40101 note § 405(c)(3)(C)(i). The claim form ensures that claimants are aware of this statutory waiver requirement by requiring claimants to acknowledge it. Moreover, as noted, nothing in the VCF states that this waiver is conditioned on the Government's right to

apply any particular methodology for calculating compensation, or to award any compensation at all.

Seventh, Mr. White alleges that by evaluating claimant eligibility, the Government shows its intent to form contracts with claimants, Am. Compl. ¶ 100, but the VCF statute and regulations require the VCF to "determine eligibility and the claimant's presumed award." *See* 28 C.F.R. § 104.31(b); *see also* 49 U.S.C. § 40101 note § 405(b)(1)(A), (b)(1)(B)(ii) (providing that "the Special Master shall review a claim" and "determine . . . whether the claimant is an eligible individual" and "the amount of compensation to which the claimant is entitled").

Eighth, Mr. White alleges that paying compensation shows the VCF's intent to form contracts with claimants, Am. Compl. ¶ 100, but the statute directs the VCF to determine "the amount of compensation to which the claimant is entitled" and to "authorize payment to such claimant of the amount determined[.]" 49 U.S.C. § 40101 note § 405(b), 406(a). If payment were sufficient to establish a contractual relationship, then every legislative program providing a monetary benefit would be converted into a contractual one—contrary to the presumption that Congress does not typically intend to establish binding obligations.

At base, Mr. White's effort to convert the VCF into a contractual program would encroach on Congress' power to enact compensation policies around the September 11th attacks. If the Government is contractually obligated to maintain a particular compensation structure, that obligation would undermine Congress' authority to "make laws that establish policy." *Nat'l R.R. Passenger Corp.*, 470 U.S. at 465-66. Unlike contracts, policies "are inherently subject to revision and repeal." *Id.*; *see also Last Chance Mining Co.*, 12 Cl. Ct. at 556 ("It would do violence to traditional contract theory, not to mention the operation of government, to hold that any statute requiring some action by a citizen to obtain a benefit or protect a right constituted an

21

open offer to contract.").  Mr. White has failed to show that Congress intended its policy choice to provide compensation to victims of the September 11th attacks to be treated as a contractual offering that was forever fixed and immune from subsequent policy revisions.

>   B.   Mr. White Does Not Allege An Unambiguous VCF Offer To Determine Compensation Using The "Loss Calculation Methodology" In Place When He Applied, Or His Unambiguous Acceptance Of Any Such Offer

Mr. White also cannot show the existence of a contract given the absence of plausible allegations reflecting the Government's unambiguous offer to enter into a contract or Mr. White's unambiguous acceptance of any such offer by applying for VCF compensation.

An offer is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24.  Acceptance is "a manifestation of assent to the terms [of the offer] made by the offeree in a manner invited or required by the offer." *Id.* § 50.  The offer and acceptance must be unambiguous to show contract formation. *See Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003).

The amended complaint does not allege an unambiguous offer and acceptance.  In alleging an express contract, Mr. White attempts to locate an unambiguous offer in his "VCF claim documents," Am. Compl. ¶ 102, but Mr. White points to nothing in those documents reflecting the Government's "willingness to enter into a bargain."  Mr. White further asserts that the VCF "establish[ed] methodologies and publish[ed] information," but he cites to no language in his VCF claim forms reflecting an unambiguous VCF offer to him form a contract governing the applicable "loss calculation methodology" to be employed. *Id.* ¶ 100.

Mr. White also does not plausibly allege that an unambiguous acceptance arose from his claim forms.  Although Mr. White attaches a signed "Acknowledgement of Waiver of Rights" to

his amended complaint, the acknowledgment simply requires Mr. White to confirm that he knows the statutory effect of submitting an Eligibility Form. *Id.,* Ex. 3. It does not require Mr. White to waive anything more than what the statute already requires, and as noted, the statute does not condition the waiver on the Government's agreement to use any particular methodology in making awards.

With respect to an implied contract, Mr. White alleges that an unambiguous offer and acceptance may be "inferred from the conduct and representations of the parties and the surrounding circumstances," but does not allege any particular conduct, representation, or circumstance that would plausibly support such an inference. Instead, Mr. White identifies two general statements, neither of which reflects an unambiguous Government offer to consider his claim using "the loss calculation methodology in place at the time [he] waived [his] rights":

- The Special Master emphasized that potential applicants needed to be aware of the way their awards would be calculated.

- The Special Master stated that the implementing regulations for the 2010 Act were designed so that VCF would be "fair, transparent, and easy to navigate."

Am. Compl. ¶¶ 29-30, 37, 101.

Neither statement supports a plausible implied contract claim. First, the Special Master's alleged statement that claimants "should have some understanding of how their award will be calculated and how much they would receive from the Fund should they decide to file a claim" does not support an offer to evaluate Mr. White's claim using "the loss calculation methodology in place at the time" he applied for compensation, *id.* ¶¶ 30, 101, because the statement neither identifies a methodology nor guarantees that it will not be changed. Indeed, the regulations authorize the Special Master to publish information from which prospective claimants may *estimate* award amounts, but do not promise any such amounts, and provide the Special Master

23

with discretion in determining them.  28 C.F.R. § 104.43(a).  Second, the Special Master's statement that the implementing regulations are "fair, transparent, and easy to navigate," reflects subjective judgments about the VCF's own regulations—not an unambiguous offer to apply a particular "loss calculation methodology."  Am. Compl. ¶ 101.

Mr. White alleges an unambiguous acceptance of an implied contract by applying for compensation, and thus waiving his civil suit rights, but as we demonstrated above, these actions are statutory conditions for participation in the VCF program—not a manifestation of an intent to make a Government offer that Mr. White was expected to accept.

C.    The Special Master Lacks Actual Authority To Form Contracts With Claimants

Finally, Mr. White cannot allege the existence of a contract given the absence of a plausible allegation that the Special Master has "actual authority to bind the government in contract."  *City of El Centro*, 922 F.2d at 820.

"A government agent possesses express actual authority to bind the government in contract only when the Constitution, a statute, or a regulation grants it to that agent in unambiguous terms."  *McAfee v. United States*, 46 Fed. Cl. 428, 435 (2000).  This rule applies whether the alleged contract is express or implied.  *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997).  Thus, "[a]nyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government, and this risk remains with the contractor even when the Government agents themselves may have been unaware of the limitations on their authority."  *Id.* at 1325.

Congress grants contracting authority unambiguously.  For instance, the VA MISSION Act of 2018 authorizes the Secretary of Veterans Affairs to "enter into consolidated, competitively bid contracts to establish networks of health care providers[.]"  38 U.S.C.

24

§ 1703(h).  Another example is the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, which authorizes the Office of the Comptroller of the Currency to "enter into and perform contracts . . . as the Comptroller deems necessary to carry out the duties and responsibilities of the Office[.]").  12 U.S.C. § 5416.  Similarly, the Energy Policy Act of 2005 permits the "Secretary of Defense [to] enter into one or more contracts or other agreements . . . to procure a covered fuel to meet 1 or more fuel requirements of the Department of Defense."  10 U.S.C. § 2922d(b).  These statutes leave no doubt about Congress' intent to provide contracting authority.

Here, in contrast, neither the VCF statute nor its implementing regulations provide the Special Master with authority to enter into contracts at all, let alone contracts with VCF claimants.  Although Mr. White alleges that the "Special Master, on behalf of the VCF, had authority to bind the Government in contract," the amended complaint identifies no constitutional, statutory, or regulatory provision providing that authority.  Am. Compl. ¶ 107.  So even if Mr. White could allege the other contract elements, he still could not plausibly show contract formation because the Special Master lacks actual authority to contract with claimants.

In sum, because Mr. White has not sufficiently alleged the existence of a contract, the amended complaint should be dismissed.

CONCLUSION

For these reasons, we respectfully request that the Court dismiss the amended complaint.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director


s/ Elizabeth M. Hosford
ELIZABETH M. HOSFORD
Assistant Director


s/ Eric E. Laufgraben
ERIC E. LAUFGRABEN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone:   (202) 353-7995
Facsimile:   (202) 353-0461
Email:        Eric.E.Laufgraben@usdoj.gov

November 8, 2023                    Attorneys for Defendant



49 U.S.C.A. § 40101



**Effective:** April 05, 2000

United States Code Annotated Currentness
    Title 49. Transportation (Refs & Annos)
        Subtitle VII. Aviation Programs
            Part A. Air Commerce and Safety (Refs & Annos)
                Subpart I. General
                    Chapter 401. General Provisions (Refs & Annos)

TITLE IV--VICTIM COMPENSATION

**"Sec. 401. Short title.**

"This title [Title IV of this note] may be cited as the 'September 11th Victim Compensation Fund of 2001'.

**"Sec. 402. Definitions.**

"In this title [Title IV of this note], the following definitions apply:

"**(1) Air carrier.**--The term 'air carrier' means a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation and includes employees and agents (including persons engaged in the business of providing air transportation security and their affiliates) of such citizen. For purposes of the preceding sentence, the term 'agent', as applied to persons engaged in the business of providing air transportation security, shall only include persons that have contracted directly with the Federal Aviation Administration on or after and commenced services no later than February 17, 2002, to provide such security, and had not been or are not debarred for any period within 6 months from that date.

"**(2) Air transportation.**--The term 'air transportation' means foreign air transportation, interstate air transportation, or the transportation of mail by aircraft.

"**(3) Aircraft manufacturer.**--The term 'aircraft manufacturer' means any entity that manufactured the aircraft or any parts or components of the aircraft involved in the terrorist related aircraft crashes of September 11, 2001, including employees and agents of that entity.

"**(4) Airport sponsor.**--The term 'airport sponsor' means the owner or operator of an airport (as defined in section 40102 of title 49, United States Code).

"**(5) Claimant.**--The term 'claimant' means an individual filing a claim for compensation under section 405(a)(1) [of this note].

"**(6) Collateral source.**--The term 'collateral source' means all collateral sources, including life insurance, pension funds, death benefit programs, and payments by Federal, State, or local governments related to the terrorist-related aircraft crashes of September 11, 2001, **or debris removal**, including under the World Trade Center Health Program established under section 3001 of the Public Health Service Act [sic; probably should read 'section 3301 of the Public Health Service Act' which is classified to 42 U.S.C.A. § 300mm], and payments made pursuant to the settlement of a civil action described in section 405(c)(3)(C)(iii) [this note].

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Excerpt from original document pages 23-32*



49 U.S.C.A. § 40101

**"(7) Contractor and subcontractor.**--The term 'contractor and subcontractor' means any contractor or subcontractor (at any tier of a subcontracting relationship), including any general contractor, construction manager, prime contractor, consultant, or any parent, subsidiary, associated or allied company, affiliated company, corporation, firm, organization, or joint venture thereof that participated in debris removal at any 9/11 crash site. Such term shall not include any entity, including the Port Authority of New York and New Jersey, with a property interest in the World Trade Center, on September 11, 2001, whether fee simple, leasehold or easement, direct or indirect.

**"(8) Debris removal.**--The term 'debris removal' means rescue and recovery efforts, removal of debris, cleanup, remediation, and response during the immediate aftermath of the terrorist-related aircraft crashes of September 11, 2001, with respect to a 9/11 crash site.

**"(9) Economic loss.**--The term 'economic loss' means any pecuniary loss resulting from harm (including the loss of earnings or other benefits related to employment, ~~medical expense loss,~~ replacement services loss, loss due to death, burial costs, ~~and~~ loss of business or employment opportunities), and past out-of-pocket medical expense loss but not future medical expense loss to the extent recovery for such loss is allowed under applicable State law.

**"(10) Eligible individual.**--The term 'eligible individual' means an individual determined to be eligible for compensation under section 405(c) [of this note].

**"(11) Immediate aftermath.**--The term 'immediate aftermath' means any period beginning with the terrorist-related aircraft crashes of September 11, 2001, and ending on May 30, 2002.

**"(12) Noneconomic losses.**--The term 'noneconomic losses' means losses for physical and emotional pain, suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of enjoyment of life, loss of society and companionship, loss of consortium (other than loss of domestic service), hedonic damages, injury to reputation, and all other nonpecuniary losses of any kind or nature.

**"(13) Special Master.**--The term 'Special Master' means the Special Master appointed under section 404(a) [of this note].

**(14) WTC Program Administrator.** The term 'WTC Program Administrator' has the meaning given such term in section 3306 of the Public Health Service Act (42 U.S.C. 300mm-5).

**(15) WTC-related Physical Health Condition.** The term 'WTC-related physical health condition' –

(A) means, subject to subparagraph (B), a WTC-related health condition as defined by section 3312(a) of the Public Health Services Act (42 U.S.C. 300mm-22(a)), including the conditions listed in section 3322(b) of such Act (42 U.S.C. 300mm-32(b)); and

(B) does not include –
(i) a mental health condition described in paragraph (1)(A)(ii) or (3)(B) of section 3312(a) of such Act (42 U.S.C. 300mm-22(a));
(ii) any mental health condition certified under section 3312(b)(2)(B)(iii) of such Act (42 U.S.C. 300mm-22(b)2(B)(iii)) (including such certification as applied under section 3322(a) of such Act (42 U.S.C. 300mm-32(a));
(iii) a mental health condition described in section 3322(b)(2) of such Act (42 U.S.C. 300mm-32(b)(2)); or
(iv) any other mental health condition.

**"(~~14~~16) 9/11 crash site.**--The term '9/11 crash site' means--

**"(A)** the World Trade Center site, Pentagon site, and Shanksville, Pennsylvania site;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Excerpt from original document pages 23-32*

Westlaw

49 U.S.C.A. § 40101

"**(B)** the buildings or portions of buildings that were destroyed as a result of the terrorist-related aircraft crashes of September 11, 2001;

"**(C)** the area in Manhattan that is south of the line that runs along Canal Street from the Hudson River to the intersection of Canal Street and East Broadway, north on East Broadway to Clinton Street, and east on Clinton Street to the East River~~any area contiguous to a site of such crashes that the Special Master determines was sufficiently close to the site that there was a demonstrable risk of physical harm resulting from the impact of the aircraft or any subsequent fire, explosions, or building collapses (including the immediate area in which the impact occurred, fire occurred, portions of buildings fell, or debris fell upon and injured individuals)~~; and

"**(D)** any area related to, or along, routes of debris removal, such as barges and Fresh Kills.

"**Sec. 403. Purpose.**

"It is the purpose of this title [Title IV of this note] to provide full compensation to any individual (or relatives of a deceased individual) who was physically injured or killed as a result of the terrorist-related aircraft crashes of September 11, 2001 or the rescue and recovery efforts during the immediate aftermath of such crashes.

"**Sec. 404. Administration.**

"**(a) In general.**--The Attorney General, acting through a Special Master appointed by the Attorney General, shall--

"**(1)** administer the compensation program established under this title [Title IV of this note];

"**(2)** promulgate all procedural and substantive rules for the administration of this title [Title IV of this note]; and

"**(3)** employ and supervise hearing officers and other administrative personnel to perform the duties of the Special Master under this title [this note].

"**(b) Authorization of appropriations.**--There are authorized to be appropriated such sums as may be necessary to pay the administrative and support costs for the Special Master in carrying out this title [Title IV of this note].

"**Sec. 405. Determination of eligibility for compensation.**

"**(a) Filing of claim.--**

"**(1) In general.**--A claimant may file a claim for compensation under this title [this note] with the Special Master. The claim shall be on the form developed under paragraph (2) and shall state the factual basis for eligibility for compensation and the amount of compensation sought.

"**(2) Claim form.--**

"**(A) In general.**--The Special Master shall develop a claim form that claimants shall use when submitting claims under paragraph (1). The Special Master shall ensure that such form can be filed electronically, if determined to be practicable.

"**(B) Contents.**--The form developed under subparagraph (A) shall request--

"**(i)** information from the claimant concerning the physical harm that the claimant suffered, or in the case of a claim filed

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Excerpt from original document pages 23-32*

3

Westlaw.

49 U.S.C.A. § 40101

on behalf of a decedent information confirming the decedent's death, as a result of the terrorist-related aircraft crashes of September 11, 2001, **or debris removal** during the immediate aftermath;

"(ii) information from the claimant concerning any possible economic and noneconomic losses that the claimant suffered as a result of such crashes **or debris removal** during the immediate aftermath; and

"(iii) information regarding collateral sources of compensation the claimant has received or is entitled to receive as a result of such crashes **or debris removal** during the immediate aftermath.

"**(3) Limitation.**--

"**(A) In general.**--Except as provided by subparagraph (B), no claim may be filed under paragraph (1) after the date that is 2 years after the date on which regulations are promulgated under section 407(a) [this note].

"**(B) Exception.**--A claim may be filed under paragraph (1), in accordance with subsection (c)(3)(A)(i), by an individual (or by a personal representative on behalf of a deceased individual) during the period beginning on the date on which the regulations are updated under section 407(b)(1) [this note] and ending on the date that is 5 years after the date of enactment of the James Zadroga 9/11 Health and Compensation Reauthorization Acton which such regulations are updated.

"**(C) Special Master Determination. –**

"**(i)** IN GENERAL. - - For claims filed under this title during the period described in subparagraph (B), the Special Master shall establish a system for determining whether, for purposes of this title, the claim is –

"**(I)** a claim in Group A, as described in clause (ii); or

"**(II)** a claim in Group B, as described in clause (iii).

"**(ii)** Group A Claims.—A claim under this title is a claim in Group A if—

"**(I)** the claim is filed under this title during the period described in subparagraph (B); and

"**(II)** on or before the day before the date of enactment of the James Zadroga 9/11 Health and Compensation Reauthorization Act, the Special Master postmarks and transmits a final award determination to the claimant filing such claim.

"**(iii)** Group B Claims.—A claim under this title is a claim in Group B if the claim—

"**(I)** is filed under this title during the period described in subparagraph (B); and

"**(II)** is not a claim described in clause (ii).

"**(iv)** Definition of Final Award Determination.—For purposes of this subparagraph, the term 'final award determination' means a letter from the Special Master indicating the total amount of compensation to which a claimant is entitled for a claim under this title without regard to the limitation under the second sentence of section 406 (d)(1), as such section was in effect on the day before the date of enactment of the James Zadroga 9/11 Health and Compensation Fund Reauthorization Act.

"**(b) Review and determination.--**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Excerpt from original document pages 23-32*

4

Westlaw.

49 U.S.C.A. § 40101

"**(1) Review.**--The Special Master shall review a claim submitted under subsection (a) and determine--

"**(A)** whether the claimant is an eligible individual under subsection (c);

"**(B)** With respect to a claimant determined to be an eligible individual--

"**(i)** the extent of the harm to the claimant, including any economic and noneconomic losses; and

"**(ii)** subject to paragraph (7), the amount of compensation to which the claimant is entitled based on the harm to the claimant, the facts of the claim, and the individual circumstances of the claimant.

"**(2) Negligence.**--With respect to a claimant, the Special Master shall not consider negligence or any other theory of liability.

"**(3) Determination.**--Not later than 120 days after that date on which a claim is filed under subsection (a), the Special Master shall complete a review, make a determination, and provide written notice to the claimant, with respect to the matters that were the subject of the claim under review. Such a determination shall be final and not subject to judicial review.

"**(4) Rights of claimant.**--A claimant in a review under paragraph (1) shall have--

"**(A)** the right to be represented by an attorney;

"**(B)** the right to present evidence, including the presentation of witnesses and documents; and

"**(C)** any other due process rights determined appropriate by the Special Master.

"**(5) No punitive damages.**--The Special Master may not include amounts for punitive damages in any compensation paid under a claim under this title [this note].

"**(6) Collateral compensation.**--

**(A) In General.--**The Special Master shall reduce the amount of compensation determined under paragraph (1)(B)(ii) by the amount of the collateral source compensation the claimant has received or is entitled to receive as a result of the terrorist-related aircraft crashes of September 11, 2001.

**(B) Group B Claims.—**Notwithstanding any other provision of this title, in the case of a claim in Group B as described in subsection (a)(3)(C)(iii), a claimant filing such claim shall receive an amount of compensation under this title for such claim that is not greater than the amount determined under paragraph (1)(B)(ii) less the amount of any collateral source compensation that such claimant has received or is entitled to receive for such claim as a result of the terrorist-related aircraft crashes of September 11, 2001.

"**(7) Limitations for Group B Claims.—**

"**(A)** Noneconomic Losses.—With respect to a claim in Group B as described in subsection (a)(3)(C)(ii), the total amount of compensation to which a claimant filing such claim is entitled to receive for such claim under this title on account of any noneconomic loss—

"**(i)** that results from any type of cancer shall not exceed $250,000; and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Excerpt from original document pages 23-32*

49 U.S.C.A. § 40101

"**(ii)** that does not result from any type of cancer shall not exceed $90,000.

"**(B)** Determination of Economic Loss.—

"**(i)** In General.—Subject to the limitation described in clause (ii) and with respect to a claim in Group B as described in subsection (a)(3)(C)(iii), the Special Master shall, for purposes of calculating the amount of compensation to which a claimant is entitled under this title for such claim on account of any economic loss, determine the loss of earnings or other benefits related to employment by using the applicable methodology described in section 104.43 or 104.45 of title 28, Code of Federal Regulations, as such Code was in effect on the day before the date of enactment of the James Zadroga 9/11 Health and Compensation Fund Reauthorization Act.

"**(ii)** ANNUAL GROSS INCOME LIMITATION.—In considering annual gross income under clause (i) for the purposes described in such clause, the Special Master shall, for each year of any loss of earnings or other benefits related to employment, limit the annual gross income of the claimant (or decedent in the case of a personal representative) for each such year to an amount that is not greater than $200,000.

"**(C)** Gross Income Defined.-- For purposes of this paragraph, the term 'gross income' has the meaning given such term in section 61 of the Internal Revenue Code of 1986.

"**(c) Eligibility.--**

"**(1) In general.**--A claimant shall be determined to be an eligible individual for purposes of this subsection if the Special Master determines that such claimant--

"**(A)** is an individual described in paragraph (2); and

"**(B)** meets the requirements of paragraph (3).

"**(2) Individuals.**--A claimant is an individual described in this paragraph if the claimant is--

"**(A)** An individual who--

"**(i)** was present at the World Trade Center, (New York, New York), the Pentagon (Arlington, Virginia), the site of the aircraft crash at Shanksville, Pennsylvania, or any other 9/11 crash site at the time, or in the immediate aftermath, of the terrorist-related aircraft crashes of September 11, 2001; and

"**(ii)** suffered physical harm or death as a result of such an air crash **or debris removal**;

"**(B)** an individual who was a member of the flight crew or a passenger on American Airlines flight 11 or 77 or United Airlines flight 93 or 175, except that an individual identified by the Attorney General to have been a participant or conspirator in the terrorist-related aircraft crashes of September 11, 2001, or a representative of such individual shall not be eligible to receive compensation under this title [Title IV of this note]; or

"**(C)** in the case of a decedent who is an individual described in subparagraph (A) or (B), the personal representative of the decedent who files a claim on behalf of the decedent.

"**(3) Requirements.--**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Excerpt from original document pages 23-32*



49 U.S.C.A. § 40101

**"(A) Requirements for filing claims during extended filing period.--**

**"(i) Timing requirements for filing claims.**--An individual (or a personal representative on behalf of a deceased individual) may file a claim during the period described in subsection (a)(3)(B) as follows:

**"(I)** In the case that the Special Master determines the individual knew (or reasonably should have known) before the date specified in clause (iii) that the individual suffered a physical harm at a 9/11 crash site as a result of the terrorist-related aircraft crashes of September 11, 2001, or as a result of debris removal, and that the individual knew (or should have known) before such specified date that the individual was eligible to file a claim under this title [Title IV of this note], the individual may file a claim not later than the date that is 2 years after such specified date.

**"(II)** In the case that the Special Master determines the individual first knew (or reasonably should have known) on or after the date specified in clause (iii) that the individual suffered such a physical harm or that the individual first knew (or should have known) on or after such specified date that the individual was eligible to file a claim under this title [Title IV of this note], the individual may file a claim not later than the last day of the 2- year period beginning on the date the Special Master determines the individual first knew (or should have known) that the individual both suffered from such harm and was eligible to file a claim under this title [Title IV of this note].

**"(ii) Other eligibility requirements for filing claims.—** —Except with respect to claims in Group B as described in subsection (a)(3)(C)(iii), An individual an individual may file a claim during the period described in subsection (a)(3)(B) only if--

**"(I)** the individual was treated by a medical professional for suffering from a physical harm described in clause (i)(I) within a reasonable time from the date of discovering such harm; and

**"(II)** the individual's physical harm is verified by contemporaneous medical records created by or at the direction of the medical professional who provided the medical care.

**"(iii) Date specified.**--The date specified in this clause is the date on which the regulations are updated under section 407(a)407(b)(1) [this note].

**"(iv) Group B Claims.—**

    **"(I)** In General.--Subject to subclause (II), an individual filing a claim in Group B as described in subsection (a)(3)(C)(iii) may be eligible for compensation under this title only if the Special Master, with assistance from the WTC Program Administrator as necessary, determines based on the evidence presented that the individual has a WTC-related physical health condition, as defined by section 402 of this Act.

    **"(II).** Personal Representatives.-- An individual filing a claim in Group B, as described in subsection (a)(3)(C)(iii), who is a personal representative described in paragraph (2)(C) may be eligible for compensation under this title only if the Special Master, with assistance from the WTC Program Administrator as necessary, determines based on the evidence presented that the applicable decedent suffered from a condition that was, or would have been determined to be, a WTC-related physical health condition, as defined by section 402 of this Act

**"(B) Single claim.**--Not more than one claim may be submitted under this title [Title IV of this note] by an individual or on behalf of a deceased individual.

**"(C) Limitation on civil action.--**

**"(i) In general.**--Upon the submission of a claim under this title [Title IV of this note], the claimant waives the right to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Excerpt from original document pages 23-32*

Westlaw.

49 U.S.C.A. § 40101

file a civil action (or to be a party to an action) in any Federal or State court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001, or for damages arising from or related to debris removal. The preceding sentence does not apply to a civil action to recover collateral source obligations, or to a civil action against any person who is a knowing participant in any conspiracy to hijack any aircraft or commit any terrorist act.

"(ii) **Pending actions.**--In the case of an individual who is a party to a civil action described in clause (i), such individual may not submit a claim under this title [Title IV of this note]--

"(I) during the period described in subsection (a)(3)(A) unless such individual withdraws from such action by the date that is 90 days after the date on which regulations are promulgated under section 407(a) [this note]; and

"(II) during the period described in subsection (a)(3)(B) unless such individual withdraws from such action by the date that is 90 days after the date on which the regulations are updated under section 407(b)(1) [this note].

"(iii) **Settled actions.**--In the case of an individual who settled a civil action described in clause (i), such individual may not submit a claim under this title [Title IV of this note] unless such action was commenced after December 22, 2003, and a release of all claims in such action was tendered prior to the date on which the James Zadroga 9/11 Health and Compensation Act of 2010 [Pub.L. 111-347, Jan. 2, 2011, 124 Stat. 3623, enacting subchapter XXXI of chapter 6A of Title 42, 42 U.S.C.A. § 300mm et seq., enacting chapter 50 of Title 26, 26 U.S.C.A. § 5000C, enacting provisions set out as notes under 26 U.S.C.A. § 5000C, and amending provisions set out in a note under this section, and 8 U.S.C.A. § 1101] was enacted.

**"Sec. 406. Payments to eligible individuals.**

"(a) **In general.**--Subject to the limitations under subsection (d), not later than 20 days after the date on which a determination is made by the Special Master regarding the amount of compensation due a claimant under this title [Title IV of this note], the Special Master shall authorize payment to such claimant of the amount determined with respect to the claimant.

"(b) **Payment authority.**-- For the purposes of providing compensation for claims in Group A as described in section 405(a)(3)(C)(ii), Tthis title [Title IV of this note] constitutes budget authority in advance of appropriations Acts in the amounts provided under subsection (d)(1) and represents the obligation of the Federal Government to provide for the payment of amounts for compensation under this title [Title IV of this note] subject to the limitations under subsection (d).

"(c) **Additional funding.**--

"(1) **In general.**--The Attorney General is authorized to accept such amounts as may be contributed by individuals, business concerns, or other entities to carry out this title [Title IV of this note], under such terms and conditions as the Attorney General may impose.

"(2) **Use of separate account.**--In making payments under this section, amounts contained in any account containing funds provided under paragraph (1) shall be used prior to using appropriated amounts.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Excerpt from original document pages 23-32*

Westlaw.

49 U.S.C.A. § 40101

**''(d) Limitations.--**

**''(1) Group A Claims.—**

**''(A) In general.**--The total amount of Federal funds paid for compensation under this title [Title IV of this note], with respect to claims in Group A as described in section 405(a)(3)(C)(ii), shall not exceed $2,775,000,000.filed on or after the date on which the regulations are updated under section 407(b) [this note], shall not exceed $2,775,000,000. Of such amounts, not to exceed $875,000,000 shall be available to pay such claims during the 5-year period beginning on such date.

**''(B) Remainder of Claim Amounts.--** In the case of a claim in Group A as described in section 405(a)(3)(C)(ii) and for which the Special Master has ratably reduced the amount of compensation for such claim pursuant to paragraph (2) of this subsection, as this subsection was in effect on the day before the date of enactment of the James Zadroga 9/11 Health and Compensation Fund Reauthorization Act, the Special Master shall, as soon as practicable after the date of enactment of such Act, authorize payment of the amount of compensation that is equal to the difference between—

**''(i)** the amount of compensation that the claimant would have been paid under this title for such claim without regard to the limitation under the second sentence of paragraph (1) of this subsection, as this subsection was in effect on the day before the date of enactment of the James Zadroga 9/11 Health and Compensation Fund Reauthorization Act; and

**''(ii)** the amount of compensation the claimant was paid under this title for such claim prior to the date of enactment of such Act.

**''(2) Group B Claims.—**

**''(A) In General.--** The total amount of Federal funds paid for compensation under this title, with respect to claims in Group B as described in section 405(a)(3)(C)(iii), shall not exceed the amount of funds deposited into the Victims Compensation Fund under section 410.

**''(B) Payment System.--** The Special Master shall establish a system for providing compensation for claims in Group B as described in section 405(a)(3)(C)(iii) in accordance with this subsection and section 405(b)(7).

**''(C) Development of Agency Policies and Procedures.—**

**''(i) Development.—**

**''(I) IN GENERAL.--** Not later than 30 days after the date of enactment of the James Zadroga 9/11 Health and Compensation Fund Reauthorization Act, the Special Master shall develop agency policies and procedures that meet the requirements under subclauses (II) and (III) for providing compensation for claims in Group B as described in section 405(a)(3)(C)(iii), including policies and procedures for presumptive award schedules, administrative expenses, and related internal memoranda.

**''(II) LIMITATION.--** The policies and procedures developed under subclause (I) shall ensure that total expenditures, including administrative expenses, in providing compensation for claims in Group B, as described in section 405(a)(3)(C)(iii), do not exceed the amount of funds deposited into the Victims Compensation Fund under section 410.

**''(III) PRIORITIZATION.--** The policies and procedures developed under subclause (I) shall prioritize claims for claimants who are determined by the Special Master as suffering from the most debilitating

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Excerpt from original document pages 23-32*

Westlaw.

49 U.S.C.A. § 40101

physical conditions to ensure, for purposes of equity, that such claimants are not unduly burdened by such policies or procedures.

"**(i)** REASSESSMENT.— Beginning 1 year after the date of enactment of the James Zadroga 9/11 Health and Compensation Fund Reauthorization Act, and each year thereafter until the Victims Compensation Fund is permanently closed under section 410(e), the Special Master shall conduct a reassessment of the agency policies and procedures developed under clause (i) to ensure that such policies and procedures continue to satisfy the requirements under subclauses (II) and (III) of such clause. If the Special Master determines, upon reassessment, that such agency policies or procedures do not achieve the requirements of such subclauses, the Special Master shall take additional actions or make such modifications as necessary to achieve such requirements.

"**(2) Pro-ration and payment of remaining claims.**--

"**(A) In general.**--The Special Master shall ratably reduce the amount of compensation due claimants under this title [Title IV of this note] in a manner to ensure, to the extent possible, that--

"**(i)** all claimants who, before application of the limitation under the second sentence of paragraph (1), would have been determined to be entitled to a payment under this title [Title IV of this note] during such 5-year period, receive a payment during such period; and

"**(ii)** the total amount of all such payments made during such 5-year period do not exceed the amount available under the second sentence of paragraph (1) to pay claims during such period.

"**(B) Payment of remainder of claim amounts.**--In any case in which the amount of a claim is ratably reduced pursuant to subparagraph (A), on or after the first day after the 5-year period described in paragraph (1), but in no event later than 1 year after such 5-year period, the Special Master shall pay to the claimant the amount that is equal to the difference between--

"**(i)** the amount that the claimant would have been paid under this title [Title IV of this note] during such period without regard to the limitation under the second sentence of paragraph (1) applicable to such period; and

"**(ii)** the amount the claimant was paid under this title [Title IV of this note] during such period.

"**(C) Termination.**--Upon completion of all payments pursuant to this subsection, the Victim's Compensation Fund shall be permanently closed.

"**(e) Attorney fees.**--

"**(1) In general.**--Notwithstanding any contract, the representative of an individual may not charge, for services rendered in connection with the claim of an individual under this title [Title IV of this note], more than 10 percent of an award made under this title [Title IV of this note] on such claim.

"**(2) Limitation.**--

"**(A) In general.**--Except as provided in subparagraph (B), in the case of an individual who was charged a legal fee in connection with the settlement of a civil action described in section 405(c)(3)(C)(iii) [this note], the representative of the individual may not charge any amount for compensation for services rendered in connection with a claim filed under this title [Title IV of this note].

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Excerpt from original document pages 23-32*

10

Westlaw.

49 U.S.C.A. § 40101

**"(B) Exception.**--If the legal fee charged in connection with the settlement of a civil action described in section 405(c)(3)(C)(iii) [this note] of an individual is less than 10 percent of the aggregate amount of compensation awarded to such individual through such settlement, the representative of such individual may charge an amount for compensation for services rendered to the extent that such amount charged is not more than--

**"(i)** 10 percent of such aggregate amount through the settlement, minus

**"(ii)** the total amount of all legal fees charged for services rendered in connection with such settlement.

**"(3) Discretion to lower fee.**--In the event that the special master finds that the fee limit set by paragraph (1) or (2) provides excessive compensation for services rendered in connection with such claim, the Special Master may, in the discretion of the Special Master, award as reasonable compensation for services rendered an amount lesser than that permitted for in paragraph (1).

**"Sec. 407. Regulations.**

**"(a) In general.**--Not later than 90 days after the date of enactment of this Act [Sept. 22, 2001], the Attorney General, in consultation with the Special Master, shall promulgate regulations to carry out this title [Title IV of this note], including regulations with respect to--

**"(1)** forms to be used in submitting claims under this title [Title IV of this note];

**"(2)** the information to be included in such forms;

**"(3)** procedures for hearing and the presentation of evidence;

**"(4)** procedures to assist an individual in filing and pursuing claims under this title [Title IV of this note]; and

**"(5)** other matters determined appropriate by the Attorney General.

**"(b) Updated regulations.—__**

**"(1) James Zadroga 9/11 Health and Compensation Act of 2010--**Not later than 180 days after the date of the enactment of the James Zadroga 9/11 Health and Compensation Act of 2010 [Jan. 2, 2011], the Special Master shall update the regulations promulgated under subsection (a) to the extent necessary to comply with the provisions of title II of such Act [Pub.L. 111-347, Title II, § 201 et seq., Jan. 2, 2011, 124 Stat. 3659, amending provisions set out in a note under this section].

**"(2) James Zadroga 9/11 Victim Compensation Fund Reauthorization Act.--** Not later than 180 days after the date of enactment of the James Zadroga 9/11 Victim Compensation Fund Reauthorization Act, the Special Master shall update the regulations promulgated under subsection (a), and updated under paragraph (1), to the extent necessary to comply with the amendments made by such Act.

**"Sec. 408. Limitation on liability.**

**"(a) In general.--**

**"(1) Liability limited to insurance coverage.**--Notwithstanding any other provision of law, liability for all claims, whether for compensatory or punitive damages or for contribution or indemnity, arising from the terrorist-related aircraft crashes

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Excerpt from original document pages 23-32*

Westlaw.

49 U.S.C.A. § 40101

of September 11, 2001, against an air carrier, aircraft manufacturer, airport sponsor, or person with a property interest in the World Trade Center, on September 11, 2001, whether fee simple, leasehold or easement, direct or indirect, or their directors, officers, employees, or agents, shall not be in an amount greater than the limits of liability insurance coverage maintained by that air carrier, aircraft manufacturer, airport sponsor, or person.

"(2) **Willful defaults on rebuilding obligation.**--Paragraph (1) does not apply to any such person with a property interest in the World Trade Center if the Attorney General determines, after notice and an opportunity for a hearing on the record, that the person has defaulted willfully on a contractual obligation to rebuild, or assist in the rebuilding of, the World Trade Center.

"(3) **Limitations on liability for New York City.**--Liability for all claims, whether for compensatory or punitive damages or for contribution or indemnity arising from the terrorist-related aircraft crashes of September 11, 2001, against the City of New York shall not exceed the greater of the city's insurance coverage or $350,000,000. If a claimant who is eligible to seek compensation under section 405 of this Act [section 405 of this note], submits a claim under section 405 [of this note], the claimant waives the right to file a civil action (or to be a party to an action) in any Federal or State court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001, including any such action against the City of New York. The preceding sentence does not apply to a civil action to recover collateral source obligations.

"(4) **Liability for certain claims.**--Notwithstanding any other provision of law, liability for all claims and actions (including claims or actions that have been previously resolved, that are currently pending, and that may be filed) for compensatory damages, contribution or indemnity, or any other form or type of relief, arising from or related to debris removal, against the City of New York, any entity (including the Port Authority of New York and New Jersey) with a property interest in the World Trade Center on September 11, 2001 (whether fee simple, leasehold or easement, or direct or indirect) and any contractors and subcontractors, shall not be in an amount that exceeds the sum of the following, as may be applicable:

"(A) The amount of funds of the WTC Captive Insurance Company, including the cumulative interest.

"(B) The amount of all available insurance identified in schedule 2 of the WTC Captive Insurance Company insurance policy.

"(C) As it relates to the limitation of liability of the City of New York, the amount that is the greater of the City of New York's insurance coverage or $350,000,000. In determining the amount of the City's insurance coverage for purposes of the previous sentence, any amount described in subparagraphs (A) and (B) shall not be included.

"(D) As it relates to the limitation of liability of any entity, including the Port Authority of New York and New Jersey, with a property interest in the World Trade Center on September 11, 2001 (whether fee simple, leasehold or easement, or direct or indirect), the amount of all available liability insurance coverage maintained by any such entity.

"(E) As it relates to the limitation of liability of any individual contractor or subcontractor, the amount of all available liability insurance coverage maintained by such contractor or subcontractor on September 11, 2001.

"(5) **Priority of claims payments.**--Payments to plaintiffs who obtain a settlement or judgment with respect to a claim or action to which paragraph (4) applies, shall be paid solely from the following funds in the following order, as may be applicable:

"(A) The funds described in subparagraph (A) or (B) of paragraph (4).

"(B) If there are no funds available as described in subparagraph (A) or (B) of paragraph (4), the funds described in subparagraph (C) of such paragraph.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Excerpt from original document pages 23-32*

Westlaw.

49 U.S.C.A. § 40101

  **"(C)** If there are no funds available as described in subparagraph (A), (B), or (C) of paragraph (4), the funds described in subparagraph (D) of such paragraph.

  **"(D)** If there are no funds available as described in subparagraph (A), (B), (C), or (D) of paragraph (4), the funds described in subparagraph (E) of such paragraph.

  **"(6) Declaratory judgment actions and direct action.**--Any claimant to a claim or action to which paragraph (4) applies may, with respect to such claim or action, either file an action for a declaratory judgment for insurance coverage or bring a direct action against the insurance company involved, except that no such action for declaratory judgment or direct action may be commenced until after the funds available in subparagraph (A), (B), (C), and (D) of paragraph (5) have been exhausted consistent with the order described in such paragraph for payment.

**"(b) Federal cause of action.--**

  **"(1) Availability of action.**--There shall exist a Federal cause of action for damages arising out of the hijacking and subsequent crashes of American Airlines flights 11 and 77, and United Airlines flights 93 and 175, on September 11, 2001. Notwithstanding section 40120(c) of title 49, United States Code [49 U.S.C.A. § 40120(c)], this cause of action shall be the exclusive remedy for damages arising out of the hijacking and subsequent crashes of such flights.

  **"(2) Substantive law.**--The substantive law for decision in any such suit shall be derived from the law, including choice of law principles, of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law.

  **"(3) Jurisdiction.**--The United States District Court for the Southern District of New York shall have original and exclusive jurisdiction over all actions brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001.

  **"(4) Nationwide subpoenas.--**

  **"(A) In general.**--A subpoena requiring the attendance of a witness at trial or a hearing conducted under this section may be served at any place in the United States.

  **"(B) Rule of construction.**--Nothing in this subsection is intended to diminish the authority of a court to quash or modify a subpoena for the reasons provided in clause (i), (iii), or (iv) of subparagraph (A) or subparagraph (B) of rule 45(c)(3) of the Federal Rules of Civil Procedure."

**"(c) Exclusion.**--Nothing in this section shall in any way limit any liability of any person who is a knowing participant in any conspiracy to hijack any aircraft or commit any terrorist act. Subsections (a) and (b) do not apply to civil actions to recover collateral source obligations.

**"Sec. 409. Right of subrogation.**

"The United States shall have the right of subrogation with respect to any claim paid by the United States under this title [Title IV of this note], subject to the limitations described in section 408 [of this note].

**"Sec. 410. VICTIMS COMPENSATION FUND.**

  **''(a)** IN GENERAL.—There is established in the Treasury of the United States a fund to be known as the 'Victims Compensation Fund', consisting of amounts deposited into such fund under subsection (b).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Excerpt from original document pages 23-32*

Westlaw

49 U.S.C.A. § 40101

''**(b)** DEPOSITS INTO FUND.—There shall be deposited into the Victims Compensation Fund each of the following:

''**(1)** Effective on the day after the date on which all claimants who file a claim in Group A, as described in section 405(a)(3)(C)(ii), have received the full compensation due such claimants under this title for such claim, any amounts remaining from the total amount made available under section 406 to compensate claims in Group A as described in section 405(a)(3)(C)(ii).

''**(2)** The amount appropriated under subsection (c).

''**(c)** APPROPRIATIONS.—There is appropriated, out of any money in the Treasury not otherwise appropriated, $4,600,000,000 for fiscal year 2017, to remain available until expended, to provide compensation for claims in Group B as described in section 405(a)(3)(C)(iii).

''**(d)** AVAILABILITY OF FUNDS.—Amounts deposited into the Victims Compensation Fund shall be available, without further appropriation, to the Special Master to provide compensation for claims in Group B as described in section 405(a)(3)(C)(iii).

''**(e)** TERMINATION.—Upon completion of all payments under this title, the Victims Compensation Fund shall be permanently closed.''

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Excerpt from original document pages 23-32*