## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MICHAEL WHITE, on behalf of himself and all others similarly situated, | **:** **Case No. 23-383** |
| | **:** |
| Plaintiff, | **:** **Judge Silfen** |
| | **:** |
| v. | **:** |
| | **:** |
| THE UNITED STATES OF AMERICA, | **:** |
| | **:** |
| Defendant. | **:** |
| | **:** |

## PLAINTIFF MICHAEL WHITE'S BRIEF
## <u>IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>

Jeremy S. Spiegel, Esq.
**LAW OFFICE OF JEREMY SPIEGEL**
1 South Broad Street, Suite 1500
Philadelphia, PA 19107
Tel. (215) 609-3154
Spiegel@JeremySpiegelLaw.com

December 20, 2023            Counsel for Plaintiff Michael White

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES..** ............................................................................................iii

**INTRODUCTION**.............................................................................................. 1

**QUESTIONS PRESENTED** ........................................................................... 6

**STATEMENT OF THE CASE**........................................................................ 6

  I.   NATURE OF THE CASE ......................................................................... 7

  II.  STATEMENT OF FACTS ....................................................................... 7

     A.  Plaintiff Michael White Joins Thousands of First Responders at Ground Zero .............. 7

     B.  History of the Victim Compensation Fund .................................................... 8

        1.  Congress Establishes the VCF in 2001 ............................................ 8

        2.  The Zadroga Act Re-Opens the VCF ............................................. 11

        3.  Congress Reauthorizes the VCF in 2015 and the Government<br>           Amends the VCF Regulations in 2016 ............................................ 14

        4.  Plaintiff Michael White Accepts the Government's Offer<br>           and Enters Into a Binding Agreement With the Government .......................... 17

        5.  The Government Breaches Its Agreement With Michael White ...................... 18

**ARGUMENT**....................................................................................... 19

  I.   THE SUPREME COURT'S DECISION IN FRANCONIA ASSOCS. V. UNITED<br>     STATES CONTROLS THIS CASE AND COMPELS DENIAL OF THE<br>     GOVERNMENT'S RULE 12(B)(1) MOTION ................................................. 19

     A.  Legal Standard......................................................................... 19

     B.  Franconia Establishes That Mr. White's Claims Did Not Accrue<br>        Until July 2017, When the Special Master Refused His Request<br>        to Process His Claim in Accordance With the 2011 Regulations................................ 19

  II.  MR. WHITE HAS PLAUSIBLY ALLEGED A BREACH OF CONTRACT BY<br>     THE GOVERNMENT ................................................................... 25

     A.  Legal Standard......................................................................... 25

B.  Mr. White Has Sufficiently Alleged That the Parties Entered Into an Enforceable Agreement ...................................................................................................... 26

    1.  The Parties' Agreement Includes the VCF Statute, 2011 Regulations, and VCF Documents ............................................................ 26

        a.  The VCF Statute ........................................................................... 27

        b.  The 2011 Regulations .................................................................. 27

        c.  The VCF Documents .................................................................... 29

    2.  The Agreement, as Alleged, Is an Enforceable Settlement of Mr. White's Litigation Claims .................................................... 29

    3.  Defendant's Challenges to the Sufficiency of the Parties' Contract Must Fail in Light of Plaintiff's Well-Pled Allegations ................................... 33

        a.  Mr. White Adequately Alleged a Mutual Intent Between the Parties to Enter Into an Enforceable Agreement ....................................................... 33

        i. The Cases Cited by the Government Concerning "Mutual Intent to Contract" Do Not Support Dismissal ...................... 34

        ii. "Indicia" of Mutual Intent Support the Plausibility of Mr. White's Contract Claims .................................38

        b.  Mr. White Sufficiently Alleges the Offer and Acceptance of the Agreement Terms ....................................................................... 42

        c.  Mr. White Has Plausibly Alleged That the Attorney General, Acting Through the Special Master, Had Authority to Enter Into an Enforceable Agreement With Mr. White ..................................... 44

**CONCLUSION** ........................................................................................................ 46

**REQUEST FOR ORAL ARGUMENT** ................................................................ 46

## **TABLE OF AUTHORITIES**

### **Cases**

*Am. Bankers Ass'n v. United States,*
   932 F.3d 1375 (Fed. Cir. 2019) ................................................................. 34, 35

*Am. Fed. Bank, FSB v. United States*, 62 Fed. Cl. 185, 194 (2004) ..................................... 33

*Anderson v. United States,*
   344 F.3d 1343 (Fed. Cir. 2003) ......................................................................... 33

*Arakaki v. United States*, 62 Fed. Cl. 244 (2004) ........................................................ 21, 22

*Ariadne Fin. Servs. Pty. v. United States,*
   133 F.3d 874 (Fed. Cir. 1998) ........................................................................ 20, 23

*Baker v. United States,*
   50 Fed. Cl. 483 (2001) ................................................................................ 36, 37

*Boyd v. United States,*
   No. 22-1473, 2023 WL 3118132, (Fed. Cl. Apr. 27, 2023) ............................................ 35

*Brooks v. Dunlop Mfg.,*
   702 F.3d 624 (Fed. Cir. 2012) ............................................................................ 34

*Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) ............................................... 25

*Cooley v. United States*, 76 Fed. Cl. 549 (2007) ........................................................... 25, 26

*Extreme Coatings, Inc. v. United States*, 109 Fed. Cl. 450 (2013) ........................................ 25

*Fifth Third Bank of W. Ohio v. United States,*
   402 F.3d 1221 (Fed. Cir. 2005) ........................................................................... 34

*First Commerce Corp. v. United States*, 335 F.3d 1373 (Fed. Cir. 2003) ............................. 40

*Flint v. United States*, 162 Fed. Cl. 91 (2022) ........................................................... 36

*Franconia Assocs. v. United States*, 536 U.S. 129 (2002) ............................................... *passim*

*Franconia Assocs. v. United States*, 240 F.3d 1358 (Fed. Cir. 2001) ................................... 20

*Franconia Assocs. v. United States*, 43 Fed. Cl. 702 (1999). ................................................ 20

*Gilead Sciences, Inc. v. United States*, 151 Fed. Cl. 742 (2020) ............................................ 19

*H. Landau & Co. v. United States,* 886 F.2d 322 (Fed. Cir. 1989) ...................................... 45

*Halbach v. Markham*, 106 F. Supp. 475, 480 (D.N.J. 1952) .................................................. 45

*Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573 (Fed. Cir. 1988) ............. 20

*Ingham Reg'l Med. Ctr. v. United States*, 874 F.3d 1341 (Fed. Cir. 2017) .................... 32, 41

*Ingham Reg'l Med. Ctr. v. United States*, 126 Fed. Cl. 1 (2016) ............................ 26, 32, 43

*LaBatte v. United States*, 899 F.3d 1373 (Fed. Cir. 2018) ........................................ 31, 32, 41

*LaBatte v. United States*, No. 16-cv-798 (Fed. Cl.) ................................................................ 31

*Last Chance Mining Co. v. United States,*
     12 Cl. Ct. 551 (1987) ................................................................................................ 37, 38

*Peterson Indus. Depot, Inc. v. United States*, 140 Fed. Cl. 1 (2018) .................................... 22

*Ridenour v. United States*, 44 Fed. Cl. 202, 209-10 (1991) ............................................ 24, 44

*Roy v. United States*, 38 Fed. Cl. 184 (June 9, 1997) ............................................................ 45

*Sebastian v. United States*, 185 F.3d 1368 (Fed. Cir. 1999) ................................................. 31

*SGS-92-X003 v. United States*, 74 Fed. Cl. 637 (2007) ........................................................ 45

*Shane v. United States,*
     161 F.3d 723 (Fed. Cir. 1998) ......................................................................................... 23

*Trauma Servs. Grp. v. United States*, 104 F.3d 1321 (Fed. Cir. 1997) ........................... 20, 44

*Trusted Integration v. United States*, 659 F.3d 1159 (Fed. Cir. 2011) ................................. 19

*Turping v. United States,*
     913 F.3d 1060 (Fed. Cir. 2019) ....................................................................................... 22

*United States v. Winstar Corp.,*
     518 U.S. 839 (1996) ....................................................................................... 23, 39, 40

*VanDesande v. United States*, 673 F.3d 1342 (Fed. Cir. 2012) ............................................ 30

*Wheeler v. United States*, 167 Fed. Cl. 345 (2023) ............................................................... 19

**Statutes**

Air Transportation Safety and System Stabilization Act,
   Pub. L. No. 107-42, 115 Stat. 230 (2001)................................................................. 8, 9, 10
James Zadroga 9/11 Health and Compensation Act of 2010,
   Pub. L. No. 111-347, 124 Stat. 3623, 3659 (2011)................................................... 11, 12
James Zadroga 9/11 Health and Compensation Reauthorization Act,
   Pub. L. No. 114-113, 129 Stat. 2242, 3000 (2015).................................................. 14, 15
49 U.S.C. 40101 note................................................................................................... 8, 27
28 U.S.C. § 2501........................................................................................................ 19, 20, 21

**Regulations**

28 C.F.R. § 104.6. ................................................................................................... *passim*
28 C.F.R. § 104.21. ................................................................................................... 10, 11
28 C.F.R. § 104.22. ................................................................................................... *passim*
28 C.F.R. § 104.41. ................................................................................................ 14,16, 28, 42
28 C.F.R. § 104.42. ................................................................................................ 28, 42
28 C.F.R. § 104.43. ................................................................................................ 14, 16, 28, 42
28 C.F.R. § 104.44. ................................................................................................ 28, 42
28 C.F.R. § 104.45. ................................................................................................ 28, 42
28 C.F.R. § 104.46. ................................................................................................ 15, 28, 42, 43
28 C.F.R. § 104.51. ................................................................................................ 16
28 C.F.R. § 104.61. ................................................................................................ 28

**Other Authorities**

"A Proclamation on Patriot Day and National Day of Service and Remembrance, 2023."
   President Joseph R. Biden................................................................................................. 1

EPA's Response to the World Trade Center Collapse:
   Challenges, Successes, and Areas for Improvement. ........................................ 2, 9, 10, 11

Testimony of Kenneth Feinberg, Paying With Their Lives:
   The Status of Compensation for 9/11 Health Effects,
   Joint Hearing Before the Subcommittee on Immigration,
   Citizenship, Refugees, Border Security, and International Law
   and the Subcommittee on the Constitution, Civil Rights, and Civil Liberties
   of the Committee on the Judiciary, House Of Representatives, April 1, 2008........... 30, 31

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

MICHAEL WHITE, on behalf of himself and    **:**
all others similarly situated,                         **:**    **Case No. 23-383**
                                                                    **:**
                             Plaintiff,                   **:**    **Judge Silfen**
                                                                    **:**
        v.                                                    **:**
                                                                    **:**
THE UNITED STATES OF AMERICA,          **:**
                                                                    **:**
                             Defendant.                 **:**
                                                                    **:**

**PLAINTIFF MICHAEL WHITE'S BRIEF**
**IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

        Plaintiff Michael White, through his undersigned counsel, requests that the Court deny

the Defendant's motion to dismiss his amended complaint pursuant to R.C.F.C. 12(b)(1) and

12(b)(6). As set forth herein, the Court should deny the Defendant's motion because Mr. White's

complaint was timely filed and because he has stated a claim for the existence of an enforceable

contract between himself and the United States of America (the "Government").

## **INTRODUCTION**

        This case concerns a breach of contract committed by the United States Government

against a group that it routinely holds up as "heroes": the 9/11 search and rescue workers who

"returned to the twisted steel and broken concrete slabs of Ground Zero and the Pentagon for

months — breathing in toxins and ash that would damage their own health but nonetheless

refusing to stop searching through the destruction."[1]

---

[1] *See* President Joseph R. Biden, "A Proclamation on Patriot Day and National Day of Service
and Remembrance, 2023."

1

Plaintiff Michael White traveled Ground Zero after the 9/11 terrorist attacks. A former Navy submariner and Philadelphia firefighter, Mr. White worked the pile for days, digging through wreckage without proper protective equipment. Mr. White and thousands of others received false assurances from the federal government that the air at Ground Zero was "safe to breathe."[2]

Following his time at Ground Zero, Mr. White developed severe respiratory issues and other debilitating conditions. He suffers from obstructive chronic bronchitis, chronic rhinitis, nodules on his vocal cords, esophageal reflux, and laryngeal spasm. Mr. White has been hospitalized on multiple occasions and requires regular respiratory therapy as a result of these conditions. His quality of life has dramatically worsened.

Seeking compensation for their injuries, Mr. White and thousands of other Ground Zero workers elected to participate in the 9/11 Victim Compensation Fund (VCF) upon its re-opening in 2011 (through the Zadroga Act). At that time, the Government made prospective claimants an offer: Those individuals could agree to waive their right to bring civil lawsuits for damages associated with 9/11 – including actions against the United States; in return, they could participate in the VCF claims process pursuant to the VCF regulations then in place. Mr. White accepted this offer and filed a VCF claim – releasing any civil claims for 9/11-related damages. Accordingly, the Government promised that he was "entitled to have [his] claims processed in accordance with the provisions that were in effect at the time that [his] claims were submitted."

---

[2] *See* EPA's Response to the World Trade Center Collapse: Challenges, Successes, and Areas for Improvement https://www.epa.gov/sites/default/files/2015-12/documents/wtc_report_20030821.pdf ("EPA Report") ("EPA's early public statements following the collapse of the WTC towers reassured the public regarding the safety of the air outside the Ground Zero area.").

28 C.F.R. § 104.6 (2011). This agreement constituted an enforceable contract between the Government and Mr. White.

Between 2011 and 2015, thousands of others accepted the Government's offer and filed claims with the VCF. The VCF regulations in effect (the "2011 Regulations"), promulgated pursuant to the Zadroga Act, placed no limit on the compensation available for claimant pain and suffering. The 2011 Regulations imposed a limit of approximately $368,000 for determining the loss of employment earnings incurred by claimants. The 2011 Regulations established minimum compensation amounts for deceased victims. And the Government provided for a minimum award of $10,000 to all eligible claimants.

The pace of VCF claim resolution was excruciatingly slow. In addition, by 2015 it became clear that first responders and rescue workers were continuing to fall ill from the effects of their exposure to the terrorist attack areas, and that the funding authorized for the VCF was inadequate. Thus, in late 2015, Congress voted to reauthorize the VCF.

In doing so, the Government made changes to the VCF program. These changes resulted in amendments to the VCF regulations (the "Amended Regulations"). The Amended Regulations established a "Group B" that comprised all VCF claimants whose final awards had not been mailed as of December 2015. Group B thus included thousands of claimants, like Mr. White, who had filed their VCF claims (and waived their civil claims) long before the Zadroga Act Reauthorization. These claimants had contracted for the opportunity to have their claims adjudicated pursuant to the 2011 Regulations.

The Government imposed a series of limitations on Group B awards. Most relevant to this action, the Amended Regulations limited the pain and suffering ("non-economic") damages for Group B non-cancer claimants to $90,000. The Amended Regulations also imposed a

maximum gross income of $200,000 for purposes of Group B economic loss calculations. And, as part of the Amended Regulations, the Government eliminated the $10,000 minimum award as well as minimum compensation amounts for deceased victims.

In 2017, the Government issued Mr. White an award letter stating that he was entitled to a $90,000 non-economic award – *the maximum available for a non-cancer claimant under the Amended Regulations*. Mr. White appealed this award, consistent with the parties' agreement, electing to pursue additional non-economic compensation available under the 2011 Regulations. After an appeal hearing, the Government refused to apply the 2011 Regulations to Mr. White's claim. The Government instead reiterated, contrary to the parties' agreement, that Mr. White was only entitled to an award calculated pursuant to the Amended Regulations. This constituted a breach of Mr. White's agreement with the Government.

Mr. White brings this action to obtain justice for himself and the thousands of other 9/11 rescue workers whom the Government has wronged by refusing to honor the clear terms of their agreement.

In response, the Government seeks to dismiss Mr. White's complaint on two bases, both of which fail. The Government's first argument is that Mr. White's claim accrued when the Government reauthorized the Zadroga Act in 2015, that Mr. White's 2023 complaint is untimely, and therefore the Court lacks jurisdiction. To make this argument, the Government ignores the language of the parties' agreement and the relevant case law. Under the governing law of *Franconia Assocs. v. United States*, 536 U.S. 129 (2002), Mr. White's action is timely and the Court possesses jurisdiction.

Pursuant to the parties' agreement, Mr. White had to notify the Government that he desired application of the 2011 Regulations. He did so in his January 2017 appeal. The

Government then denied his request – and breached the parties' agreement – in July 2017. Only then did Mr. White's claim accrue. As *Franconia* makes clear, the Government's intervening legislation and regulatory amendments were at most repudiations that had not ripened into a breach.

The Government also argues that Mr. White has failed to plausibly allege a claim for a breach of contract. The Government asserts that Mr. White has not identified a "mutual intent" to form a contract; that Mr. White has not sufficiently alleged an offer or acceptance of the contract terms; and that the Government – through the Special Master – lacked "actual authority" to form a contract with claimant. Accordingly, the Government requests dismissal pursuant to R.C.F.C. 12(b)(6).

This argument fails as well. Mr. White has plausibly alleged that he entered into a contract with the Government. The parties' agreement is, at its core, something that the Government undertakes on a regular basis: a settlement of civil litigation. Here, Mr. White released civil claims against the Government and others, thereby providing the Government with meaningful consideration. In exchange, the Government promised that Mr. White could participate in the VCF in accordance with the regulations then in place. That is, the Government indemnified Mr. White against any future detrimental change to the VCF regulations in order to secure his waiver of civil claims. These elements distinguish Mr. White's action from those cases cited by the Government for the proposition that mutual intent is lacking.

The Government's arguments with respect to the parties' "offer" and "acceptance," and the Government's "actual authority" to enter into an agreement with Mr. White, also fail. The Government's offer – an exchange of future civil claims for VCF participation under certain terms – is found in the statute, regulations, and VCF documents provided to Mr. White and other

claimants. There was no ambiguity as to the terms proposed. Further, Mr. White's acceptance

was unambiguous, as he signed documents acknowledging his waiver of related civil claims. The

Government reaffirmed the offer and acceptance in a letter confirming the filing of Mr. White's

VCF claim. Accordingly, Mr. White's pleading is sufficient with regard to the offer and

acceptance of the parties' agreement.

Finally, the Government suggests that Mr. White should have known better than to trust

in the authority of the Special Master. Over 20 years after the Government falsely assured 9/11

workers that the air at Ground Zero was safe to breathe, the Government now takes the position

that it should escape liability – to those same workers – because the VCF Special Master did not

have authority to enter agreements with VCF claimants. As set forth below, the Attorney General,

acting through the Special Master, had ample authority to enter the agreement with Mr. White

described above. Accordingly, Mr. White has sufficiently pled a claim for breach of contract

against the Government. The Court should deny the Government's motion and permit Mr. White

to proceed to discovery and trial.

## QUESTIONS PRESENTED

1.    Whether Mr. White's claim for breach of contract is timely filed where, pursuant

to *Franconia*, his claim for breach did not accrue until the Government failed to perform, and he

filed his claim within six years of the Government's breach.

2.    Whether Mr. White plausibly alleges the existence of an express or implied

contract with the Government in which he waived 9/11-related civil litigation claims in exchange

for the ability to participate in the VCF and have his claim processed in accordance with the

regulations in place at the time of his claim filing.

<u>**STATEMENT OF THE CASE**</u>

**I.      <u>Nature of the Case</u>**

This case concerns allegations that the Government breached an express or implied contract with Mr. White by refusing to determine Mr. White's VCF compensation in accordance with the 2011 Regulations, thereby reducing his award.

**II.     <u>Statement of Facts</u>**

      **A.  Plaintiff Michael White Joins Thousands of First Responders at Ground Zero**

On September 11, 2001, the United States suffered a devastating terrorist attack. First responders raced to the scene of the World Trade Center, with additional workers pouring in during the ensuing days for rescue and recovery efforts. Plaintiff Michael White is one of those workers. Amended Complaint ("Am. Compl.") at ¶ 16. On September 13, 2001, Mr. White – a former Navy submariner and Philadelphia firefighter – drove up I-95 to Lower Manhattan, so that he could work on the pile together with thousands other selfless individuals hoping to rescue victims trapped beneath the rubble. *Id.* Like many others, Plaintiff continued working at Ground Zero for approximately six days, around the clock, without proper protective equipment. *Id.* at ¶ 17.

In the ensuing years, Mr. White developed serious breathing issues and other health complications. Mr. White has been hospitalized numerous times resulting from the respiratory damage he sustained at Ground Zero. He struggles to breathe each day. His quality of life has dramatically worsened as a result of his efforts following the 9/11 terrorist attacks. *Id.* at ¶ 18. Faced with these life-altering conditions, and seeking compensation for his injuries, Mr. White entered into an agreement with the United States government to participate in the 9/11 Victim Compensation Fund. *Id.* at ¶ 66.

### B.  History of the Victim Compensation Fund

#### 1.  Congress Establishes the VCF in 2001

The United States Government created the 9/11 Victim Compensation Fund ("VCF") in September 2001, immediately after the 9/11 terrorist attacks. The VCF served two principal objectives: 1) to distribute funds to 9/11 victims efficiently and without requiring proof of loss causation, and 2) to prevent victims' legal claims from inundating U.S. courts and generating enormous liabilities for potential defendants. *Id.* at ¶ 2.

To accomplish these objectives, the Government conceived of the VCF as a contractual offering: If an individual waived their right to bring a civil action concerning damages sustained related to the 9/11 attacks, including any claims against the United States, the Government would – in exchange – include that person in the VCF and award compensation in accordance with the regulations and loss calculation methodology in effect at the time of waiver. *Id.* at ¶¶ 3, 24.

The terms of the agreement between VCF claimants and the government were set out in the authorizing statute and the associated regulations. *Id.* at ¶ 100. *See* Air Transportation Safety and System Stabilization Act (ATSSSA), Pub. L. No. 107-42, 115 Stat. 230, 237 (2001).[3] The VCF statute provided that the Attorney General would administer the VCF through a Special Master. ATSSSA at § 404(a). The Attorney General, through the Special Master, was tasked with promulgating regulations with respect to the VCF and employing personnel to operate the VCF. *Id.* at § 404(a)(2)-(3).

Persons eligible for the VCF included anyone present "at the World Trade Center, (New York, New York), the Pentagon (Arlington, Virginia), or the site of the aircraft crash at

---

[3] The VCF statutory provisions, including those found in the ATSSSA, are codified at 49 U.S.C. 40101 note.

Shanksville, Pennsylvania at the time, or in the immediate aftermath, of the terrorist-related aircraft crashes of September 11, 2001" and who "suffered physical harm or death as a result of such an air crash[.]" *Id.* at § 405(c)(2)(A).

For eligible individuals, the Special Master was to determine the "extent of the harm to the claimant, including any economic and noneconomic losses," as well as "the amount of compensation to which the claimant is entitled . . . ." *Id.* at § 405(b)(1)(B). In making this determination, "the Special Master shall not consider negligence or any other theory of liability." *Id.* at § 405(b)(2).

The legislation established that each claimant would provide consideration in exchange for engagement with the VCF. Under Section 405, captioned "Determination of Eligibility for Compensation," the VCF statute stated: "Upon the submission of a claim under this title, the claimant waives the right to file a civil action (or to be a party to an action) in any Federal or State court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001." *Id.* at § 405(c)(3)(B)(1).

The VCF statute defined two components of losses sustained by 9/11 victims. "Economic Loss" comprised "any pecuniary loss resulting from harm (including the loss of earnings or other benefits related to employment, medical expense loss, replacement services loss, loss due to death, burial costs, and loss of business or employment opportunities)[.]" *Id.* at § 402(5). "Noneconomic losses" comprised "losses for physical and emotional pain, suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of enjoyment of life, loss of society and companionship, loss of consortium (other than loss of domestic service), hedonic damages, injury to reputation, and all other nonpecuniary losses of any kind or nature." *Id.* at § 402(7).

The statute further required the Special Master to develop a claim form for claimants to file. *Id.* at § 405(a)(2). The original VCF statute required that all claims were to be filed within two years of the promulgation of the VCF regulations. *Id.* at § 405(a)(3).

On December 21, 2001, the Attorney General, through the Special Master, promulgated an interim final rule with respect to the VCF. Am. Compl. at ¶ 30. The newly-appointed Special Master, Kenneth Feinberg, submitted a statement together with the regulations. *Id.* The Special Master explained how the regulations clarified the terms of the agreement between the Government and each claimant:

> The first objective is that the process should be efficient, straightforward, and understandable to the claimants. . . . **More important, however, is that claimants be able to enter the program—or choose not to enter the program—with an understanding of how their claims will be treated. This is especially important because the Act provides that, upon submission of a claim, a claimant waives the right to file a civil action for damages sustained as a result of the September 11 attacks. For claimants to make an informed decision regarding this waiver, they should have some understanding of how their award will be calculated and how much they would receive from the Fund should they decide to file a claim**.

*Id.* at ¶ 30 (Emphasis added) (quoting 28 C.F.R. Part 104, Interim Final Rule With Request for Comments) (Dec. 21, 2001).

Consistent with that objective, the 2001 Final Rule established that: **"In the event that amendments are subsequently made to any section of this Part, claimants are entitled to have their claims processed in accordance with the provisions that were in effect at the time that their claims were submitted** under § 104.21(d)." 28 C.F.R. § 104.6 (2001) (Emphasis added).

The referenced regulation, § 104.21(d), reiterated that a VCF claimant waives any right to file a 9/11-related civil action upon submission of a claim, and establishes that "a claim shall be deemed submitted" for that purpose "when the claim is deemed filed pursuant to § 104.21[.]" *Id.*

at § 104.21(d). Section 104.21, in turn, established that a claim is deemed filed "when a Claims Evaluator determines that [two forms are] substantially complete." In sum, the Final Rule established that, upon submission of a filed claim, the VCF participant waives their right to bring a 9/11-related civil action and, in exchange, the claimant is entitled to have their VCF claim processed in accordance with the provisions that were in effect on that date.

The Final Rule also addressed compensation under the VCF. For example, the regulations established that "the presumed noneconomic losses for decedents shall be $250,000 plus an additional $50,000 for the spouse and each dependent of the deceased victim." *Id.* at § 104.44. The regulations stated that "the presumed noneconomic losses for claimants who suffered physical harm (but did not die) by relying upon the noneconomic losses described in § 104.44 and adjusting the losses based upon the extent of the victim's physical harm." The regulations identified no limit on compensation under the VCF. *See generally*, 28 C.F.R. Part 104 (2001).

The VCF was initially open for approximately two years, closing in December 2003. From 2001 to 2003, the Government issued compensation of over $7 billion to over 5,500 claimants. Am. Compl. ¶ 32.

## 2. The Zadroga Act Re-Opens the VCF

In subsequent years, it became clear that the physical harm of 9/11 extended to first responders, rescue workers, and others who spent time in the areas of the terrorist attacks. *Id.* at ¶ 33. Recognizing this fact, Congress passed the James Zadroga 9/11 Health and Compensation Act of 2010, Pub. L. No. 111-347, 124 Stat. 3623, 3659 (2011) (Zadroga Act). *Id.* at ¶ 34. The Zadroga Act, among other things, restarted the VCF and expanded eligibility to first responders, rescue workers, and others who had been in the areas of the terrorist attacks in the months that followed 9/11. *Id.*

The Zadroga Act made slight modifications to the original VCF statute, while maintaining the VCF as a contract-based program. Under the Zadroga Act, the VCF was to re-open for an additional five years of claims in order to distribute up to $2.775 billion in additional compensation. Zadroga Act at § 205. The Zadroga Act expanded the definition of "crash site" to include the "area contiguous to a site of such crashes that the Special Master determines was sufficiently close to the site that there was a demonstrable risk of physical harm resulting from the impact of the aircraft or any subsequent fire, explosions, or building collapses . . . and any area related to, or along, routes of debris removal, such as barges and Fresh Kills." *Id.* at § 201. The Zadroga Act also clarified that VCF claimants must have spent time in the crash site between September 11, 2001 and May 30, 2002 to be eligible. *Id.*

Pursuant to the Zadroga Act, the Special Master updated the 2001 VCF regulations to reflect changes implemented through the new legislation. The Special Master updated the applicable regulations so that the VCF would be, in her words, "fair, transparent, and easy to navigate." Am. Compl. at ¶ 37 (quoting 28 C.F.R. Part 104, James Zadroga 9/11 Health and Compensation Act of 2010, Final Rule) (Aug. 31, 2011). In the Final Rule implementing these updated regulations, echoing the original Special Master's comments, the new Special Master wrote that she "agrees that making public as much information as possible concerning the Fund's valuation methodologies will assist claimants in deciding whether to file with the Fund or pursue other forms of relief." *Id.* at "Other Comments."[4]

The VCF remained contract-based following enactment of the Zadroga Act. Claimants would have to waive their ability to bring related civil actions in order to receive a VCF award. Prospective claimants with lawsuits pending at the time of Zadroga Act enactment also were

---

[4] The Final Rule implementing the 2011 Regulations is Ex. 1 to Mr. White's Complaint.

required to withdraw their suits prior to moving forward with a VCF claim. In return, the Government promised claimants that their claims would be processed pursuant to the regulations in place at the time their waiver became effective. Am. Compl. at ¶¶ 38-40.

Specifically, at 28 C.F.R. §104.6 of the 2011 Regulations, titled "Amendments to this part," the Government promised: "**Claimants are entitled to have their claims processed in accordance with the provisions of this Part that were in effect at the time that their claims were submitted**. All claims will be processed in accordance with the current provisions of this Part, unless the claimant has notified the Special Master that he or she has elected to have the claim resolved under the regulations that were in effect at the time that the claim was submitted under § 104.22(d)." Thus, claimants were guaranteed that they could elect to proceed under the then-existing regulations in the event of a future amendment to VCF regulations. *Id.* at ¶ 40 (Emphasis added).

As with the original VCF regulations, the 2011 Regulations specified that the waiver of civil claims was effectuated by the submission of a filed claim.[5] *Id.* at ¶ 38. In turn, the date of claim filing fixed the applicable date should the claimant elect to apply prior regulatory provisions pursuant to § 104.6. *See* 2011 Regulations at § 104.22, § 104.6.

The VCF retained a compensation structure comprising economic and non-economic losses. The 2011 Regulations included a presumed non-economic loss for decedents of $250,000 plus an additional $100,000 for the spouse and each dependent of the deceased victim. For living claimants who had suffered physical harm, presumed non-economic losses would be calculated through adjustment from the presumed non-economic losses for decedents. *Id.* at ¶¶ 41-43.

---

[5] The 2011 Regulations also required that the "Special Master shall take appropriate steps to inform potential claimants" of this waiver. *Id.* at 104.61(a).

Again, the updated regulations identified no limit on compensation under the VCF. *See generally* 2011 Regulations.

For economic losses suffered by decedents, the Special Master was to create a methodology and schedules, tables, or charts identifying "presumed determinations of loss of earnings or other benefits related to employment for annual incomes up to but not beyond the 98th percentile of individual income in the United States for the year preceding the year of death." Am. Compl. at ¶ 45; 2011 Regulations at § 104.43. The 98th percentile of income for 2011 was approximately $368,000. Am. Compl. at ¶ 45. This approach was also used to determine economic losses for living claimants. Am. Compl. at ¶ 45; 2011 Regulations at § 104.45. In addition, the 2011 Regulations mandated a minimum award of $300,000 - $500,000 for deceased claimants (before offsets). *See* 2011 Regulations at § 104.41.

### 3. Congress Reauthorizes the VCF in 2015 and the Government Amends the VCF Regulations in 2016

The re-opened VCF commenced operation in 2011. Between that time and December 18, 2015, over 20,000 people sought compensation through the VCF. However, the pace of VCF award issuance was extremely slow. In addition, by 2015 it became clear that first responders and rescue workers were continuing to fall ill from the effects of their exposure to the terrorist attack areas, and that the funding authorized in the Zadroga Act would be inadequate. Am. Compl. at ¶¶ 51-52. On December 18, 2015, President Barack Obama signed into law the James Zadroga 9/11 Health and Compensation Reauthorization Act (the "Reauthorization Act"), Pub. L. No. 114-113, 129 Stat. 2242, 3000 (2015). *Id.* at 54.

The Reauthorization Act extended the time period for VCF claim submissions and made available additional funds for compensation. It also divided claimants into two groups (Group A and Group B) depending upon the date by which the VCF mailed a final award to the claimant.

14

With regard to Group B, the Reauthorization Act introduced compensation caps, as well as limits on gross income to be considered for purposes of economic loss calculations. *See* Reauthorization Act at § 402. Following passage of the Zadroga Reauthorization Act, the Special Master made significant amendments to the VCF regulations (the "Amended Regulations") pursuant to the Reauthorization Act. Am. Compl. at ¶ 55.[6]

The Amended Regulations modified the VCF claims and compensation process. The Amended Regulations established two different groups for VCF compensation purposes. *Id.* at ¶ 56. "Group A" comprised VCF claimants to whom "the Special Master postmarks and transmits a final award determination" on or before December 18, 2015. *Id.* "Group B" comprised those VCF claimants excluded from Group A, including thousands of claimants who, prior to December 18, 2015, had waived their rights to bring any related civil action to as part of their agreement with the Government. *Id.* at ¶ 57.

Under the Amended Regulations, compensation calculations for Group A were unchanged. The Government applied the 2011 Regulations protocol: Non-economic and economic loss calculations for living claimants were not subject to a cap, nor were awards prioritized for parties based on their condition. *Id.* at ¶ 58.

Persons placed into Group B, however, faced a different loss calculation methodology under the Amended Regulations. This approach would reduce the compensation awarded to living VCF participants without a cancer diagnosis. *Id.* at ¶ 59. Under the Amended Regulations, Group B was subject to a $90,000 cap on non-economic losses for living claimants without a cancer diagnosis. *Id.* at ¶ 60; *see* Amended Regulations at § 104.46 ("The presumed noneconomic loss for a claim based on any single type of cancer shall not exceed $250,000 and

---

[6] The Final Rule implementing the Amended Regulations is Ex. 2 to Mr. White's Complaint.

the presumed noneconomic loss for a claim based on any single type of noncancer condition shall not exceed $90,000.).

For Group B claimants, the Special Master prioritized "claims for claimants . . . suffering from the most debilitating physical conditions" – thereby *reducing* the compensation available to Group B claimants not suffering from the "most debilitating" conditions. Am. Compl. at ¶ 61; Amended Regulations at § 104.51(e). Further, economic loss calculations for Group B under the Amended Regulations were based on a maximum of $200,000 in gross income. Am. Compl. at ¶62; Amended Regulations at §§ 104.43, 104.44. In addition, as part of the Amended Regulations, the Government "eliminat[ed] the $10,000 minimum award that the Fund issued for Group A claims in the event that collateral offsets exceeded losses," as well as the minimum compensation standard for deceased claimants. *See* 28 C.F.R. Part 104, James Zadroga 9/11 Victim Compensation Fund Reauthorization Act, Interim Final Rule (Jun. 15, 2016) (Summary of Key Statutory Changes); 28 C.F.R. §104.41.

The Amended Regulations also eliminated the provision promising claimants the right to invoke those regulations in place at the time of VCF claim filing. *See id.* at § 104.6. Instead, for persons filing claims in 2016 and beyond, "[a]ll claims will be processed in accordance with the current provisions of this part." *Id.*

The changes to the Group B loss calculation methodology implemented in the Amended Regulations have had a significant negative impact on the awards issued to claimants with non-cancer conditions. Am. Compl. at ¶ 64. According to VCF reports, first responders whose non-cancer claims were calculated under the Amended Regulations methodology (i.e., Group B) received an average award of **$22,000 less** than those whose non-cancer claims were calculated under the 2011 Regulations. *Id.* at ¶ 65.

16

### 4. Plaintiff Michael White Accepts the Government's Offer and Enters Into a Binding Agreement With the Government

In late 2013, Michael White decided to seek compensation from the VCF. To do so, Mr. White submitted a claim form, together with a set of signed "Attestations and Certifications." *Id.* at ¶¶ 66-67. One such attestation was a statement that, by submitting his VCF claim, he was waiving their right to file a civil lawsuit to pursue damages related to the 9/11 terrorist attacks. *See* Am. Compl. Ex. 3. Specifically, Mr. White affirmed:

> I hereby acknowledge that **by submission of a substantially complete Eligibility Form, I am waiving the right to file a lawsuit (or be a party to a lawsuit) in any federal or state court for damages sustained** as a result of the terrorist-related aircraft crashes of September 11, 2001 or for damages arising from or related to debris removal.

*Id.* at ¶ 68. Mr. White's filing of a VCF claim, and release of related civil claims, constituted his acceptance of the Government's offer. *Id.* at ¶ 102. In return, the Government was obligated to process Mr. White's VCF claim in accordance with the regulations then in effect, should he so elect. *Id.* at ¶¶ 97, 101.

The Government reaffirmed the parties' contractual relationship in its letter of September 11, 2014. The Government wrote: "The Claims Evaluator determined that your Eligibility Form was substantially complete on September 11, 2014. As stated in the Regulations and on the Eligibility Form, by filing a substantially complete Eligibility Form, you have waived your right to file or be a party to a September 11th-related lawsuit." *See* Am. Compl. Ex. 4. In addition to referencing the regulations, the Government's letter directed Mr. White to a website containing the VCF statute and 2011 Regulations. *Id.* at ¶ 71.

On January 11, 2017, over three years after Plaintiff submitted his VCF claim, Plaintiff received a loss calculation letter awarding non-economic damages of $90,000. *Id.* at ¶ 72 (Am.

17

Compl. Ex. 5). The letter stated that Plaintiff's claim had been calculated pursuant to the Amended Regulations. *Id.*

### 5. The Government Breaches Its Agreement With Michael White

Mr. White appealed this determination to the Special Master. On appeal, Mr. White requested that the Special Master provide additional non-economic loss compensation to which Plaintiff was entitled pursuant to the claims process provisions in place at the time he submitted his claim – i.e., the 2011 Regulations. *Id.* at ¶ 73.

On April 4, 2017, Plaintiff had a VCF appeal hearing. Relying on the language in the 2011 Regulations, Plaintiff requested an increased non-economic loss award in excess of that permitted under the Amended Regulations. The Special Master was thus notified that Plaintiff was electing his contractual right to proceed under the 2011 Regulations. *Id.* at ¶ 74.

On July 5, 2017, the Special Master issued Plaintiff a determination on his appeal denying any additional compensation. *Id.* at ¶ 75; *see* Am. Compl. Ex. 6. The Special Master, in her July 5, 2017 denial of Plaintiff's appeal, wrote: "Your claim was calculated using our published regulations [i.e. the Amended Regulations], and I believe it is fair and reasonable under the requirements of the Reauthorized Zadroga Act." Am. Compl. at ¶ 76.

The Special Master thus refused to apply the 2011 Regulations to Plaintiff's claim, in direct contravention of the terms of Plaintiff's agreement with the Government. This constituted a breach of the parties' agreement. *Id.* at ¶ 77. Having entered into an agreement with the Government and waived his rights prior to December 18, 2015, Plaintiff was entitled to have his loss calculation performed in accordance with the 2011 Regulations. *Id.* at ¶ 78.

## ARGUMENT

**I.**    **The Supreme Court's Decision In *Franconia Assocs. v. United States* Controls This Case And Compels Denial Of The Government's Rule 12(b)(1) Motion**

### A.  Legal Standard

Mr. White as plaintiff must establish jurisdiction by a preponderance of the evidence. *Gilead Sciences, Inc. v. United States*, 151 Fed. Cl. 742, 747 (2020) (citing, *inter alia, Trusted Integration v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011)). When ruling on the Government's motion to dismiss for lack of jurisdiction, the Court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the plaintiff's favor. *See LaBatte v. United States*, 899 F.3d 1373 (Fed. Cir. 2018). *See also Wheeler v. United States*, 167 Fed. Cl. 345, 349 (2023) (citations omitted). In this Court, the statute of limitations is a jurisdictional issue that must be strictly construed, and "every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such a claim first accrues." 28 U.S.C. §2501. *See also Gilead*, 151 Fed. Cl. at 747 (citations omitted).

### B.  *Franconia* Establishes That Mr. White's Claims Did Not Accrue Until July 2017, When the Special Master Refused His Request to Process His Claim in Accordance With the 2011 Regulations

The Government argues that Mr. White's claims first accrued when the Reauthorization Act was enacted on December 18, 2015, or when the regulations thereunder were implemented on June 15, 2016, and that in either event his claims are time-barred because he filed them more than six years later. This argument fails under the controlling decision in *Franconia Assocs. v. United States*, 536 U.S. 129 (2002).

Just as in our case, *Franconia* involved a claim for breach of contract against the Government, and just as in our case, the decision turned on whether the enactment of an

unfavorable statutory amendment and its implementing regulations triggered the running of the statute of limitations. At issue in *Franconia* was the Housing Act of 1949, a law encouraging development of low-income housing. The Government made loans on favorable terms to borrowers, who in turn agreed to ensure that their projects were affordable for low-income residents for so long as the loans remained unpaid. 536 U.S. at 134-35. The contracts provided that the borrowers could prepay their loans at any time (and thus the borrowers could free themselves from the low-income restrictions). *Id*.

In response to the concern that the unrestricted prepayment terms were undermining the goal of promoting low-income housing, Congress passed statutory amendments in 1979 and again in February 1988 that imposed restrictions on borrowers' ability to prepay the loans before the end of the loan term. *Id*. at 135-36. There were also amendments to the implementing regulations, which addressed how the Government would process borrowers' prepayment requests. *Id*. at 136-37. These amended regulations were enacted in May 1988. *Id*.

In 1997, a group of borrowers sued the Government over the amended prepayment restrictions. *Id*. at 137-38. Just as the Government has done in our case, the Government in *Franconia* argued that the claims were time-barred by the six-year statute of limitations at 28 U.S.C. §2501. The District Court, 43 Fed. Cl. 702 (1999), and the Federal Circuit, 240 F.3d 1358 (Fed. Cir. 2001), both agreed. The lower courts held that the borrowers' claims accrued when the law changed to the potential detriment of the borrowers, either when the statute was amended in February 1988 or when the amended regulations were implemented in May 1988. In reaching this conclusion, the lower courts in *Franconia* relied on several of the same cases that the Government relies upon in our case, including *Ariadne Fin. Servs. v. United States*, 133 F.3d 874 (Fed. Cir. 1998), *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573 (Fed. Cir.

1988), and *Trauma Servs. Grp. v. United States*, 104 F.3d 1321 (Fed. Cir. 1997). The Federal

Circuit (as characterized by the Supreme Court) concluded that when the law changed and

eliminated the borrowers' ability to prepay, that change constituted a breach which "occurred

*immediately*, totally, and definitively." 536 U.S. at 142 (orig. emphasis).

> **The Supreme Court unanimously reversed this holding**. The Court first declared that:

> "[T]he promisor's renunciation of a contractual duty *before* the time fixed in the
> contract for performance is a repudiation…Such a repudiation ripens into a breach
> prior to the time for performance only if the promisee elects to treat it as such."

536 U.S. at 142-43 (internal quot., cit. and ellipses omitted).

Applying this principle to the situation of the borrowers before them, *Franconia* held that

the unfavorable subsequent changes to the law:

> "…effected a repudiation of the [loan contracts], not an immediate breach. The Act
> conveyed an announcement by the Government that it would not perform as represented
> in the [contracts] if and when, at some point in the future, petitioners attempted to prepay
> their mortgages….Unless petitioners treated [the amended law] as a present breach by
> filing suit prior to the date indicated for performance, breach would occur when a
> borrower attempted to prepay, for only at that time would the Government's responsive
> performance become due."

536 U.S. at 143-144.

Applying *Franconia*, this Court reached the same result in *Arakaki v. United States*, 62

Fed. Cl. 244 (2004). In *Arakaki*, the plaintiff filed suit in June 2002. He alleged that in 1991,

HUD had persuaded him to purchase a property in return for a promise that if HUD ever sold his

mortgage, then plaintiff himself would have the right to bid on it (and thus plaintiff could have

bought his own mortgage at a discount). 62 Fed. Cl. at 245-47. The Government moved to

dismiss under (among other things) the six-year limitations period at 28 U.S.C. § 2501. The

Government specifically argued that under HUD regulations that became effective in April 1996,

the plaintiff was legally prohibited from bidding on his own mortgage. Thus, the Government

21

argued, his claim accrued when the unfavorable regulations were enacted, and his lawsuit, filed more than six years later in 2002, was untimely. 62 Fed. Cl. at 254-60.

This Court, relying on *Franconia*, found that the 1996 regulations prohibiting plaintiff from bidding constituted a repudiation of the contract, not a breach. 62 Fed. Cl. at 257-59. Therefore, the statute of limitations did not begin to run until plaintiff's bid was rejected and the mortgage was actually sold to someone else. *Id*.  In other cases, too, this Court has relied on *Franconia* to reject the same § 2501 timeliness argument, as applied to a claim of breach, that the Government has asserted here. *See, e.g., Peterson Indus. Depot, Inc. v. United States*, 140 Fed. Cl. 1, 8-10 (2018).

In addition, the Federal Circuit did so in a decision that the Government itself relies upon in our case. *See Turping v. United States*, 913 F.3d 1060, 1064-65 (Fed. Cir. 2019). *Turping* involved amendments to a retirement plan that were enacted in the fall of 1996 and that would reduce the plaintiffs' benefits upon retirement. 913 F.3d at 1063-64. The lead plaintiff retired in 2014. After his benefits were calculated pursuant to the amended plan, he (and others similarly situated) filed suit in 2016. *Id*. The Government argued that the claims accrued when the plan changes were enacted in 1996, and thus the lawsuit was untimely. Applying *Franconia*, the Federal Circuit in *Turping* rejected that argument, finding that the plan amendments amounted to a renunciation, and that the breach did not occur until the time of performance, which was when the participants received the (reduced) retirement benefits. *Turping* thus concluded that the claims were not time-barred. *Id*. at 1064-65.[7]

---

[7] *Turping* did affirm dismissal for failure to state a claim, finding that the there was no privity to support the contract claim. That is not an issue in our case, and thus that part of *Turping's* holding is entirely distinguishable.

*United States v. Winstar*, 518 U.S. 839 (1996), which the Government relies upon in its Motion, does not suggest a different result. *Winstar* expressly endorsed application of "ordinary principles of contract construction and breach" to contracts involving the Government. 518 U.S. at 870-71. Such "ordinary principles of contract construction and breach," such as the difference between repudiation and breach, are precisely what *Franconia* applied several years after *Winstar*. *See Franconia*, 536 U.S. at 142-44. Moreover, *Winstar* did not decide the question of the specific date when the claims of the *Winstar* plaintiffs accrued. That was left to subsequent cases, including *Ariadne*, relied upon by the lower court in *Franconia*, and the companion case of *Shane v. United States*, 161 F.3d 723 (Fed. Cir. 1998). The Government tries to analogize our case to *Ariadne* and *Shane*, arguing that under the holdings of those cases, Mr. White's claims accrued not when the Government failed to perform, but rather when the regulatory scheme was amended to the plaintiffs' potential detriment. (Gov. Br. at p. 12). Four years after *Ariadne* and *Shane*, the Supreme Court in *Franconia* rejected that argument.

*Franconia* controls Mr. White's case. Under *Franconia*, Mr. White had the right to treat the change in law as a repudiation, not a breach, and to "await performance." If he elected that right, then his "cause of action accrue[d], and the statute of limitations commence[d] to run, from the time fixed for performance, rather than from the earlier date of repudiation." *Franconia*, 536 U.S. at 144 (citations omitted).

That is precisely what occurred here. Mr. White had the right to elect application of the 2011 Regulations regardless of subsequent changes in the law. *See, e.g.*, Am. Comp. at ¶ 40, citing 28 C.F.R. §104.6: "Claimants are entitled to have their claims processed in accordance with the provisions of this Part that were in effect at the time that their claims were submitted. All claims will be processed in accordance with the current provisions of this Part, unless the

claimant has notified the Special Master that he or she has elected to have the claim resolved under the regulations that were in effect at the time that the claim was submitted under § 104.22(d).

Under *Franconia*, Mr. White had the right to await performance from the Government, and his claim for breach did not accrue until the Government failed to perform. Mr. White did not request performance until he appealed the January 11, 2017 award to the Special Master, and "requested that the Special Master provide additional non-economic loss compensation to which Plaintiff was entitled pursuant to the claims process provisions in place at the time he submitted his claim—i.e., the 2011 Regulations." Am. Comp. at ¶74; *see also* Am. Comp. at ¶75 (alleging that, at the April 4, 2017 hearing, Mr. White requested an award for non-economic loss in excess of that permitted under the Amended Regulations).

In July 2017, the Government refused performance when the Special Master rejected Mr. White's request to apply the 2011 methodology and instead affirmed the Award under the Amended Regulations. Mr. White's claims did not accrue until then, and he filed this lawsuit less than six years later. *See also Ridenour v. United States*, 44 Fed. Cl. 202, 209-10 (1991) (holding that plaintiff's claims did not accrue under § 2501 until final agency action on awards under employee bonus plan, rather than when agency issued interim decisions). Thus, the Government's Motion to Dismiss for lack of jurisdiction should be denied.

To avoid any confusion, Mr. White must also address an inaccuracy in the Government's brief. The Government writes that Mr. White "alleges that the Government breached the alleged contract in 2015 . . . ." Gov. Br. at 12. That is wrong. Paragraphs 61-63 and 100 of the Amended Complaint, cited by the Government at p.12, say no such thing. The other paragraphs of the Amended Complaint cited by the Government, 109 and 115, allege that the Government's breach

occurred when the Government "fail[ed] to apply" the 2011 Regulations. That is precisely consistent with Mr. White's argument – supported by *Franconia* – that the breach did not occur until 2017.

## II.   <u>**Mr. White Has Plausibly Alleged a Breach of Contract By the Government**</u>

### A.  **Legal Standard**

On a motion to dismiss pursuant to R.C.F.C. 12(b)(6), the Court "must presume that the facts are as alleged in the complaint, and make all reasonable inferences in favor of the plaintiff." *Extreme Coatings, Inc. v. United States*, 109 Fed. Cl. 450, 453 (2013) (quoting *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009)). Further, to state a claim, "the complaint must allege facts plausibly suggesting (not merely consistent with) a showing of entitlement to relief. The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." *Id.* (internal citation omitted).

With regard to a breach of contract claim, the plaintiff must plausibly allege "the existence of a valid contract, a duty arising out of the contract, a breach of that duty, and damages caused by the breach." *Cooley v. United States*, 76 Fed. Cl. 549, 555-56 (2007). Here, the Government challenges only the first of those requirements – the existence of a valid contract. *See* Gov. Br. at 14-25. The Government does not challenge the sufficiency of Mr. White's allegations regarding a breach of the Government's alleged contractual duty, nor the damages resulting therefrom. Thus, to overcome the Government's motion, Mr. White must demonstrate only that he has plausibly alleged a valid contractual relationship between himself and the Government.

25

In pleading the existence of an express or implied-in-fact contract with the Government, a plaintiff must allege: (1) mutual intent of the parties to contract, (2) consideration, (3) an unambiguous offer and acceptance, and (4) authority on the part of the government representative who entered or ratified the agreement to bind the United States. *Ingham Reg'l Med. Ctr. v. United States*, 126 Fed. Cl. 1, 22-23 (2016), *aff'd in part, rev'd in part*, 874 F.3d 1341 (Fed. Cir. 2017); *Cooley*, 76 Fed. Cl. at 555-56. Here, the Government concedes that the parties have exchanged consideration. The Government asserts that Mr. White has failed to plausibly allege the parties' mutual intent to contract; an unambiguous offer and acceptance; and the Government's authority to contract. As set forth below, Mr. White has sufficiently pled all elements of a valid contract between the parties. Accordingly, the Government's motion must fail on this basis as well.

## B. Mr. White Has Sufficiently Alleged That the Parties Entered Into an Enforceable Agreement

In seeking to dismiss Mr. White's Complaint, the Government substitutes its own interpretation of Plaintiff's allegations, and recasts his allegations in an unfavorable light. Accordingly, before rebutting the Government's argument, it is necessary to set forth Mr. White's allegations regarding the parties' contract.

### 1. The Parties' Agreement Includes the VCF Statute, 2011 Regulations, and VCF Documents

Mr. White has alleged that the parties entered an express or implied-in-fact contract. The Government made an offer to Mr. White to waive any civil claims for 9/11-related damages, including claims against the Government. In exchange, Mr. White could participate in the Government's VCF claims process pursuant to the VCF regulations then in place. The Government's offer was communicated through the VCF statute, the 2011 Regulations, and VCF

documents provided to Mr. White. Mr. White, in turn accepted that offer by filing his VCF claim and releasing the Government and any other potential defendants from 9/11-related civil actions.

### a.  The VCF Statute

Section 405 of the VCF statute, 49 U.S.C. 40101 note, stated that "[u]pon the submission of a claim under this title, the claimant waives the right to file a civil action (or to be a party to an action) in any Federal or State court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001." That section further stated that "[a] claimant may file a claim for compensation under this title with the Special Master" and that the Special Master would determine "the amount of compensation to which the claimant is entitled." Section 407 of the VCF statute obligated the Attorney General to "promulgate regulations to carry out this title," and the Zadroga Act required the Special Master to update those regulations. Thus, through the VCF statute, the Government communicated an offer for a Plaintiff to release future claims against the Government and others in exchange for participation in the VCF pursuant to the prevailing regulations.

### b.  The 2011 Regulations

The 2011 Regulations added detail regarding the Government's offer. This detail was needed to ensure that claimants could "make an informed decision" regarding whether to release their civil claims in favor of participation in the VCF.

The 2011 Regulations reiterated that, "upon the submission of a claim under the Fund, the claimant waives the right to file a civil action (or be a party to an action) in any Federal or State court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001, or for damages arising from or related to debris removal." *Id.* at 104.61(a) (2021). Relatedly, the 2011 Regulations established that "Claimants are entitled to have their claims

processed in accordance with the provisions of this Part that were in effect at the time that their claims were submitted. All claims will be processed in accordance with the current provisions of this Part, unless the claimant has notified the Special Master that he or she has elected to have the claim resolved under the regulations that were in effect at the time that the claim was submitted under § 104.22(d)." *Id.* at § 104.6. Thus, the 2011 Regulations guaranteed claimants protection in the event of a detrimental amendment to the regulations.

The 2011 Regulations specified that the waiver of civil claims was effectuated by the submission of a filed claim. In turn, the date of claim filing was fixed as the relevant date should the claimant elect to proceed under the prior regulatory provisions. *See* 2011 Regulations at § 104.22.

The 2011 Regulations also addressed the compensation structure for VCF claimants, including presumed loss amounts and methodologies. *See* 2011 Regulations at §§ 104.41-104.47 ("Amount of Compensation for Eligible Claimants").

Thus, the 2011 Regulations added specificity to the terms of the parties' agreement. These regulations confirmed that the Government's offer, in exchange for Mr. White's waiver of civil claims, included a promise that he be able to pursue VCF compensation under the then-effective regulations (*i.e.*, the 2011 Regulations) in the event the Government amended the regulations in the future. The 2011 Regulations further provided that the claim filing date triggered both the claim waiver and fixing of the VCF regulations available for a claimant's election. Finally, the 2011 Regulations established key factors concerning compensation, including the lack of any limitation on such losses.

### c.  The VCF Documents

Documents generated by the Government as part of the claims process also bear on the parties' agreement. The Government promulgated a claim form, pursuant to which claimants could file claims with the VCF. This document manifested the Government's offer for claimants to pursue a VCF claim in exchange for their waiver of civil actions.

In connection with his 2013 claim form filing, Mr. White executed an attestation verifying that, "by submission of a substantially complete Eligibility Form, I am waiving the right to file a lawsuit (or be a party to a lawsuit) in any federal or state court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001." The following year, the Government sent a letter to Mr. White reiterating that, "**[a]s stated in the Regulations and on the Eligibility Form**, by filing a substantially complete Eligibility Form, you have waived your right to file or be a party to a September 11th-related lawsuit." (Emphasis added). The VCF letter directed Mr. White to the VCF statute and 2011 Regulations.

Through its claim documents and correspondence, the Government reiterated its offer, confirmed that Plaintiff accepted its offer, and emphasized that the parties' agreement comprised the terms of the VCF statute and then-effective regulations set forth above.

### 2.  The Agreement, as Alleged, Is an Enforceable Settlement of Mr. White's Litigation Claims

Viewed in the light most favorable to Mr. White, his allegations in the Amended Complaint have plausibly set forth an express or implied breach of contract against the Government. The Government's offer, made through the VCF statute, the 2011 Regulations, and the VCF claim form, includes an offer for Mr. White to release any civil claims in exchange for his participation in the VCF under regulations then in effect.

Mr. White, in turn, accepted that offer by filing his VCF claim form and attesting that he was waiving his right to bring any civil action to recover 9/11-related damages. Thus, Mr. White cannot, for example, sue the EPA for subjecting him to toxic Ground Zero air. The Government, for its part, had agreed to calculate Mr. White's VCF award in accordance with the 2011 Regulations if he so elected.

Mr. White's release of future litigation claims in exchange for VCF participation is, by its nature, a settlement agreement. It is not a legislative or regulatory action, but rather an enforceable contract. *See VanDesande v. United States*, 673 F.3d 1342, 1351 (Fed. Cir. 2012) (holding that "a settlement agreement . . . is a contract within the meaning of the Tucker Act") (internal citation omitted).

Indeed, this is precisely how the original VCF Special Master, Kenneth Feinberg, has characterized the VCF's actions. Testifying before Congress in 2008 regarding the possible re-opening of the VCF, former Special Master Feinberg observed that during the original VCF, "97 percent of all eligible families who lost a loved one on September 11 voluntarily agreed to enter the 9/11 Fund rather than litigate."[8] He continued, "when you **settle** 97 percent of all the claims brought by the families of lost loved ones, they are waiving their right to litigate against anybody. We are getting a **full release** for domestic would-be tortfeasors." *Id.* He added, "**we were able, when we settled the claims, to get full releases from 97 percent of the people that**

---

[8] Testimony of Kenneth Feinberg, Paying With Their Lives: The Status of Compensation for 9/11 Health Effects, Joint Hearing Before the Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law and the Subcommittee on the Constitution, Civil Rights, and Civil Liberties of the Committee on the Judiciary, House Of Representatives, April 1, 2008, available at https://www.govinfo.gov/content/pkg/CHRG-110hhrg41582/html/CHRG-110hhrg41582.htm (Emphasis added).

**were litigating**." *Id.* (Emphasis added). The Special Master was correct: VCF claims, including Mr. White's, constitute contractual settlements and releases.[9]

Mr. White's allegations here are analogous to those in *LaBatte v. United States*, 899 F.3d 1373, 1379 (Fed. Cir. 2018). In *LaBatte*, a Native American farmer brought a breach of contract action to enforce a class action settlement agreement with the Government. In the underlying settlement agreement, as with the VCF, the Government agreed to allow participants to submit claims to a substantial compensation fund in exchange for releases of current and future civil actions by all claimants. *LaBatte*, 899 F.3d at 1375; *LaBatte v. United States*, No. 16-cv-798 (Fed. Ct. Claims), at Dkt. 1-2 (*Keepseagle v. Vilsack* settlement agreement).

The settlement agreement featured two payment tracks. *Id.* Track B, the subject of the breach of contract action, authorized a recovery up to $250,000, depending on the damages proved by a claimant. *Id.* In *LaBatte*, the plaintiff had pursued a claim under Track B and was stymied when the Government prevented his witnesses from engaging. He then pursued a breach of contract action in this Court to obtain money damages on account of the Government's breach of the settlement agreement.

After this Court dismissed the plaintiff's action, the Federal Circuit reversed. The Circuit Court found that this Court has jurisdiction over a claim for a monetary recovery alleging a breach of the parties' agreement with respect to compensation awarded from that fund. The Circuit Court further held that the plaintiff had plausibly pled a breach of contract based on allegations that the Government, *inter alia*, breached the implied covenant of good faith and fair

---

[9] Although not referenced in Mr. White's Amended Complaint, the Court may consider the Special Master's congressional testimony on this motion to dismiss. *See Sebastian v. United States*, 185 F.3d 1368, 1374 (Fed. Cir. 1999) ("In deciding whether to dismiss a complaint under Rule 12(b)(6), the court may consider matters of public record.").

dealing through "interference with or failure to cooperate in the other party's performance." *Id.* at 1379. The Court observed that this holds "even if the actor believes his conduct to be justified." *Id.* (internal citation omitted). This approach "prevents parties from acting so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Id.* (internal citation omitted). Here, as in *LaBatte*, Mr. White has plausibly alleged a breach of the parties' agreement where the Government has destroyed Mr. White's reasonable expectations regarding the contract.

This case is also similar to *Ingham Reg'l Med. Ctr. v. United States*, 874 F.3d 1341 (Fed. Cir. 2017). There, the plaintiff hospital granted the Government a release of certain claims in exchange for payment adjustments regarding certain radiology services. *Ingham*, 126 Fed. Cl. at 41-42. This Court held that the plaintiff and Government had formed a contract that included the release and additional documents. *Id.* at 32-36. The plaintiff asserted that the Government had "failed to follow the methodology for calculating payment adjustments in the contract." *Ingham*, 874 F.3d at 1347. The Circuit Court explained that the Government's "promise to follow the agreed upon methodology was part of the consideration for Ingham's agreement to the Release in the first place. . . Accordingly, the court erred in finding that Ingham could not bring a claim for breach of contract." *Id.* So, too, has the Government breached its agreement with Mr. White, following his grant of a release to the Government, by failing to follow the contractual terms for processing and evaluating his claim.

As in *LaBatte* and *Ingham*, Mr. White has plausibly alleged the existence of a contract, and the breach thereof, by the Government.

32

### 3. Defendant's Challenges to the Sufficiency of the Parties' Contract Must Fail in Light of Plaintiff's Well-Pled Allegations

The Government, applying its own interpretation of Mr. White's allegations, suggests three bases for rejecting Mr. White's assertion that he contracted with the Government. First, the Government argues that there is no "mutual intent to contract." Gov. Br. at 15-22. Next, the Government asserts that Mr. White insufficiently alleged an unambiguous offer and acceptance. *Id.* at 22-24. Finally, the Government suggests that "the Special Master lacks actual authority to form contracts with claimants." *Id.* at 24-25. The Government's arguments fail on each count.

### a. Mr. White Adequately Alleged a Mutual Intent Between the Parties to Enter Into an Enforceable Agreement

To prove mutual intent to contract, "a plaintiff must proffer objective evidence demonstrating the existence of an offer and a reciprocal acceptance." *Am. Fed. Bank, FSB v. United States*, 62 Fed. Cl. 185, 194 (2004) (citing *Anderson v. United States,* 344 F.3d 1343, 1353 (Fed. Cir. 2003)) (citation omitted). An offer "is made by the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Id.* (quoting *Anderson*, 344 F.3d at 1353) (internal citations omitted). As described above, Mr. White has plausibly alleged an agreement consummated through an offer by the Government and his reciprocal acceptance. Thus, Mr. White's complaint sufficiently alleges a mutual intent to contract.

For its part, the Government asserts that Mr. White's allegations of mutual intent are insufficient because he relies, in part, on the VCF statute and regulations. Yet, **none of the Government's cases involve an offer by the Government, through statute, regulation, or otherwise, to convey something of value in exchange for a counterparty's release of litigation claims**. As noted, this type of agreement is inherently contractual.

Moreover, the Circuit Court has rejected "the proposition that contractual terms cannot be found in agency regulatory documents." *Fifth Third Bank of W. Ohio v. United States*, 402 F.3d 1221, 1234 (Fed. Cir. 2005). Here, Mr. White has carefully alleged the manner in which the statute, regulations, and VCF documents articulate a clear offer from the Government and acceptance by Mr. White.

### i. The Cases Cited by the Government Concerning "Mutual Intent to Contract" Do Not Support Dismissal

The cases cited by the Government as to "mutual intent" are distinguishable and do not support dismissal of Mr. White's complaint. For example, *Brooks v. Dunlop Mfg.*, 702 F.3d 624 (Fed. Cir. 2012), involved a *qui tam* relator who alleged a breach of contract by the Government when Congress eliminated the relevant *qui tam* provision. The *Brooks* court focused on the jurisprudence around *qui tam* statutes, noting that treating such a provision as a unilateral contract offer would be "inconsistent with the history of *qui tam* provisions." *Brooks*, 702 F.3d at 632. Here, by contrast, Mr. White has alleged an exchange of consideration between the Government and Mr. White that was entirely lacking in *Brooks*. Moreover, unlike the regulations in this matter, the statute in *Brooks* did not promise a putative relator any protection in the event of an amendment to the law. Thus, the *Brooks* court's analysis of the parties' mutual intent to contract is irrelevant.

Similarly, the Federal Circuit's analysis in *American Bankers Ass'n v. United States*, 932 F.3d 1374 (Fed. Cir. 2019) does not diminish the plausibility of Mr. White's allegations. *American Bankers* concerned a statutory modification to the interest rate paid by the Federal Reserve on regional Reserve Bank stock. In that case, the plaintiff asserted that "an implied-in-fact contract exists because the Federal Reserve Act constitutes an offer by the government, which Washington Federal accepted by submitting its application and payment for Reserve Bank

34

stock." *Am. Bankers* at 1380. The court disagreed, holding that "[t]he language and structure of the Act . . . do not reflect a bargained-for quid pro quo between two parties." *Id.* at 1383. In reaching this conclusion, the court explained that "the dividend rate is set forth in an entirely different section than the provisions governing stock subscription." *Id.*

Here, by contrast, the 2011 Regulations clearly reflect a quid pro quo between Mr. White and the Government. On the date of his claim filing, Mr. White released all civil claims relating to 9/11 damages, including claims against the Government. In exchange, the Government committed that, **in the event that the 2011 Regulations are amended**, Mr. White may elect to have his VCF claim processed pursuant to the regulations in place on that same date. The instant agreement involved a promise by the Government to Mr. White, delivered in exchange for his release of civil claims. These mutual commitments were made explicit in the relevant contract documents. Moreover, pertinent regulations concerning the parties' quid pro quo were either contained in 28 C.F.R. §104.22, or cross-referenced that regulation. Accordingly, *American Bankers* does not establish a failure by Mr. White to adequately plead mutual intent to contract.

Other cases cited by the Government are similarly distinguishable. *Boyd v. United States*, No. 22-1473C, 2023 WL 3118132 (Fed. Cl. Apr. 27, 2023) involved a government program, subsequently modified, where claimants merely submitted applications to participate. There, the Court declined to find a plausible allegation of mutual intent to contract because the relied-upon legislation "does not have any requirement that [claimants] provide anything in exchange for a payment by the Government." *Id.* at *3. The Court further held that submissions solicited by the Government did not evidence an intent to contract, where those documents set forth a "notice of program eligibility and the means by which [plaintiffs] could certify their eligibility and request financial assistance" under the statute. *Id.*

In this case, by contrast, Mr. White has alleged that he provided substantial consideration in connection with his VCF claim. Moreover, by filing his claim form, Mr. White not only communicated his VCF claim, but also conveyed consideration by waiving his right to pursue 9/11-related civil litigation. Thus, *Boyd* does not support dismissal of this action.

*Flint v. United States*, 162 Fed. Cl. 91 (2022) is also readily distinguishable. In *Flint*, the plaintiff alleged that she had contracted with the Government by providing a form that authorized immediate assessment and collection of certain penalties, in exchange for an agreement that the IRS would not "assert other penalties with respect to [her] failure to report foreign financial assets as required." *Id.* at 124-25. However, in that form, the IRS explicitly "reserves the ability . . . to conduct further examination and assess additional penalties if [plaintiff's] behavior was found to be willful after examination." *Id.* at 125. The Court found that, [b]y providing in the [form] that the IRS could 'open an examination' into Mrs. Jones, with the explicit possibility of assessing . . . penalties as a result, the IRS reserved its right to conduct an examination and assess further penalties after [plaintiff's] completion of the [form]." *Id.* at 125. Thus, there was plausible allegation of mutual intent to enter into a contract that foreclosed the IRS from assessing additional penalties. *Id.*

Here, by contrast, Mr. White exchanged valuable consideration in exchange for certainty that was lacking in *Flint*. Mr. White has alleged that the Government explicitly promised that he could elect to have his VCF claim adjudicated in accordance with the 2011 Regulations – regardless of any intervening regulatory amendments. Accordingly, *Flint* does not support the Government's motion.

Nor does *Baker v. United States*, 50 Fed. Cl. 483 (2001), demonstrate a failure by Mr. White to plausibly allege a contractual agreement. In *Baker*, the plaintiff asserted that their

submission of a loan application constituted an acceptance of an offer by the Government, communicated in statute and regulations, "to consider the application in accordance with the schedule and guidelines set forth in the regulations." *Id.* at 488-89. This Court rejected that position on summary judgment. *Id.*

In Baker, unlike this case, "[n]either the regulations nor a qualified application [cited by the plaintiff] contain[ed] the material terms of the ultimate guarantee agreement." *Baker*, 50 Fed. Cl. at 495. Moreover, the *Baker* Court reasoned, "the fact that the loan application and regulations contemplate future negotiation of material terms, and their reduction to a future writing—the conditional commitment, and ultimately the loan agreement and loan note guarantee—undercuts the notion that a meeting of the minds occurred upon submission of plaintiffs' application." *Id.* Thus, the court granted summary judgment to the Government on the plaintiff's implied contract claim.

In this case, by contrast, the statute and regulatory provisions relied upon by Mr. White contain the material terms of the parties' agreement. Indeed, the regulations contain an "explicit promise" by the Government that – if he agreed to waive 9/11-reltaed civil claims – the Government would evaluate Mr. White's VCF claim in accordance with the 2011 Regulations. As the Court in *Baker* observed, "the requirements of mutuality of intent to contract and lack of ambiguity require that the statute or regulation make an explicit promise—sufficient to justify another person in understanding that his assent to that bargain will conclude it and sufficient for the courts to determine the existence of a breach and give an appropriate remedy." *Id.* at 493. Mr. White, through his allegations regarding the Government's promise, has plausibly alleged mutuality of intent between the parties.

*Last Chance Mining Co. v. United States*, 12 Cl. Ct. 551 (1987) is also clearly inapposite.

37

There, the plaintiff alleges that the Government breached an implied contract by failing to file documents purportedly mailed by the plaintiff. *Id.* at 555-56. The plaintiff in *Last Chance* relied on a statute that "merely declares that mineral deposits on federal lands are open to exploration and purchase[,]" and did not specify in the complaint "what the terms of the Government's offer were." *Id.* at 55. The Court emphatically dismissed this claim, finding:

> Nothing in Last Chance's analysis fulfills the requirements necessary to show a contractual relationship between the parties. . . . The statutes and regulations . . . in question do not purport, even by implication, to constitute an offer. While in the broadest sense, the FLPMA is an "offer" to allow proof of claims, it is certainly not an offer to *contract.* It is more accurately characterized as a unilateral ultimatum on the part of the Government.

*Id.* at 556.

  *Last Chance* has no bearing on the plausibility of Mr. White's allegations. Unlike the plaintiff there, Mr. White has plausibly and specifically alleged an offer conveyed through statute, regulations, and associated VCF documents – an offer that he clearly accepted. Accordingly, Mr. White has sufficiently alleged a mutual intent to contract.

### ii.  "Indicia" of Mutual Intent Support the Plausibility of Mr. White's Contract Claims

  The Government also suggests that the Court should look to certain indicia to ascertain whether the parties' intended to form a contract. The first of these indicia is whether statutes or regulation contain "promissory language." Here, the promises contained in the 2011 Regulations, which were operative at the time Mr. White filed his VCF claim, constitute a key component of the parties' agreement. The 2011 Regulations explicitly promised that, even in the event of an amendment to those regulations, Mr. White had the right to have his VCF claim processed in accordance with the regulations in effect at the time he filed his claim (i.e., the 2011 Regulations). *See* 2011 Regulations at § 104.6. The 2011 Regulations guaranteed that the

Government would process his claim pursuant to those regulations if Mr. White so elected. *Id.* The inclusion of this promise in the regulation, in exchange for Mr. White's waiver of his civil litigation claims, evidenced the parties' intent to contract.

The Government dismisses the significance of this provision by arguing that it was nullified by Congress's subsequent change to the VCF statute. *See* Gov. Br. at 19-20. This argument misses the point. Mr. White is not seeking to enforce *the regulation*; he is alleging that: 1) the regulation constituted a component of the parties' contract, which 2) the Government has breached. That is, the parties agreed, pursuant to 2011 Regulation § 104.6, that in the event the government amended the relevant regulations, Mr. White could still elect to have his claim governed by the 2011 Regulations. The Zadroga Reauthorization Act and subsequent amendment of the regulations did not "supersede" Mr. White's contractual right, Gov. Br. at 19; rather it activated Mr. White's option (conveyed through his agreement with the Government) to have his claim processed under the prior regulations.

This is not, as the Government suggests, a threat to Congress's ability to govern. *See* Gov. Br. at 19, 21-22. Mr. White is not challenging Congress's ability to modify the VCF. Nor is he obligating the Government to "maintain a particular compensation structure." *Id.* at 21. Rather, he has plausibly alleged that, as to himself and other claimants who filed claims with the VCF under the 2011 Regulations, the Government contractually agreed to insure them against regulatory changes. As in *Winstar*, Mr. White "seek[s] nothing more than the benefit of promises by the Government to insure them against any losses arising from future regulatory change." *Winstar*, 518 U.S. at 881.

In *Winstar*, the Government had agreed to authorize certain thrifts to utilize advantageous accounting methods. Congress subsequently enacted a law to the contrary, and the Government

seized two of the affected thrifts for failure to meet capital requirements. The thrifts then sued for breach of contract. The Supreme Court rejected the argument raised by the Government here: that enforcement of the parties' agreement would constrain the ability of Congress to govern. *Id.* at 887.

There, the Supreme Court held, "the Government agreed to do something that did not implicate its sovereign powers at all, that is, to indemnify its contracting partners against financial losses arising from regulatory change." *Id.* Here, too, by guaranteeing Mr. White the ability to have his claim evaluated pursuant to the regulations in place at the time of contract, the Government has simply indemnified him against regulatory change.

Applying *Winstar*, the Federal Circuit in *First Commerce Corp. v. United States*, cautioned against deference to the Government's assertion – echoed here – that it did not contract because it was engaged in regulation. 335 F.3d 1373, 1383 (Fed. Cir. 2003). There, the appellate court observed: "the argument that the government is immune from contractual liability *because* it was acting in its regulatory capacity was rejected squarely by this court and the Supreme Court in *Winstar*." *Id.* The Court continued:

> The question . . . is whether the government, in exchange for First Commerce's agreement to rescue a failing thrift, also made promises that certain regulatory treatment would be extended and maintained: namely, treating supervisory goodwill as regulatory capital and permitting its amortization over an extended period of time. **If the elements of contract formation are absent, then the government was acting solely in its regulatory capacity; if a contract was formed, then the government may be liable for its breach. To assert that the government was acting solely in its regulatory capacity is to assert a conclusion about contractual liability, not a premise that negates it.** As we held in *D & N Bank,* the supervisory nature of the business transaction is not "probative of the government's intent to contract." *D & N Bank,* at 1380. **Nor can the characterization of "regulatory" or "supervisory" absolve the government of its contractual liability if it is shown that the government has indeed bound itself by contract.**

*Id.* (Emphasis added.)

The Court should therefore reject the Government's position that there can be no plausible allegations of mutual intent to contract because the statutes and regulations at issue constitute legislation or policymaking. *See* Gov. Br. at 19, 21-22. Instead, the Court must consider the substance of Plaintiff's allegations – which sufficiently set forth a claim that the parties entered into an enforceable agreement.

The Government also asserts, incorrectly, that Mr. White's allegations are deficient because he relies on a promise from the Government to apply the 2011 Regulations, including the methodologies set forth therein. The Government suggests this is inadequate because the regulations are "not a guarantee to pay any particular amount." Gov. Br. at 20.

There is no requirement that, in order for an agreement to be enforceable, a party must compromise his civil claims for a specific dollar amount. Indeed, in *Ingham*, the plaintiff asserted that the Government "failed to follow the methodology for calculating payment adjustments in the contract." *Ingham*, 874 F.3d at 1347. The Federal Circuit explained that the Government's "promise to follow the agreed upon methodology was part of the consideration for Ingham's agreement to the Release" and held that plaintiff had stated a claim for breach of contract. *Id.* (Emphasis added).

Similarly, in *LaBatte*, *supra*, the Government created a compensation fund and claims process pursuant to which some claimants, after releasing their claims against the Government, would receive nothing. *See Keepseagle* Settlement, *supra*, at 1; *LaBatte*, 899 F.3d at 1375. The Federal Circuit nevertheless found that the Government had breached the agreement with a fund participant by failing to abide by the agreement terms.

Here, Plaintiff has plausibly alleged the existence of a contract to have his VCF claim processed in accordance with the 2011 Regulations and the methodologies contained therein. That the agreement guarantees the application of certain rules and approaches (*e.g.* 2011 Regulations at §§ 104.41-104.47), rather than a specific dollar amount, is no bar to the plausibility of Plaintiff's contract allegations.

### b.  Mr. White Sufficiently Alleges the Offer and Acceptance of the Agreement Terms

The Government next argues that Mr. White has failed to plausibly allege an unambiguous offer and acceptance of an agreement. *See* Gov. Br. at 22-24. Because Mr. White has sufficiently pled that the Government made an unambiguous offer, either as to an express or implied contract, and that Mr. White accepted that offer, this argument also fails.

 As described above, Mr. White has alleged an offer that comprised the VCF statute, regulations, and claim form. The Government's offer, which is unambiguous in those documents, establishes that if Mr. White waived his civil claims for 9/11-related damages, he would in turn be eligible to participate in the VCF and have his claim "processed in accordance with [the 2011 Regulations]." No more is required to allege an unambiguous offer to contract.

Echoing its earlier argument, the Government asserts that Mr. White's reference to the 2011 Regulations renders the offer unambiguous. This is incorrect. The 2011 Regulations included a series of provisions addressing "Amount of Compensation for Eligible Claimants." *See* 2011 Regulations at §§ 104.41-104.47. Those provisions established a methodology for calculation of non-economic losses – which did not impose any limitation on resulting awards. 2011 Regulations at §§ 104.44; 104.46. In addition, the regulations established a limitation of approximately $368,000 as the income limit to be considered for economic losses. *Id.* at §§ 104.43; 104.45. And the regulations did not require any preference as between different types of

claims. These unambiguous regulations were among those provisions offered by the Government in exchange for Mr. White's release of claims, and they protected Mr. White against future detrimental modifications to the regulations.

Indeed, Mr. White sought to proceed in accordance with these 2011 provisions when he pursued his appeal with the Special Master. Mr. White desired a non-economic loss determination that was not capped under § 104.46, and he did not want his non-cancer claim to be deprioritized (as it was under the Amended Regulations).

As set forth above, Mr. White accepted the Government's offer by filing a VCF claim and waiving his right to pursue 9/11-related civil claims against the Government or anyone else. There was no ambiguity in his acceptance. Further, the Government affirmed Mr. White's acceptance with its 2014 letter confirming his waiver of 9/11-related civil claim and directing him to the VCF statute and regulations. Accordingly, Mr. White has sufficiently alleged the existence of a contract based on offer and acceptance.

Mr. White has alleged that the statute, regulations, and exchange of VCF documents, including the claim form, constituted an express offer and acceptance, establishing a contract between the parties. Alternatively, these components taken together, in the context of the parties' conduct, "indicate [the] mutual assent" necessary to allege an implied-in-fact contract. *Ingham*, 126 Fed. Cl. at 23. The Government communicated that, in the event Mr. White was willing to waive his 9/11-related civil claims, he could proceed with a VCF claim guaranteed to be processed, at Mr. White's election, in accordance with the provisions of the 2011 Regulations. Mr. White manifested his agreement with that proposition by filing a claim and waiving his 9/11-related civil claims. Thus, the parties' conduct established "enforceable expectations" – an

implied-in-fact contract – between Mr. White and the Government. *See Ridenour*, 44 Fed. Cl. at 207.

Although not necessary in this case to establish an implied contract claim, statements by the Government reinforce the parties' mutual assent regarding Mr. White's waiver of claims in exchange for a governmental promise concerning his election of the 2011 Regulations. For example, the Special Masters – in 2001 and 2011 – communicated the importance of claimants possessing information (i.e., knowing which regulations would apply) before agreeing to waive claims. Moreover, the information provided by the VCF to inform prospective claimants' waiver decisions would have only been meaningful if the Government intended to uphold its promise that a claimant could later elect to have their claim processed in accordance with the then-effective regulations. Thus, the Government's conduct further demonstrated an intent to be bound in an enforceable agreement with Mr. White and other VCF claimants. The original Special Master's testimony to Congress in 2008 further confirmed that the Government viewed the VCF as a contractual endeavor. Accordingly, Plaintiff has sufficiently alleged an implied-in-fact contract as an alternative basis to proceed in this matter.

### c. Mr. White Has Plausibly Alleged That the Attorney General, Acting Through the Special Master, Had Authority to Enter Into an Enforceable Agreement With Mr. White

Finally, the Government asserts that the Special Master lacked authority to contract. The Government remarkably argues that Mr. White and his fellow search and rescue workers, injured serving the country after 9/11, should have their claim dismissed because they "[took] the risk of accurately ascertaining the authority" of the 9/11 Victim Compensation Fund Special Master. Gov. Br. at 24 (quoting *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997)). This argument has no merit.

As an initial matter, the VCF statute establishes that it is the U.S. attorney general (the "Attorney General") who administers the VCF, and that they do so "through a Special Master." Thus, the Special Master's authority is derivative of the Attorney General.

Mr. White has alleged that the VCF is a contractual program through which the Government settles prospective civil legal claims as consideration for VCF participation. As noted, the original Special Master has spoken of his work, on behalf of the Attorney General, to "settle" VCF claims and obtain "releases." Accordingly, Mr. White has sufficiently alleged that the Attorney General (through the Special Master) was vested with authority, pursuant to their general settlement authority, to contract with VCF claimants. *See, e.g.*, *Halbach v. Markham*, 106 F. Supp. 475, 480 (D.N.J. 1952) ("The opinions of the Attorney General since 1831 uphold his authority to compromise Government litigation."), *aff'd*, 207 F.2d 503 (3d Cir. 1953).

Moreover, Mr. White has alleged that the VCF statute directs the Attorney General, through the Special Master, to implement the compensation program and process claims. Such implementation necessarily included the establishment of the terms pursuant to which claimants would release their potential civil claims and receive compensation. At a minimum, the Attorney General possessed implied actual authority to contract as part of this role, absent which he could not have performed his tasks.

A government official with implied actual authority can bind the government "when such authority is considered to be an integral part of the duties assigned to a government employee." *SGS-92-X003 v. United States*, 74 Fed. Cl. 637, 652 (2007) (quoting *H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed. Cir. 1989). This authority is "integral to an employee's duties when the employee cannot perform his assigned tasks without such authority." *SGS-92-X003*, 74 Fed. Cl. at 652. *See also Roy v. United States*, 38 Fed. Cl. 184, 190 n.18 (1997), *dismissed*, 124

F.3d 224 (Fed. Cir. 1997) (observing that "express actual authority" to approve payments could provide support for the implied authority to contract).

Here, Plaintiff has sufficiently alleged that entry into agreements with VCF claimants was an integral part of the Attorney General's duties, as carried out by the Special Master. Moreover, the Attorney General had authority to issue billions of dollars in awards pursuant to their VCF responsibilities. Thus, viewing the allegations in the light most favorable to Mr. White, he has plausibly alleged that the Attorney General, acting through the Special Master, had authority to enter into the contract that is the subject of this action.

## CONCLUSION

For the reasons set forth herein, Plaintiff Michael White respectfully requests that the Court deny the Government's motion to dismiss this action pursuant to R.C.F.C. 12(b)(1) and 12(b)(6).

## REQUEST FOR ORAL ARGUMENT

Pursuant to R.C.F.C. 20(c), Plaintiff Michael White respectfully requests oral argument on the Government's motion to dismiss.


Respectfully submitted,

Dated:   December 20, 2023          /s/ Jeremy S. Spiegel
                                   Jeremy S. Spiegel, Esq.
                                   **LAW OFFICE OF JEREMY SPIEGEL**
                                   1 South Broad Street, Suite 1500
                                   Philadelphia, PA 19107
                                   Tel. (215) 609-3154
                                   Spiegel@JeremySpiegelLaw.com