IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MICHAEL WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 23-383 |
| v. | ) | (Judge Silfen) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

ELIZABETH M. HOSFORD
Assistant Director

ERIC E. LAUFGRABEN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone:   (202) 353-7995
Facsimile:   (202) 353-0461
Email:        Eric.E.Laufgraben@usdoj.gov

February 2, 2024                        Attorneys for Defendant

TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................. 1

ARGUMENT ...................................................................................................... 3

I.    The Amended Complaint Is Untimely and Does Not Allege An Anticipatory Repudiation ................................................................................... 3

II.   The Amended Complaint Does Not Plausibly Allege A Contract With The VCF ...... 9

      A.    The Government Did Not Intend To Contract With VCF Claimants .......... 10

            1.    Statutory And Regulatory Text Does Not Reflect Contractual Intent ................................................................................ 11

            2.    Statutory And Regulatory Structure Does Not Reflect Contractual Intent ............................................................................... 14

            3     The Parties' Conduct Does Not Reflect Contractual Intent ............ 16

            4.    The Statutory Waiver Does Not Transform A VCF Claim Into A Settlement Agreement ........................................................ 18

            5.    The Authorities Cited In Our Motion Are Not Distinguishable ....... 20

      B.    The Amended Complaint Does Not Allege An Unambiguous VCF Offer To Determine Compensation Using The "Loss Calculation Methodology" In Place When Mr. White Applied, Or The Unambiguous Acceptance Of Any Such Offer ..................................................................... 22

      C.    The Special Master Lacks Actual Authority To Form Contracts With Claimants ................................................................................. 25

CONCLUSION .................................................................................................. 27

TABLE OF AUTHORITIES

Cases

*Am. Bankers Ass'n v. United States*,
   932 F.3d 1375 (Fed. Cir. 2019) ................................................................. *passim*

*Baker v. United States*,
   50 Fed. Cl. 483 (2001) ............................................................................. *passim*

*Brooks v. Dunlop Mfg.*,
   702 F.3d 624 (Fed. Cir. 2012) ........................................................... 10, 20

*Boyd v. United States*,
   No. 22-1473C, 2023 WL 3118132 (Fed. Cl. Apr. 27, 2023) ................................ 21

*City of El Centro v. United States*,
   922 F.2d 816 (Fed. Cir. 1990) ........................................................... 25

*Fin. Oversight & Mgmt. Bd. for P.R. v. Centro de Periodismo Investigativo, Inc.*,
   598 U.S. 339 (2023) ........................................................................... 15

*First Commerce Corp. v. United States*,
   335 F.3d 1373 (Fed. Cir. 2003) ...................................................... 21, 22

*Franconia Assocs. v. United States*,
   536 U.S. 129 (2002) ........................................................................... 6, 7

*Gallardo v. Marstiller*,
   596 U.S. 420 (2022) ........................................................................... 13

*Genentech, Inc. v. Immunex R.I. Corp.*,
   964 F.3d 1109 (Fed. Cir. 2020) ........................................................ 14

*Ingham Regional Med. Ctr. v. United States*,
   874 F.3d 1341 (Fed. Cir. 2017) ...................................................... 19, 20

*Kinsey v. United States*,
   852 F.2d 556 (Fed. Cir. 1988) ........................................................... 6

*Labatte v. United States*,
   899 F.3d 1373 (Fed. Cir. 2018) ........................................................ 19

*Nat'l R.R. Passenger Corp. v. Atchison, Topeka, & Santa Fe Ry. Co.*,
   470 U.S. 451 (1985) ........................................................................... 10

*Plaintiffs in Winstar-Related Cases v. United States*,
    37 Fed. Cl. 174 (1997) ........................................................................ 8

*Radium Mines, Inc. v. United States*,
    153 F. Supp. 403 (Ct. Cl. 1957) ........................................................ 22

*Roehm v. Horst*,
    178 U.S. 1 (1900) ............................................................................... 6

*Turping v. United States*,
    913 F.3d 1060 (Fed. Cir. 2019) ......................................................... 7

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996) .......................................................................... 21

*Wis. & Mich. Ry. Co. v. Powers*,
    191 U.S. 379 (1903) .......................................................................... 20

## Statutes

15 U.S.C. § 694b (emphasis added) ........................................................ 13

28 U.S.C. § 2501 ............................................................................... 2, 23

38 U.S.C. § 7313 ..................................................................................... 13

49 U.S.C. § 40101 note ................................................................... *passim*

Air Transportation Safety and System Stabilization Act,
    Pub. L. No. 107-42, 115 Stat. 230 (2001) .......................................... 12

James Zadroga 9/11 Health and Compensation Act of 2010,
    Pub. L. No. 111-347, 124 Stat. 362 (2011) ........................................ 15

James Zadroga 9/11 Victim Compensation Fund Reauthorization Act,
    Pub. L. No. 114-113, 129 Stat. 2242 (2015) ......................... 4, 6, 8, 14

## Regulations

28 C.F.R. § 0.160 ................................................................................... 26

28 C.F.R. § 0.161 ................................................................................... 26

28 C.F.R. § 0.168 ................................................................................... 26

iii

28 C.F.R. § 104.6 ................................................................................................ *passim*

28 C.F.R. § 104.22 ............................................................................................ 16, 17

28 C.F.R. § 104.46 ........................................................... 5, 8, 9, 14, 16, 24

28 C.F.R. § 104.61 ................................................................................................ 16

28 C.F.R. pt. O, subpts. C-E .......................................................................... 8, 9

28 C.F.R. pt. O, subpt. Y, App'x ................................................................... 26

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MICHAEL WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 23-383 |
| | ) | (Judge Silfen) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

<u>DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS</u>

Pursuant to Rules 7.2(b)(2) and 12 of the Rules of the Court of Federal Claims (RCFC), defendant, the United States, respectfully submits this reply in support of its motion to dismiss the amended complaint filed by plaintiff, Michael White.  *See* ECF No. 13 (Am. Compl.); ECF No. 18 (Mot.).  As demonstrated in our motion and below, the Court should dismiss the amended complaint for lack of jurisdiction and because it fails to state a claim upon which relief can be granted.

<u>INTRODUCTION</u>

In 2017, the September 11th Victim Compensation Fund (VCF) awarded $90,000 to Mr. White, a former firefighter and United States Navy submariner who participated in the September 11th rescue and recovery efforts.  Under amendments to the VCF statute passed by Congress in 2015, this sum was the maximum amount for which Mr. White was eligible.  In 2023, Mr. White filed this suit, the substance of which contends that, by submitting a VCF compensation claim in 2013, Mr. White entered into a binding contract with the United States, which the Government breached when it enacted statutory caps on non-economic losses in 2015 that did not exist when he first submitted his claim.

The Court lacks jurisdiction over Mr. White's claim because any alleged breach arising from the enactment of the statutory caps (or the related implementing regulations) occurred more than six years before the suit was filed.  *See* 28 U.S.C. § 2501.  In response, Mr. White argues that the statutory and regulatory changes giving rise to his breach of contract claims merely constituted an anticipatory repudiation of the Government's contractual obligations, which did not ripen into a breach until the Special Master allegedly refused to apply the prior regulations. *See* ECF No. 18 (Response).

But anticipatory repudiation occurs when one party renounces a future contractual duty that has not yet begun.  Here, the VCF was already in the process of determining Mr. White's compensation when Congress enacted the statutory caps in December 2015, and those caps thus had an immediate effect on Mr. White's right to compensation.  Accordingly, if Mr. White had a contractual right to have his claim processed under the prior framework without compensation caps, then the subsequent statutory and regulatory changes to that framework constituted more than just an anticipatory repudiation of Mr. White's compensation rights.  For that reason, the claim he alleges first accrued when Congress enacted the compensation caps in December 2015, or at the latest when the implementing regulations became effective in September 2016.  And because these events occurred more than six years before Mr. White filed this suit, the amended complaint is time barred.

The amended complaint also fails to state a claim because it does not plausibly allege the existence of a contract arising from the VCF statute and implementing regulations, or any of the program documents and public comments it cites.  To show a valid contract, Mr. White must allege: (1) mutual intent to contract; (2) unambiguous offer and acceptance; (3) consideration;

and (4) actual contracting authority.  Because these elements are conjunctive, dismissal is warranted if any one of them is missing.

Here, the VCF statutes and regulations do not evidence an intent to contract given that Congress established the VCF as a claim-based compensation program, not a contractual one. Although Mr. White characterizes various VCF statutory and regulations provisions as "contracts," "promises," "offers," "commitments," "guarantees," "obligations," etc., those characterizations are contradicted by the unambiguous statutory and regulatory provisions they purport to describe.

In addition, the amended complaint does not show an unambiguous offer to contract, and neither the amended complaint nor the response brief point to a statute or regulation authorizing the Special Master to enter into contracts with VCF claimants.  Without these contract formation elements, the amended complaint does not state a breach of contract claim.

Because the suit is untimely and does not state a claim for relief, the amended complaint must be dismissed.

<u>ARGUMENT</u>

I.    <u>The Amended Complaint Is Untimely and Does Not Allege An Anticipatory Repudiation</u>

As demonstrated in our motion, the amended complaint must be dismissed as untimely. Mot. at 10-14.  Any alleged duty to process Mr. White's claim under the regulations in effect at the time of claim submission (without statutory compensation caps) was breached more than six years before he filed his complaint—either when (1) Congress enacted those caps in December 2015, or (2) the VCF issued the September 2016 regulations, which applied those caps to Mr. White's claim.

According to the amended complaint, when Mr. White submitted a VCF claim in October 2013, neither the VCF statute nor the implementing regulations expressly included caps on economic or non-economic losses. Response at 13, 17; Am. Compl. ¶¶ 66, 70. The regulations in effect at the time, promulgated in 2011, also provided that "[c]laimants are entitled to have their claims processed in accordance with the [VCF regulations] that were in effect at the time that their claims were submitted[.]" 28 C.F.R. § 104.6, Amendments to this part (2011 ed.) (regulatory amendments provision). The provision further stated that "[a]ll claims will be processed in accordance with the current provisions of this Part, unless the claimant has notified the Special Master that he or she has elected to have the claim resolved under the regulations in effect at the time that the claim was submitted[.]" *Id.*

While the VCF was still determining Mr. White's award, Congress passed the James Zadroga 9/11 Health and Compensation Act in December 2015. *See* Pub. L. No. 114-113, § 402(c), 129 Stat. 2242, 3000 (2015) (Reauthorization Act). Among other things, the Reauthorization Act placed new compensation limits on "Group B" claims—*i.e.*, claims for which the Special Master had not postmarked and transmitted a final award determination on or before December 18, 2015—including a $90,000 cap on non-economic losses for any single non-cancer condition. *Id.* (codified at 49 U.S.C. § 40101 note § 405(b)(7)(A)(i)(II)); *see also* Mot. at 7-8. Mr. White's claim was in Group B. The Reauthorization Act also instructed the Special Master to update the regulations to comply with these and other statutory amendments. *See* Reauthorization Act § 407(b).[1]

---

[1] Mr. White alleges that the Reauthorization Act and implementing regulations also harmed claimants by limiting economic loss calculations to $200,000 in annual gross income, eliminating a $10,000 minimum award if collateral source offsets exceed the amount of

In turn, the Special Master issued new regulations, effective September 2016, which provided that Group B claims would be processed under the regulations in effect at the time of claim review, not at the time of claim submission. Thus, the 2016 regulations confirmed that Group B claimants, like Mr. White, whose claims had not been the subject of a final award determination by December 18, 2015, were subject to the caps and could no longer elect to have their claims processed under prior regulations. *Compare* 28 C.F.R. § 104.6, 104.46 (2011 ed.), *with id.* (2016 ed.); *see also* Response at 14-15. The regulations also implemented the new statutory compensation caps, including by amending the injured claimant non-economic loss provision. 28 C.F.R. § 104.46 (2016 ed.) ("The presumed noneconomic loss for a claim based on any single type of . . . non-cancer condition shall not exceed $90,000).[2]

After Mr. White received an initial determination in January 2017, which awarded him $90,000 in non-economic losses, he appealed to the Special Master. Response at 17-18. At that point, Mr. White alleges that he requested that the Special Master apply "the claims process provisions" in the 2011 regulations and award him additional non-economic loss compensation. *Id.* The Special Master allegedly "refused" his request by affirming the initial award in June 2017. *Id.*

In our motion, we demonstrated that Mr. White's claim was time barred under 28 U.S.C. § 2501. If, as alleged, Mr. White entered into a contract with the United States by filing a VCF claim in October 2013, when there was no express statutory or regulatory cap on non-economic

---

compensation, and eliminating minimum awards for decedents, Response at 4, but Mr. White does not allege that any of those changes applied to him.

   [2] A redline reflecting the changes between the 2011 and 2016 regulations is available at https://www.vcf.gov/sites/vcf/files/resources/VCF_Regs_2011v2016_Redline.pdf (last visited February 2, 2024).

losses, then that contract was breached when Congress enacted statutory caps on those losses under the Reauthorization Act in December 2015 or, at the latest, when the VCF implemented those caps in amended regulations, effective September 2016. *See* Mot. at 12 (citing *Ariadne Fin. Servs. Pty. v. United States*, 133 F.3d 874, 879 (Fed. Cir. 1998)).

In his response, Mr. White argues that we misunderstood his allegations. Response at 24-25. Mr. White contends the Government did not breach an alleged contract solely by enacting and implementing those statutory caps. Response at 24. Rather, Mr. White alleges that those caps merely comprised an "anticipatory repudiation" of his right under the prior version of 28 C.F.R. § 104.6 to have his claim resolved under the regulations in effect at the time of claim submission. *Id.* According to Mr. White, that anticipatory repudiation did not ripen into a breach until the Special Master refused his request to apply the prior regulations, in July 2017. Response at 18. And if no breach occurred until July 2017, then Mr. White's suit, filed in March 2023, is timely.

But Mr. White's allegations do not satisfy the anticipatory repudiation framework. An anticipatory repudiation is a "renunciation of a contractual duty before the time fixed in the contract for . . . performance[.]" *Franconia Assocs. v. United States*, 536 U.S. 129, 143 (2002). If a promisor repudiates a contractual obligation prior to the time for performance, that "repudiation 'give[s] the promisee the right of either to . . . wait till the time for [the promisor's] performance has arrived, or to act upon [the renunciation] and treat it as a final assertion by the promisor that he is no longer bound by the contract.'" *Id.* (*quoting Roehm v. Horst*, 178 U.S. 1, 13 (1900)). But if "the breach is not wholly anticipatory because it involves some contractual nonperformance, the statute of limitations begins to run immediately." *Kinsey v. United States*, 852 F.2d 556, 558 (Fed. Cir. 1988).

In *Franconia*, the Supreme Court clarified that anticipatory repudiation requires a renouncement of *future* performance. The *Franconia* plaintiffs were property owners who received low-interest mortgages from the Government in exchange for maintaining the properties as low-income housing during the life of the mortgage. *Franconia Assocs.*, 536 U.S. at 134-35. The contracts gave the owners the right to prepay their mortgages and exit the program "at any time." *Id.* at 135. Congress subsequently enacted a statute, in 1988, that permanently restricted the property owners' prepayment right. *Id.* When the owners sued for breach in 1997, the Government contended that the statute of limitations barred the suits because they were filed more than six years after Congress enacted the statutory prepayment restriction. *Id.* at 138. In rejecting the Government's timeliness argument, the Supreme Court determined that the statutory prepayment restriction was an anticipatory repudiation of the Government's future duty to accept the owners' prepayments, in part, because no performance by the Government was due until then. *See id.* at 146-48. The Court reasoned that, when a statutory change affects performance due entirely in the future, Congress could retract or amend the change before the time for performance. *Id.* at 148.

Mr. White also cites to *Turping v. United States*, 913 F.3d 1060 (Fed. Cir. 2019), which involved changes to a contractual pension calculation formula, made in 1996, that did not affect plaintiff until he retired and was eligible for pension benefits in 2014. *Id.* at 1063-64. The Federal Circuit found that the suit was timely because the 1996 changes to the pension formula comprised an anticipatory repudiation of future performance, which did not ripen into a breach until the plaintiff was eligible to receive pension benefits. *Id.* at 1065.

Both *Franconia* and *Turping* are thus distinguishable from the instant matter because in those two cases the alleged breaches involved only future obligations that had not yet

commenced.  In *Turping*, the claimant was not eligible for pension benefits for another 20 years; in *Franconia*, the statutory changes could have no effect until the homeowners sought to prepay their mortgages.  Here, by contrast, Mr. White was eligible for compensation and the VCF was processing his claim at the time of the statutory and regulatory changes to the claims-processing rules, which had an immediate effect on the VCF's performance of any claim-processing duties. *See Plaintiffs in Winstar-Related Cases v. United States*, 37 Fed. Cl. 174, 183 (1997) ("[E]ven a largely anticipatory breach may be sufficiently 'actual' to trigger the statute of limitations if 'it involves some contractual nonperformance,' [in which case] the statute of limitations begins to run immediately.'") (quoting *Kinsey*, 852 F.2d at 557-58).

Comparing the state of affairs before and after the Reauthorization Act and implementing regulations illustrates that the effect of those changes had an immediate effect on the processing of Mr. White's claim, such that any alleged breach was not wholly anticipatory.  Before the new claims processing rules went into effect:

1. The VCF was applying the claim processing rules from the 2011 regulations to Mr. White's claim.  28 C.F.R. pt. O, subpts. C-E (2011 ed.).

2. The VCF was determining his injured claimant non-economic loss compensation under a regulation that did not expressly cap that compensation.  28 C.F.R. § 104.46 (2011 ed.)

3. The VCF regulations "entitled claimants to have their claims processed in accordance with the regulations in place at the time of claim submission." *Id.* § 104.6 (2011 ed.).

4. The VCF regulations provided that, if the regulations are amended, claims will be "resolved" under the amended regulations, "unless the claimant has notified the Special Master that he or she has elected to have the claim resolved under the [2011] regulations[.]" *Id.* (2011 ed.).

After the new claims processing rules went into effect:

1. The VCF changed course and began to apply the new claim processing rules adopted in the Reauthorization Act and implemented in the 2016

8

regulations to Mr. White's claim.  49 U.S.C. § 40101 note § 405(b)(7); 28 C.F.R. pt. O, subpts. C-E (2016 ed.).

2.  The VCF began determining Mr. White's injured claimant non-economic losses subject to the $90,000 cap for any single non-cancer condition.  49 U.S.C. § 40101 note § 405(b)(7); 28 C.F.R. § 104.46 (2016 ed.).

3.  The VCF regulations mandated that "[a]ll claims will be processed in accordance with the current" regulations.  28 C.F.R. § 104.6 (2016 ed.).

4.  The VCF regulations removed any option for a claimant to "notif[y] the Special Master that he or she has elected to have the claim resolved under the [2011] regulations[.]"  *See id.*

Thus, the 2016 amendment to 28 C.F.R. § 104.6, coupled with the other statutory and regulatory changes imposing the new cap on non-economic losses, had an immediate effect on the amount that Mr. White could recover for his non-cancer condition.  Those changes altered the rules applicable to his pending claim, by precluding him from electing to use the prior regulatory framework and requiring the Special Master to limit his non-economic recovery to $90,000.  And because the legal developments allegedly giving rise to Mr. White's contract damages had an immediate effect on his compensation—and did not solely relate to future performance—the amended complaint should be dismissed as time barred.

II.  The Amended Complaint Does Not Plausibly Allege A Contract With The VCF

As demonstrated in our motion, even if there is jurisdiction, the amended complaint does not state a plausible claim for relief because it does not allege three essential elements of contract formation: (1) mutual intent to contract; (2) unambiguous offer and acceptance; and (3) actual contracting authority.  Mot. at 15-25.[3]  This deficiency requires dismissal of the contract claims.

---

[3]  Mr. White's response incorrectly states that we "concede[] that the parties have exchanged consideration."  Response at 26.  Rather, we have simply not moved to dismiss on that specific basis.

9

*See Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1384 (Fed. Cir. 2019) (dismissing

contract claim for failure to allege contractual intent).

    A.    <u>The Government Did Not Intend To Contract With VCF Claimants</u>

    To begin, the amended complaint does not sufficiently allege contractual intent.  Mot. at

15-22.  When, as in this case, a plaintiff relies on a statute or regulation to prove the

Government's objective manifestation of intent to contract, it must identify "some clear

indication that the [Government] intend[ed] to bind itself contractually."  *Nat'l R.R. Passenger*

*Corp. v. Atchison, Topeka, & Santa Fe Ry. Co.,* 470 U.S. 451, 465-66 (1985).  This requirement

presumes that because the "principal function of a legislature is not to make contracts, but to

make laws that establish the policy of the state," courts must "proceed cautiously both in

identifying a contract within the language of a regulatory statute and in defining the contours of

any contractual obligation."  *Id.* at 466.

    To overcome that established presumption, the plaintiff must point to "a 'clear indication'

that the legislature intended to create contractual rights against the government" in the statute

itself, such as by "speak[ing] of a contract" or "provid[ing] for the execution of a written contract

*on behalf of the United States.*"  *Am. Bankers Ass'n*, 932 F.3d at 1381 (emphasis in original)

(quoting *Nat'l R.R. Passenger Corp.*, 470 U.S. at 465-66).  Thus, whether a statute or regulation

reflects contractual intent requires close examination of that statute or regulation.  *See Brooks v.*

*Dunlop Mfg.*, 702 F.3d 624, 631 (Fed. Cir. 2012) ("In determining whether a statute creates a

contract, the [Supreme] Court has instructed us to first look to the language of the statute.");  *see*

*also Baker v. United States*, 50 Fed. Cl. 483, 494-95 (2001) (applying same standard to statutory

and regulatory provisions).

Here, the amended complaint does not overcome the established presumption against treating Government statutes and regulations as contractual undertakings in that neither the VCF statute nor the implementing regulations evidence the Government's intent to provide VCF claimants with enforceable contractual rights against the United States.

                1.    <u>Statutory And Regulatory Text Does Not Reflect Contractual Intent</u>

In our motion, we demonstrated that the VCF statute and implementing regulations do not include "traditional indicia of a contract"—either by "speak[ing] of a contract" or "provid[ing] for execution of a written contract on behalf of the United States." *See* Mot. at 18. In response, Mr. White identifies the statutory and regulatory provisions that allegedly reflect the terms of a contractual bargain: (1) the statutory waiver set forth in Section 405(c)(3)(C) of the VCF statute; (2) the regulatory amendments provision; and (3) the 2011 version of the injured claimant non-economic loss provision. The amended complaint's reliance on these provisions does not show contractual intent.

Mr. White's first basis for alleging such intent—the statutory waiver of civil claims in Section 405(c)(3)(C) of the VCF statute—provides:

> **Limitation on Civil Action; In General. —** Upon the submission of a claim under this title, the claimant waives the right to file a civil action (or to be a party to an action) in any Federal or State court for damages sustained as a result of the terrorist-related aircraft crashes of September 11, 2001[.]

49 U.S.C. § 40101 note § 405(c)(3)(C).

The second part of his contractual intent argument rests on the 2011 regulatory change provision. According to Mr. White, in exchange for his waiver of statutory claims, the Government "promise[d] that he [would] be able to pursue VCF compensation under the then-

effective regulations (*i.e.*, the 2011 Regulations) in the event the Government amended the regulations in the future," Response at 28, as set forth in the 2011 regulatory changes provision:

> **Amendments to this part.** Claimants are entitled to have their claims processed in accordance with the provisions of this Part that were in effect at the time that their claims were submitted under § 104.22(d). All claims will be processed in accordance with the current provisions of this Part, unless the claimant has notified the Special Master that he or she has elected to have the claim resolved under the regulations that were in effect at the time that the claim was submitted under § 104.22(d).

*Id.* § 104.6 (2011 ed.).

As the final prong of his contractual intent argument, Mr. White points to the 2011 injured claimant non-economic loss provision, which allegedly sets forth the "loss calculation methodology" that he was entitled to have applied to his compensation claim:

> **Determination of presumed noneconomic loss for claimants who suffered physical harm.** The Special Master may determine the presumed noneconomic losses for claimants who suffered physical harm (but did not die) by relying upon the noneconomic losses described in § 104.44 [for decedents] and adjusting the losses based upon the extent of the victim's physical harm.

*Id.* § 104.46 (2011 ed.).

None of these provisions is framed as a contractual undertaking. *See Am. Bankers Ass'n*, 932 F.3d at 1383. The statutory waiver in Section 405(c)(3)(C) "speaks of" claims—not contracts—and requires waiver as a condition of VCF eligibility. Although Mr. White alleges that contractual intent is implicit from his "release of future litigation claims in exchange for VCF participation," Response at 30, the statutory waiver promises no benefit or compensation in return. Thus, nothing in the statutory waiver "unequivocally express[es] the government's intent to bind itself in contract." *Am. Banker's Ass'n*, 932 F.3d at 1383. In addition, the VCF statutory waiver could not reflect a quid pro quo for Mr. White to obtain VCF compensation without caps

on non-economic losses because the statute does not address what rules would apply to a given claim if the regulations are later amended.

As for the regulatory changes provision, 28 C.F.R. § 104.6 (2011 ed.), Mr. White contends that it "confirmed the Government's offer, [that] in exchange for Mr. White's waiver of civil claims," the Government "promise[d] that he [would] be able to pursue VCF compensation under the then-effective regulations (*i.e.*, the 2011 Regulations) in the event the Government amended the regulations in the future." Response at 28. The provision, however, neither speaks of a contract nor provides for execution of a written agreement on behalf of the United States. Nor does the provision contain language indicating that any rights conferred by the provision were intended to be part of any exchange of promises. Similarly, Mr. White describes the regulatory changes provision as a "guarantee" or "indemnification" against future regulatory changes, but none of those terms appears in the text. *See id.* at 28, 38, 40, 42. If the Government intended to provide such a contractual guarantee or indemnity, "it easily could have drafted language to that effect." *Gallardo v. Marstiller*, 596 U.S. 420, 421 (2022) (internal quotation omitted). And while the United States Code contains several statutes expressing contractual intent to provide a guarantee or indemnity, the VCF is not one of them. *Cf., e.g.,* 15 U.S.C. § 694b (authorizing the Small Business Administration to "guarantee a surety . . . for a total work order or contract amount that does not exceed $10,000,000") (emphasis added); 38 U.S.C. § 7313 (authorizing the Veterans Health Administration to enter into contracts "provid[ing] that the United States will indemnify the contractor" for especially hazardous projects) (emphasis added). Because no such language exists in the regulatory changes provision, it cannot be treated as a contractual guarantee or indemnity.

Likewise, the non-economic loss provision does not evidence contractual intent.  *See* 28 C.F.R. § 104.46 (2011 ed.).  Like the other provisions invoked by Mr. White, that provision is not framed as a contractual undertaking.  Indeed, the "loss calculation methodology" set forth in the provision is discretionary.  *See Baker v. United States*, 50 Fed. Cl. 483, 494 (2001) ("The statute cannot represent an offer on the part of the Government, for it is clearly permissive").  The provision states that "[t]he Special Master *may* determine the presumed noneconomic losses for claimants who suffered physical harm (but did not die) by relying upon the noneconomic losses described in § 104.44 [for decedents] and adjusting the losses based upon the extent of the victim's physical harm."  28 C.F.R. § 104.46 (2011 ed.) (emphasis added).  The provision thus mandates no award or formula, let alone a formula that requires more than $90,000 in non-economic loss compensation.  Thus, nothing in the 2011 regulations would preclude the Special Master from independently placing the same caps on non-economic losses that Congress enacted in the Reauthorization Act.

> 2. Statutory And Regulatory Structure Does Not Reflect Contractual Intent

In addition to considering statutory and regulatory text, courts also look to statutory and regulatory structure to discern contractual intent.  *See Am. Bankers Ass'n*, 932 F.3d at 1382; *see also Genentech, Inc. v. Immunex R.I. Corp.*, 964 F.3d 1109, 1111 (Fed. Cir. 2020) ("In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself.") (quoting *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019)).

Here, the VCF's statutory and regulatory structure confirms that Congress did not intend to carry out the VCF's policy objectives by contracting with claimants.  First, in authorizing and reauthorizing the VCF, Congress provided contracting authority to certain entities, but provided

no such authority to the VCF. That the legislation "speaks of a contract" in some sections, but not those addressing the VCF, confirms that Congress did not intend that the VCF would be carried out by means of contracts with claimants. *See Fin. Oversight & Mgmt. Bd. for P.R. v. Centro de Periodismo Investigativo, Inc.*, 598 U.S. 339, 348 (2023) (("'[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act,' we generally take the choice to be deliberate.") (quoting *Badgerow v. Walters*, 596 U.S. 1, 11 (2022)).

For instance, when Congress passed the Air Transportation Safety and System Stabilization Act in 2001, which established the original VCF, it also established in that legislation another entity, the Air Transportation Stabilization Board, to provide aviation disaster relief for air carriers. *See* Air Transportation Safety and System Stabilization Act, Pub. L. No. 107-42, § 102(c),115 Stat. 230, 231-32 (2001). To carry out that purpose, Congress provided that the "Board may enter into agreements with 1 or more [air carriers] to issue Federal credit instruments," under specified conditions. *Id.* In contrast, Congress provided no contracting authority in that legislation to carry out the VCF's claimant compensation policy. *See id.* §§ 401-09 .

Similarly, when Congress reopened the VCF in 2010 through the James Zadroga 9/11 Victim Compensation Fund Reauthorization Act (Zadroga Act), that legislation also established the World Trade Center Health Program to provide medical benefits to individuals who were affected by the September 11, 2001 attacks. Pub. L. No. 111-347, § 3301(a), 124 Stat. 3623, 3624 (2010). To carry out that program, Congress directed the program administrator to enter into various contracts, including "contracts with Clinical Centers of Excellence," *id.* § 3305(a)(1), (2)(A); and "contracts with one or more Data Centers," *id.* § 3305(a)(2)(A).

Congress further directed the program administrator to "establish a program for paying for the medically necessary outpatient prescription pharmaceuticals prescribed under this title for WTC-related health conditions through one or more contracts with outside vendors." *Id.* § 3312(c)(1)(B)(i).  In contrast, none of the Zadroga Act provisions reauthorizing the VCF authorize contracts as a mechanism to carry out claimant compensation policy.  *See generally id.* §§ 201-05.  These distinctions undermine Mr. White's contractual intent assertions.

Second, the regulatory structure of the VCF's implementing regulations also cuts against Mr. White's assertions of contractual intent because the regulatory changes provision, injured claimant non-economic loss provision, and the waiver are all in different sections.  28 C.F.R. §§ 104.6, 104.46, 104.61; *see Am. Bankers Ass'n*, 932 F.3d at 1383 (finding that the Federal Reserve Act's structure does not "reflect a bargained-for quid pro quo between two parties [because] [t]he dividend rate is set forth in an entirely different section than the provisions governing stock subscription.").  And although Mr. White also asserts that the reference to 28 C.F.R. § 104.22(d) (2011 ed.) in the regulatory changes provision reflects the alleged quid pro quo, Section 104.22(d) merely clarified the timing of claim submission.  *See* 28 C.F.R. § 104.22(d).

3    The Parties' Conduct Does Not Reflect Contractual Intent

Mr. White also argues that the parties' "conduct" proves an intent to contract—*e.g.*, the VCF claim form, eligibility confirmation letter, and 2008 congressional testimony by the former Special Master that references settling claims and obtaining releases.  *See* Response at 29-30. However, Mr. White cites no authority to show that contractual intent may be evidenced by program documents and public statements when the underlying statute and regulations do not reflect that intent.  Indeed, courts have rejected similar efforts to use letters, applications, and

forms to transform statutory duties into contractual ones.  *See, e.g.*, *Am. Bankers Ass'n*, 932 F.3d at 1384; *Baker*, 50 Fed. Cl. at 496-97.

In any event, neither the documents nor the statement cited by Mr. White suggests that the Government entered into a contract with him for VCF compensation.  First, the claim form is the mechanism by which a "claimant may file a claim for compensation . . . with the Special Master."  49 U.S.C. § 40101 note § 405(a)(1).  Congress directed the Special Master to develop the form that claimants "shall use" and the information it should request.  *Id.* § 405(a)(2).  Although Mr. White states that the claim form "manifested the Government's offer for claimants to pursue a VCF claim in exchange for their waiver of civil actions," Response at 29, the claim form "requires the claimant to provide information necessary for determining the claimant's eligibility to recover from the Fund," 28 C.F.R. § 104.22(b), but does not contain an exchange of promises.  *See* Am. Compl., Ex. 3.

Second, sending an eligibility confirmation letter also does not evidence contractual intent.  *See id.*, Ex. 4.  Although Mr. White contends that the letter "emphasized that the parties' agreement comprised the terms of the VCF statute and then-effective regulations," Response at 29, the actual terms of the letter do not make any reference to an agreement.  Rather, the letter just acknowledges that Mr. White meets eligibility requirements and states that the "VCF will be able to determine [his] compensation award based on the eligible conditions after all compensation related documents are submitted."  Am. Compl., Ex. 4.  Mr. White points to nothing in the letter evidencing an intent to create enforceable contract rights against the United States.  *See Am. Bankers Ass'n*, 932 F.3d at 1384 ("statements of information or definition are not statements of obligation") (quoting *Chattler v. United States*, 632 F.3d 1324, 1330 (Fed. Cir. 2011)).

Third, Mr. White quotes 2008 congressional testimony by the former Special Master, in which the former Special Master referred to "settl[ing] 97 percent of all the claims brought by the families of lost loved ones" and obtaining "full releases[.]"  Response at 30.  According to Mr. White, this testimony shows that the payment of claims made under the VCF "constitute contractual settlements and releases."  *Id.* at 31.  But the former Special Master's statements are best understood merely to convey the degree to which the VCF was successfully resolving the claims of potential beneficiaries consistent with applicable statutory and regulatory requirements.  The isolated references in these statements to "settling" or "full releases" are insufficient to transform the program requirements into contractual commitments, particularly in light of the Special Master's lack of contracting authority.  *See* Section II.C, *infra.*

             4.      The Statutory Waiver Does Not Transform A VCF Claim Into A Settlement Agreement

Mr. White also attempts to show contractual intent by analogizing his VCF claim to a settlement agreement.  Response at 30-32.  Because a typical settlement agreement requires a waiver (or release) of existing claims, and the VCF statute requires that claimants waive 9/11-related civil claims, Mr. White suggests that the VCF must be a settlement agreement.  *Id.*

But just because settlement agreements typically include a waiver does not mean every waiver is evidence of a settlement agreement.  Put more broadly, language that may evince the existence of a contract in one context does not require the finding of a contract in all contexts.  The Federal Circuit made a similar point in *American Bankers*, when it rejected plaintiffs' argument that contractual intent could be inferred from the statutory terms "subscribe" and "subscription."  *Am. Bankers Ass'n*, 932 F.3d at 1382.  Although the plaintiffs argued that these were "contractual terms of art in the context of stock offerings," the court explained that

"terminology that carries contractual connotations when used in the private sector does not, on its own, establish such [contractual] intent" when used in a different setting. *Id*.

Notably, neither of the cases cited by Mr. White treats a statutory waiver as contractual. In *Labatte v. United States*, 899 F.3d 1373 (Fed. Cir. 2018), the Federal Circuit addressed the scope of a contractual waiver of judicial review in a class action settlement agreement. *Labatte*, 899 F.3d at 1375. The agreement established procedures for class members to submit and resolve individual claims, and specified that settlement participants waived judicial review to challenge claim determinations. *Id*. The plaintiff opted into the settlement, but when he tried to obtain declarations from two Government employees to support his claim, the Government directed those employees not to sign those declarations. *Id*. at 1376-77. As a result, the claim was denied because the plaintiff could not support it. *Id*. at 1377.

Plaintiff filed suit in this Court alleging that the Government's interference with his efforts to marshal proof breached the implied duty of good faith and fair dealing in the settlement agreement. *Id*. Although the Court initially determined that the judicial review waiver precluded jurisdiction over the suit, the Federal Circuit reversed because "finality provisions in settlements do not bar claims for breach of the settlement." *Id*. at 1378 (quoting *Catullo v. Metzner*, 834 F.2d 1075, 1078 (1st Cir. 1987)). Nothing in that case addressed whether the VCF process constitutes a contractual settlement and for the reasons we have explained, it does not. The case also does not hold that a statutory waiver must also be viewed as a contractual one.

In *Ingham Regional Medical Center. v. United States*, 874 F.3d 1341 (Fed. Cir. 2017), the Federal Circuit determined that a release in a contract between a hospital and the Department of Defense did not bar a hospital's suit alleging that the agency failed to follow the contractual formula for calculating payment adjustments. *Id*. at 1346. The "only issue" relating to the

contract claim was "whether the release in question could apply to a breach of the contract including that same release." *Id.* at 1346 n.2. The Federal Circuit determined that the contractual release "cannot be enforced against a claim for breach of the underlying contract." *Id.* at 1347. Again, the status of a statutory waiver was not at issue in *Ingham*.

### 5.    The Authorities Cited In Our Motion Are Not Distinguishable

At base, Congress intended the VCF to be a compensation program, not a contract program. In our motion, we cited several cases in which the Federal Circuit and this Court have rejected attempts to recast statutory and regulatory programs as contractual ones. *See* Mot. at 15-18 (*citing, e.g., Am. Bankers Ass'n*, 932 F.3d at 1381-84; *Brooks*, 702 F.3d at 631).

In response, Mr. White contends that these cases do not fit, mainly because they involved different programs and did not require waivers as conditions of eligibility. Response at 34-38. But for the reasons explained above, the statutory waiver provision does not support Mr. White's claim of contractual intent, *see* Section II.A.4, *supra*. And for the same reasons, his argument that the statutory waiver provision constituted valid consideration does not suffice. Response at 34-36. Consideration is just one of the elements of contract formation, and a plaintiff has a separate obligation to show contractual intent, which does not exist here. *See Wis. & Mich. Ry. Co. v. Powers*, 191 U.S. 379, 387 (1903) (even if the plaintiff shows consideration, no binding contract exists without an "adequate expression of an actual intent" to contract in the cited statute).

Other than pointing to the statutory waiver provision, the response brief does not explain why program differences affect the analysis when courts have consistently found the absence of contractual intent across many different programs. *See, e.g., Am. Bankers Ass'n*; 932 F.3d at 1382-84 (finding no evidence of contractual intent in the Federal Reserve Act's text, structure,

20

and context regarding dividends on regional Federal Reserve bank stock); *Brooks v. Dunlop Mfg. Inc.*, 702 F.3d 624, 631 (Fed. Cir. 2012) (finding no evidence of contractual intent in the *qui tam* provisions contained in the former version of 35 U.S.C. § 292 or in the circumstances of its passage); *Baker v. United States*, 50 Fed. Cl. 483, 494 (2001) (finding no evidence of contractual intent to provide loans in the Consolidated Farm and Rural Development Act and implementing regulations); *Boyd v. United States*; No. 22-1473C, 2023 WL 3118132, *3 (Fed. Cl. Apr. 27, 2023) (finding no evidence of contractual intent relating to financial assistance payments under Section 1005 of the American Rescue Plan Act of 2021), *appeal filed*, No. 23-2104 (Fed. Cir.); *Last Chance Mining Co. v. United States*, 12 Cl. Ct. 551, 556 (1987) (finding no evidence of contractual intent for mining claims in the Federal Land Policy and Management Act and implementing regulations).  These cases underscore the clear evidence that would have to be present, but is not here, for the Court to find that Congress intended the VCF program to create contractual relationships with claimants.

Neither the Supreme Court's decision in *United States v. Winstar Corp.*, 518 U.S. 839 (1996), nor the Federal Circuit's decision in *First Commerce Corp. v. United States*, 335 F.3d 1373, 1383 (Fed. Cir. 2003), compels a different conclusion.  In *Winstar*, the Supreme Court did not address contract formation; rather it determined that the Government breached an existing contract and addressed several affirmative defenses.  *See Winstar*, 518 U.S. at 870-72, 888-94. Here, the amended complaint does not allege facts establishing that a contract exists.

In *First Commerce,* the Federal Circuit briefly rejected a Government defense that it is "immune from contract liability *because* it was acting in its regulatory capacity. "  *First Commerce Corp.*, 335 F.3d at 1383 (emphasis in original).  But we have not argued in this case that an alleged breach of contract should be excused because the Government acted in a

regulatory capacity; rather, we have shown that the Government did not enter into a contract at all.  Tellingly, the *First Commerce* plaintiff still needed to meet all contract formation elements to hold the United States liable for breach, and the Federal Circuit remanded for further development of those elements.  *Id.* at 1380.  In short, *First Commerce* did not address the key contractual intent issue here: whether the governing statute and regulations themselves evidence such an intent.

      B.     The Amended Complaint Does Not Allege An Unambiguous VCF Offer To Determine Compensation Using The "Loss Calculation Methodology" In Place When Mr. White Applied, Or The Unambiguous Acceptance Of Any Such Offer

The amended complaint also does not allege a contract claim given the absence of plausible allegations that the VCF statute and regulations reflect an unambiguous offer to enter into an express or implied contract, or Mr. White's unambiguous acceptance of any such offer. Mot. at 22-24.  In response, and similar to his arguments concerning contractual intent, Mr. White suggests that an offer is apparent through a combination of the VCF statute and implementing regulations, along with his claim form, eligibility confirmation letter, and comments made by the former Special Master in congressional testimony.  Response at 42.

But to show unambiguous offer and acceptance, the "statute or regulation [must] make an explicit promise—sufficient to justify another person in understanding that his assent to that bargain will conclude it and sufficient for the courts to determine the existence of a breach and give an appropriate remedy."  *Baker*, 50 Fed. Cl. at 493.  Characterizing statutory and regulatory provisions as an "offer" and "acceptance" is not enough when the provisions themselves are not framed in those terms.

An example of the type of promissory language required to show an unambiguous offer in a regulation was discussed in *Radium Mines, Inc. v. United States*, 153 F. Supp. 403, 406 (Ct.

Cl. 1957).  There, this Court's predecessor considered whether a regulatory circular published in the Code of Federal Regulations comprised an unambiguous offer to buy uranium at specific prices.  Section 60.1(c) of the regulation ("Making an Offer") included specific requirements for sellers to meet—*e.g.*, furnish a representative sample and identify the material's location, character, amount, origin, and ownership information.  The regulation further provided under Section 60.1(d) ("Purchase Contract") that "[u]pon receipt of an offer and sample," if testing shows that the sample meets the requirements, "the [Atomic Energy] Commission will forward to the person making the offer a form of contract containing applicable terms and conditions ready for his acceptance."  *Id.*  Given the promissory language in the regulation reflecting the unambiguous terms of an offer and the way a uranium supplier could accept, the Court determined that the regulation constituted an offer, which became a contract when the supplier met its terms.  *Id.*

In contrast, in *Baker*, this Court rejected plaintiffs' attempt to show an unambiguous offer and acceptance in the Consolidated Farm and Rural Development Act (Development Act) by pointing to procedures for obtaining federally guaranteed loans.  In particular, the Court emphasized the discretionary nature of the Development Act, which provides that "[t]he Secretary *may* provide financial assistance to borrowers for purposes provided in this chapter by guaranteeing loans[.]"  *Baker*, 50 Fed. Cl. at 494 (emphasis added) (internal quotation omitted).  Because the Development Act "contains no promise to lenders, borrowers, or anyone, for that matter," the plaintiff could not show that the statute constituted an unambiguous offer.  *Id.*

Here, the amended complaint does not plausibly allege any unambiguous offer.  Unlike the offer in *Radium Mines*, which enumerated the specific requirements and duties, the alleged offer here lacks clarity.  The amended complaint and Mr. White's response to our motion

describe the terms of the alleged offer in multiple ways.  *See, e.g.,* Response at 5 ("an exchange of future civil claims for VCF participation under certain terms"); *id.* at 43 ("unambiguous regulations [that] . . . protected Mr. White against future detrimental modifications to the regulations were among the provisions offered by the Government in exchange for Mr. White's release of claims"); Am. Compl. ¶ 101 ("If a person waived their right to bring 9/11-related civil claims, the Government would, in return, compensate the claimant for losses pursuant to the loss calculation methodology in place at the time the claimant waived their rights.").  That inconsistency highlights the lack of any unambiguous offer.

The amended complaint also does not plausibly allege an unambiguous offer for the additional reason that the alleged "loss calculation methodology in place at the time [Mr. White] waived [his] rights" provides only a discretionary framework for determining injured claimant non-economic losses.  Am. Compl. ¶ 101.  As noted, even under the prior regulations the Special Master was not obligated to apply any particular formula or award and could have imposed the same outcome here.  *See* 28 C.F.R. § 104.46 (2011 ed.) (describing how the Special Master "may" calculate non-economic losses for injured claimants).  Because the regulation "contains no promise" to VCF claimants about the methodology to be applied, *Baker*, 50 Fed. Cl. at 494, the amended complaint does not show an unambiguous offer.

As for Mr. White's reference to the claim form, eligibility confirmation letter, and comments by the Special Master, Response at 43, for the reasons discussed above as to why these documents and statements do not reflect any contractual intent, including the absence of any express reference to a contract or any of the essential terms of a contract, they also fail to reveal any alleged offer to enter into an express or implied agreement.

The absence of an unambiguous offer and acceptance alone requires dismissal.

C.    <u>The Special Master Lacks Actual Authority To Form Contracts With Claimants</u>

In our motion, we demonstrated that the amended complaint does not plausibly allege that the Special Master has "actual authority to bind the government in contract."  Mot. at 24-25 (quoting *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990)).  We provided several examples of when Congress provided such authority in other statutory schemes, and explained how there is nothing comparable in the VCF statute or implementing regulations that resembles such authority.  *Id.*

In response, Mr. White appears to acknowledge that the VCF statute and implementing regulations grant no such authority to the Special Master, but he contends that the Attorney General's contracting authority should be imputed to the Special Master because the Attorney General administers the VCF through the Special Master.  Response at 44-46.

But that response does not provide a basis to impute any Attorney General authority to the Special Master.  First, the VCF statute provides no contracting authority to the Attorney General that could be imputed to the Special Master.  Indeed, the VCF statute directs the Attorney General, acting through the Special Master, to: (1) "administer the compensation program"; (2) "promulgate all procedural and substantive rules for VCF administration"; and (3) "employ and supervise hearing officers and other administrative personnel to perform the duties of the Special Master."  49 U.S.C. § 40101 note § 404(a).  And although Mr. White argues that these duties should be construed to include contracting with claimants, he provides no basis to support that assertion other than the fact that the VCF has "issue[d] billions of dollars in awards."  *See* Response at 45.  But the Government pays money under many statutory programs without entering into contracts.  *See, e.g.*, *Am. Bankers Ass'n*, 932 F.3d at 1381-82 (finding no contract to pay statutory dividends under the Federal Reserve Act).

25

Second, Mr. White attempts to impute the Attorney General's plenary authority to settle "prospective civil legal claims" to the Special Master.  Response at 45.  But the Attorney General did not delegate his settlement authority to the Special Master.  Attorney General delegations of settlement authority are set forth in Department of Justice regulations.  Those regulations authorize the Deputy Attorney General or the Associate Attorney General "to exercise the settlement authority of the Attorney General as to all claims asserted by or against the United States."  28 C.F.R. § 0.161(b).  The regulations also provide the Assistant Attorneys General with settlement authority "in all [defensive] cases in which the principal amount of the proposed settlement does not exceed $4,000,000," *id.* § 0.160(a)(3), and permit them to redelegate such authority in writing to subordinate officials, *id.* § 0.168(a)-(b).  In turn, the Assistant Attorney General for the Civil Division has redelegated his settlement authority, in full, to the Deputy Assistant Attorneys General, and, in part, to "United States Attorneys; Branch, Office and Staff Directors; and Attorneys-in-Charge of Field Offices"—specifically, to compromise "claims against the United States in all cases in which the principal amount of the proposed settlement does not exceed $1,000,000[.]"  *Id.* pt. O, subpt. Y, App'x, Directive No. 01-15, § 1(a)-(b).  The Department of Justice regulations contain no delegation or redelegation of the Attorney General's authority to settle civil claims to the Special Master.

Accordingly, the amended complaint does not plausibly allege that the Special Master had actual contracting authority, which is a necessary element of contract formation.

CONCLUSION

For these reasons, we respectfully request that the Court dismiss the amended complaint.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director


s/Elizabeth M. Hosford
ELIZABETH M. HOSFORD
Assistant Director


s/Eric E. Laufgraben
ERIC E. LAUFGRABEN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone:   (202) 353-7995
Facsimile:   (202) 353-0461
Email:       Eric.E.Laufgraben@usdoj.gov

February 2, 2024                    Attorneys for Defendant